UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
UNITED STATES OF AMERICA,               :            S7 22 Cr. 673 (LAK)
                                        :
          - *v* -                       :
                                        :
RYAN SALAME,                            :
                    Defendant.          :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF THE UNITED STATES OF AMERICA IN OPPOSITION
TO RYAN SALAME'S PETITION FOR A WRIT OF ERROR *CORAM NOBIS***


                          DAMIAN WILLIAMS
                          United States Attorney
                          Southern District of New York

Danielle Kudla
Thane Rehn
Nicolas Roos
Danielle R. Sassoon
Assistant United States Attorneys
          - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to Ryan Salame's Petition for a Writ of Error *Coram Nobis* (22 Cr. 673 (LAK), Dkt. 470, the "Petition"). The Petition is procedurally defective and factually and legally meritless. This Court should reject Salame's shameless and self-serving attempt to renege on his guilty plea and conviction, from which he did not file a direct appeal, and to undermine the lawful prosecution of Michelle Bond for criminal campaign finance offenses that, as alleged in the indictment of Bond, she committed with Salame.

As a threshold matter, because Salame filed his Petition *before* serving his term of custody, rather than *after*, and before exhausting other forms of relief, Salame is not eligible to seek a writ of *coram nobis* and the Petition should be dismissed for that reason alone. At the same time, the Petition is untimely because Salame has not explained his failure to raise his current claims on direct appeal.

The untimeliness of the Petition dovetails with its transparent insincerity and lack of merit. Having purported to accept full responsibility for his actions prior to sentencing, Salame now resorts to inaccurate, incomplete, and outright false assertions in an effort to evade the sentence imposed for his involvement in an illegal campaign finance scheme that was unprecedented in scale, and for his role in funneling billions of dollars through an unlicensed money transmitting business. Even had these claims been raised on direct appeal under a more favorable review standard, they would have failed. The Government did not breach its plea agreement with Salame, which—consistent with the parties' plea discussions—made no promises as to Bond, and which Salame entered knowingly and voluntarily. Salame also cannot

show any purported injustice that would entitle him to *coram nobis* relief. Salame has not asserted that he otherwise would have proceeded to trial. Indeed, he does not and cannot dispute that he is guilty of the offenses to which he pleaded guilty, that the proof of his crimes was overwhelming, and that he received substantial benefits in exchange for his guilty plea.

## PROCEDURAL HISTORY

### A.  The Plea Agreement and Information

On September 7, 2023, Salame pleaded guilty, pursuant to a plea agreement with the Government, to Superseding Information S7 22 Cr. 673 (LAK) (the "Information"), which was filed that same day. (Dkt. 262). The Information charged Salame in two counts. Count One charged Salame with conspiracy to make unlawful political contributions and defraud the Federal Election Commission, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30118, 30109, and 30122. Count Two charged Salame with conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960. Salame's offense conduct was described in detail in the Information to which Salame pleaded guilty. (Dkt. 262).

As described in the Information, Salame engaged in multiple conspiracies to advance the interests of Samuel Bankman-Fried, for whom Salame worked as a high-level executive at Alameda, and then FTX. (Dkt. 262 ¶¶ 1, 4). Specifically, between 2020 and 2022, Salame conspired to operate Alameda and its affiliates as a means for transmitting funds on behalf of FTX customers, even though Salame and his co-conspirators never obtained the required federal money transmitting licenses for Alameda and the relevant affiliates. (Dkt. 262 ¶ 1). In addition, from at least 2020 through 2022, Salame conspired to violate the federal election laws, and in the

2

process influence cryptocurrency regulation in Washington, D.C., by steering millions of dollars of illegal campaign contributions to both Democrats and Republicans. (Dkt. 262 ¶ 1).

As part of that latter scheme, in the lead up to the November 2022 election, Salame, together with Bankman-Fried and Nishad Singh, collectively made millions of dollars in campaign contributions, including in "hard money" contributions to federal candidates from both major political parties, in the name of straw donors despite using funds from Alameda bank accounts. (Dkt. 262 ¶ 14). Despite his awareness of the campaign finance laws, and in order to conceal the true source of the funds, Salame agreed with others that funds for contributions would be transferred from Alameda's bank accounts, which also contained FTX customer funds, to bank accounts in the name of the political donors, and then quickly transferred from those individuals' bank accounts to political campaigns. (*Id.*). Salame and his co-conspirators recorded outgoing wire transfers from Alameda to individuals' bank accounts for purposes of making campaign contributions as Alameda "loans" or "expenses," but most of these outgoing wire payments were not documented in agreements or on term sheets, and there were no set interest rates, no interest payments, no collateral, and no evidence of repayment. (Dkt. 262 ¶ 15). In total, Salame and his co-conspirators made over 300 political contributions, totaling tens of millions of dollars, that were unlawful because they were made in the name of a straw donor or paid for with corporate funds. (Dkt. 262 ¶ 16). In dozens of instances, use of straw donors allowed Bankman-Fried to evade contribution limits on individual candidates to whom Bankman-Fried had already donated. (*Id.*).

In advance of Salame's guilty plea proceeding, Salame, his attorneys, and the Government signed his plea agreement, which the Court marked as Court Exhibit B during

Salame's guilty plea proceeding. The plea agreement specified the maximum penalties that Salame was facing as a result of his guilty plea, including a total maximum term of imprisonment of 10 years. (Ex. 1 at 1). The agreement enumerated the conduct for which Salame would not be further prosecuted criminally by the U.S. Attorney's Office for the Southern District of New York in consideration of his guilty plea, namely the offense conduct underlying Counts One and Two of the Information, as well as four additional categories of offenses, including "willfully making excessive political contributions to a candidate for federal office in an amount in excess of the then-applicable limitation on individual contributions, and exceeding $25,000 in the calendar year 2022, and conspiracy to do the same, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109 and 30116." (Ex. 1 at 2). As described in Salame's Presentence Report, this portion of the agreement referred to unlawful excessive campaign contributions Salame made to his significant other, Michelle Bond, when she ran for Congress in the 2022 election cycle. (PSR ¶¶ 33-36). There was nothing in Salame's plea agreement that suggested that the U.S. Attorney's Office for the Southern District of New York would not criminally prosecute any of Salame's criminal co-conspirators in consideration of his guilty plea.

The plea agreement included a stipulation between the parties that Salame's sentencing range under the United States Sentencing Guidelines would be 292 to 365 months' imprisonment, but because that range is greater than the total statutorily authorized sentence of 10 years, or 120 months' imprisonment, Salame's stipulated Guidelines sentence was 120 months' imprisonment. (Ex. 1 at 4). In the plea agreement, Salame also waived the right to appeal any sentence equal to or below the stipulated Guidelines sentence of 120 months' imprisonment. (*Id.* at 5).

The final paragraph of Salame's plea agreement stated:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

(Ex. 1 at 7).

### B. The Plea Discussions

Salame's guilty plea was preceded by plea discussions between Salame's attorneys and the Government over the course of several months. Among other things, in January and February 2023, Salame's attorneys made proffers to the Government about Salame's conduct, including about areas of concern specifically identified by the Government.[1]

On April 27, 2023, the FBI executed judicially-authorized search warrants at Salame and Michelle Bond's residence to seize their electronic devices based on probable cause that the devices contained evidence of violations of numerous subject offenses, including making and receiving excessive campaign contributions, making contributions in the name of another person, making false reports to the Federal Election Commission, conspiracy to commit these offenses, as well as money laundering, wire fraud, and wire fraud conspiracy. The Government spoke to Salame's attorneys later that morning about the search.

On April 28, 2023, the Government had a virtual meeting with Salame's attorneys (who also represented Bond at that time), which the Government documented in contemporaneous

---

[1] At that point in time, the Government had not disclosed to Salame's attorneys the existence of its grand jury investigation of an illegal campaign finance scheme involving Bond.

notes. (*See* Ex. 2).[2] As reflected in those notes, the Government informed Salame's attorneys that Salame was still the subject of an active and ongoing investigation. During the meeting, the Government reviewed high level areas where Salame had criminal exposure or where the Government had uncovered criminal conduct, and noted that it expected to seek authorization to indict Salame, although the exact charges and recommendation had not been finalized. (*See* Ex. 2 at 2). The Government explained that if Salame's attorneys could represent that Salame was interested in exploring a pre-indictment resolution, the Government could provide additional information about its view of the evidence. (*See id.*). The Government also explained that it was investigating a variety of criminal conduct involving Salame and identified a mutual interest in reaching a disposition pre-indictment with a lower statutory maximum than Salame might otherwise face if indicted. (*See id.*).

Salame's attorneys asked why the Government had proceeded with a search warrant of Salame and Bond's residence, despite Salame's purported compliance with Government document requests. (*See* Ex. 2 at 3). The Government noted that Bond's status in its investigation had shifted, and Salame's attorneys indicated that they wanted an opportunity to engage in a dialogue with the Government about Bond, who was also their client. (*See id.*). At the conclusion of the meeting, the Government noted that it was not making promises outside the four corners of any plea agreement, but as is often the practice within the U.S. Attorney's Office of the Southern District of New York, if the parties did reach a resolution the Government expected

---

[2] During its discussions with Salame and Bond's attorneys, the Government raised the question of a potential conflict of interest arising from the attorneys' representation of both Bond and Salame. The attorneys informed the Government, in substance and in part, that it had discussed the potential conflict with Bond and Salame, as well as the firm's general counsel, and intended to proceed with the representation of both individuals.

that such an agreement would conclude the aspects of the investigation concerning Salame, but not Bankman-Fried. (*See id.*).

As reflected in contemporaneous notes, the Government had a follow-up virtual meeting with Salame's attorneys on May 25, 2023, to clarify the status of its investigation into Michelle Bond—whom Salame's attorneys also represented—and spelled out, for the avoidance of any doubt, that a Salame guilty plea would not stop any ongoing investigation into Bond's conduct. (*See* Ex. 3 at 2). The Government explained that in light of the attorneys' continued representation of Bond, the Government "wanted to clarify that before continued discussions about potential disposition for Ryan [Salame]," it "view[ed] Ryan and Michelle as separate, resolution of his case will not bear on her case and investigation of her conduct." (*Id.*). One of Salame and Bond's attorneys responded that he "understood," and stated, in substance, that he thought the Government had "said no promises outside plea agreement, but plea will generally resolve investigation into Ryan's conduct that doesn't involve Sam [Bankman-Fried]." The Government explained to Salame and Bond's attorneys that in light of that prior conversation, it "wanted to make very clear that we view discussions of Michelle [Bond]/Ryan [Salame] as separate, a Ryan disposition will not resolve investigation of Michelle's conduct, and to extent anything previously said was understood otherwise, that is superseded by this call." (*Id.*). Salame's counsel stated that he wanted to continue the discussions about contemplated charges. (*See id.*). After some additional discussion about the appropriate disposition, the Government transmitted the written plea agreement described above, which Salame accepted.

7

### C. The Guilty Plea Proceeding

The Court conducted a guilty plea proceeding that complied with Federal Rule of Criminal Procedure 11. Salame was placed under oath and answered a series of questions. (9/7/2023 Tr. at 4). Among other things, Salame knowingly and voluntarily waived his right to be indicted by a grand jury and agreed to be prosecuted by information. (9/7/2023 Tr. at 6). Asked by the Court whether "anyone offered you any inducements or threatened you or anyone else, or forced you in any way to plead guilty," Salame answered "No, your Honor." (9/7/2023 Tr. at 18-19). The Court also asked Salame: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?" (9/7/2023 Tr. at 19). Again, Salame answered: "No, your Honor." In reference to the plea agreement, the Court asked Salame: "Do you understand that by entering into this plea agreement, you are giving up your right to appeal from or to bring any collateral challenge to your conviction or sentence, including but not limited to any appeal or any application under 28 U.S. Code 2255 or 2241, of any sentence equal to or below the stipulated guideline sentence of 120 months of imprisonment?" (9/7/2023 Tr. at 20-21). Salame responded, "Yes, I understand, your Honor." Salame's attorneys did not interject to modify any of Salame's responses or to assert that any additional promises had been made.

Salame admitted that he committed the offenses charged in the Information, and described in his own words what made him guilty of the offenses. (9/7/2023 Tr. at 21-22). With respect to Count One, Salame stated:

> Between the fall of 2021 and November of 2022 mid-term elections, I made political contributions in my name that were funded by transfers from the bank accounts of an Alameda subsidiary. During this time I made tens of millions of

dollars in campaign contributions to candidates for public office and political action committees. While at the time these funds were categorized in both my own and Alameda's ledgers as loans, I understood then that the loans would eventually be forgiven and I never intended to repay them. I understood throughout this process that the donations in question were for the benefit of initiatives primarily introduced to me by others, which were supported by Sam Bankman-Fried. I further understood that FEC reporting would state that I, rather than Alameda, made these political contributions. At the time I knew it was prohibited by campaign finance laws to make contributions in my name with money that was not my own.

(9/7/2023 Tr. at 21-22). With respect to Count Two, Salame stated:

In late 2019 through 2021, while acting in the role of Alameda's head of settlements, I, and others at FTX and Alameda, used bank accounts owned and operated by Alameda and a subsidiary of Alameda, to help facilitate FTX customers' fiat transactions through a bank primarily located in California, which were then manually credited and debited on FTX customers' accounts by Alameda personnel acting under my management. I understood that Alameda and FTX were for-profit businesses, and while at the time I was unaware that licensure was required, it is now clear to me that neither Alameda, nor its subsidiaries, properly sought required registration or licensing that would allow these entities to act as money service businesses.

(9/7/2023 Tr. at 23).

Prior to sentencing, the U.S. Probation Office issued Salame's final Presentence Report, dated February 27, 2024. As noted above, among other things, the Presentence Report described as conduct relevant to Salame's offense the unlawful excessive campaign contributions he made to his significant other, Michelle Bond. (PSR ¶¶ 33-36).

### D.  The Continuing Investigation of Michelle Bond

As affirmatively disclosed to Salame and Bond's attorney in May 2023, the Government continued to investigate Bond after Salame's guilty plea. The Government again made Bond's attorneys aware of its continuing investigation prior to Salame's sentencing. Specifically, on April 15, 2024, prosecutors from the U.S. Attorney's Office who were involved in the

investigation of Bond (the "Bond Prosecution Team") emailed Bond's attorneys—who were also still representing Salame and would represent Salame at his sentencing—seeking to set up a call to discuss the status of the Bond investigation. (*See* Ex. 4 at 5).

The Bond Prosecution team spoke with the attorneys representing Salame and Bond by phone on April 18, 2024. During that call, Salame and Bond's attorneys indicated that they had expected that the Government would cease investigating Bond if Salame pled guilty. In response, the Bond Prosecution Team asked about the May 25, 2023 call, in which the FTX Prosecution Team explicitly told Salame and Bond's attorneys that Salame's guilty plea would have no bearing on the Bond investigation. The attorneys responded that they would review their notes from that call and get back to the Government. (*See* Ex. 5 at 2).

On May 20, 2024—over a month later and approximately one week before Salame's sentencing—one of Salame and Bond's attorneys emailed the Bond Prosecution Team to ask for a meeting with SDNY supervisors to "continue our conversation about your Office's decision to pursue the investigation of Ms. Bond in light of our prior discussions with the FTX prosecution team." (*See* Ex. 4 at 3). On May 21, 2024, the Bond Prosecution Team responded. The Bond Prosecution Team asked Salame and Bond's attorneys again about the May 25, 2023 call, and reiterated that the Government's contemporaneous notes reflected that the FTX Prosecution Team had told Salame and Bond's attorneys that "a disposition with Mr. Salame would not resolve the investigation of Ms. Bond's conduct." (*See id.*). Salame and Bond's attorneys did not respond.

On June 11, 2024, following Salame's sentencing, the Bond Prosecution Team emailed Salame and Bond's attorneys to ask if they were still interested in making a presentation to

SDNY supervisors. In response, Salame and Bond's attorneys asked for a meeting in July and also addressed, for the first time, the May 25, 2023 call, stating that their notes did not reflect that a disposition with Salame would not resolve the investigation of Bond.  (*See* Ex. 4 at 2). Later, at a July 30, 2024, meeting between Salame and Bond's attorneys and the Bond Prosecution Team and SDNY supervisors on July 30, 2024, Salame and Bond's attorneys repeated this claim. (*See* Ex. 6 at 3-4).

Notably, despite the fact that his attorneys were plainly aware that the Government was continuing to investigate Bond, Salame did not move to withdraw his guilty plea or otherwise raise this issue with the Court prior to his sentencing.

### E.  Salame's Sentencing and Scheduled Self-Surrender

Salame appeared for sentencing on May 28, 2024. At the outset of the proceeding, Salame confirmed that he had read the Presentence Report. (5/28/2024 Tr. at 2). The Court adopted the Guidelines calculation in the Presentence Report, which was consistent with the Plea Agreement, and resulted in a Guidelines sentence of 120 months' imprisonment. (5/28/2024 Tr. at 6). The Court heard from Salame's counsel, and then from Salame. Among other things, Salame stated:

> First and most importantly, I accept full responsibility for my conduct. . . . I fully understand that the means by which I sought to achieve these goals [of on-boarding and off-boarding customer currency and making political contributions] was illegal. There is no excuse for violating the law. And for that, I apologize to the Court and to the United States. . . . I failed to follow the licensing requirements that would have protecting customers [] on-boarding and off-boarding currency to FTX and I attacked the protections around our democracy when I made donations in my name with funds borrowed from Alameda Research.

(5/28/2024 Tr. at 15). At no point during the sentencing proceeding did Salame seek to withdraw his plea or raise any issue regarding any purported "implied commitment" (Salame Decl. ¶¶ 11-12) made by the Government, despite his and Bond's attorneys being repeatedly informed that Bond remained under investigation after Salame's guilty plea.

After hearing from the Government, the Court explained the basis for its sentence, and imposed a below-Guidelines total aggregate sentence of 90 months' imprisonment. (5/28/2024 Tr. at 20-24). The Court emphasized Salame's "circumvention of financial safeguards inherent in financial registration requirements for money transferring business" that "jeopardizes the stability of our economy and our financial system." (5/28/2024 Tr. at 20). The Court noted that it was undisputed that Salame "knew that this straw donor operation in which he engaged was absolutely illegal," but he "went along with it" and "was a "major figure in it, if not the person who conceived it," and "willfully assisted in destroying the limited transparency that the laws of the United States provide in this area." (5/28/2024 Tr. at 20-21). The Court also emphasized Salame's greed, including as FTX collapsed, when Salame withdrew millions of dollars from his FTX account at the expense of FTX customers: "It was me first, I'm getting in the life boat first, the heck with all those customers." (5/28/2024 Tr. at 22).

The Court also imposed a three-year term of supervised release, a mandatory special assessment of $200, and imposed forfeiture, restitution, and a fine. (5/28/2024 Tr. at 24). The Court advised Salame that he had the right to appeal, "to whatever extent you haven't waived it." (5/28/2024 Tr. at 25).

The Court granted Salame's request for a self-surrender date of August 29, 2024. (5/28/2024 Tr. at 26). On July 26, 2024, Salame moved, with the Government's consent, for a

continuance of his self-surrender date until October 13, 2024, on the basis that he was injured by a dog and needed additional medical treatment. (Dkt. 465). The Court granted Salame's request. (Dkt. 467).

### F. Michelle Bond's Indictment, Salame's *Coram Nobis* Petition, and Bond's Arrest

On August 19, 2024, a grand jury indicted Michelle Bond in four counts with (1) conspiracy to cause unlawful political contributions, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109, 30116, 30118, and 30122; (2) causing and accepting excessive campaign contributions, in violation of 52 U.S.C. §§ 30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i), and 18 U.S.C. § 2; (3) causing and receiving an unlawful corporate contribution, in violation of 52 U.S.C. §§ 30118(a) and 30109(d)(1)(A)(i), and 18 U.S.C. § 2; and (4) causing and receiving a conduit contribution, in violation of 52 U.S.C. §§ 30122, 30109(d)(1)(A)(i), and 18 U.S.C. § 2. (*See* 24 Cr. 494 (GBD), Dkt. 1).

Also on August 19, 2024, the Bond Prosecution Team spoke with Salame and Bond's attorneys and informed them of the Bond Indictment and that the District Court had issued a summons for Bond to appear on August 21, 2024. At their request, the Government agreed to move the surrender date to August 22, 2024. (*See* Exs. 7, 8).

On August 21, 2024, after Salame and Bond's attorneys were notified of the Indictment but before the Indictment was unsealed, Salame filed the present petition for *coram nobis*, seeking "[a]n order dismissing with prejudice any indictment of Michelle Bond for the campaign-finance offenses the investigation of which was supposed [sic] be concluded by Salame's guilty plea in this case" or in the alternative "an order vacating and setting aside the

judgment of conviction entered against Salame on May 28, 2024," among other things. (Dkt. 470 at 26).

Bond self-surrendered on August 22, 2024. (*See* 24 Cr. 494 (GBD), Dkt. 6). On August 29, 2024, Salame sought to withdraw his *coram nobis* petition without prejudice, asserting that because the primary relief sought is the dismissal of the indictment against Bond, "it makes sense to adjudicate the issues raised in the Petition in the docket in which the indictment is pending." (Dkt. 484). That same day, the Court ordered that notwithstanding Salame's "purported withdrawal without prejudice of his petition . . . the parties shall file the papers contemplated by the Court's [prior] order" and "appear for argument on September 12, 2024." (Dkt. 485).

## **APPLICABLE LAW**

"*Coram nobis* is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." *Fleming v. United States*, 146 F.3d 88, 89-90 (2d Cir. 1998) (per curiam). It is not a "substitute for appeal, and relief under the writ is strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996) (ellipsis in original).[3] In other words, the *coram nobis* writ may only be issued where "'extraordinary circumstances are present.'" *Id.* (quoting *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992)).

---

[3] Unless otherwise noted, case text quotations omit all internal quotation marks, internal citations, and previous alterations.

14

Thus, to obtain relief under *coram nobis*, a petitioner "must demonstrate that (1) there are circumstances compelling such action to achieve justice; (2) sound reasons exist for failure to seek appropriate earlier relief; and (3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Foont*, 93 F.3d at 79; *accord Fleming*, 146 F.3d at 90 (citing same three requirements). When a petition for a writ of error *coram nobis* is considered, courts must "'presume that the proceedings were correct,'" and "'[t]he burden of showing otherwise rests on the petitioner.'" *Fleming*, 146 F.3d at 90 (quoting *Nicks*, 955 F.2d at 167).

## DISCUSSION

### A.    The Petition is Procedurally Improper

Because Salame has not exhausted other avenues or relief, and has yet to serve his term of custody, his Petition is procedurally improper and should be dismissed. *Coram nobis* is a "remedy of last resort" for "petitioners who are *no longer in custody* pursuant to a criminal conviction," *Fleming*, 146 F.3d at 89-90 (emphasis added), but Salame has not even started his prison term, much less completed it. And because Salame can still pursue collateral relief under Section 2255 once he begins his term of imprisonment, by definition he is not a petitioner who "cannot pursue direct review or collateral review by means of a writ of habeas corpus," *Fleming*, 146 F.3d at 89-90, and his effort to shoehorn his complaints into an improper *coram nobis* petition should be rejected. (*See* Dkt. 470 at 5 (conceding that his motion would "ordinarily be brought pursuant" to Section 2255)). By alternatively labeling his petition as a "writ of audita querela," Salame fares no better. Like a *coram nobis* petition, "[a]udita querela is probably available where there is a legal . . . objection to a conviction that has arisen subsequent to the

15

conviction *and that is not redressable pursuant to another post-conviction remedy*." *United States v. LaPlante*, 57 F.3d 252, 253 (2d Cir. 1995) (emphasis added).

**B.    Salame Has Not Established Sound Reasons for Failure to Seek Relief on Direct Appeal**

Even though Salame's Petition is premature, it should also be denied as untimely because Salame did not raise these current claims either prior to or at his sentencing, despite being aware that the Government was continuing to investigate Bond, or on direct appeal, and he has not explained why. A petitioner for a writ of error *coram nobis* must show that "sound reasons exist for failure to seek appropriate earlier relief." *Fleming*, 146 F.3d at 90. *Coram nobis* relief is not available if the petitioner could have made the same claims earlier, including during the pendency of his case in this Court, on direct appeal, or under Section 2255. *See Calvert v. United States*, No. 06 Civ. 1722 (CBA), 2007 WL 160918, at *3 (E.D.N.Y. Jan. 17, 2007) (finding petitioner was not entitled to a writ of error *coram nobis* because he failed to explain why he did not seek relief through direct appeal or through a Section 2255 motion), *aff'd*, 351 F. App'x 475 (2d Cir. 2009). Delays in seeking relief are invariably fatal to petitions of this sort, particularly where, as here, the petitioner has declined to provide a reason for his untimeliness. *See United States v. Sash*, 374 F. App'x 198, 200 (2d Cir. 2010) (finding "unavailing" petitioner's argument that he delayed filing petition for multiple years "because he was preoccupied with other proceedings"); *United States v. Rodriguez*, No. 98 Cr. 764 (MHD), 2012 WL 6082477, at *10 (S.D.N.Y. Dec. 4, 2012) (denying petition; delay of more than two years); *Rojas v. United States*, No. 11 Civ. 62267, 2012 WL 3150052, at *7 (S.D. Fla. July 16, 2012) (denying petition; one-year delay); *Ahn v. United States*, Nos. 94 Cr. 982 (JFK), 02 Civ. 8031 (JFK), 2003 WL

16

21910855, at *1, 3 (S.D.N.Y. Aug. 8, 2003) (denying petition; approximately four-year delay), *aff'd*, 96 F. App'x 43 (2d Cir. 2004); *Mastrogiacomo v. United States*, No. 90 Cr. 565 (KTD), 2001 WL 799741, at *2 (S.D.N.Y. July 16, 2001) (denying petition; three-year delay).

Despite being well aware of the ongoing Bond investigation prior to his sentencing, Salame did not raise his current claims prior to sentencing, when he could have sought relief prior to judgment being entered, nor did he raise them at sentencing, including prior to learning what his sentence would be. And he did not appeal at all, much less raise claims that the Government breached the plea agreement or that the plea was unknowing and involuntary. He does not provide a persuasive reason for that failure. The Petition should be denied for this reason alone.

### C.    Salame Cannot Establish Extraordinary Circumstances that Warrant Relief

Even if the Petition were procedurally proper—which it is not—it is meritless. Whether construed as a belated claim that the Government breached the plea agreement or that his plea was unknowing and involuntary, Salame's clam fails both factually and legally. *Coram nobis* is "not a substitute for appeal," *Foont*, 93 F.3d at 78, but even if Salame's claims had been raised in a motion prior to his sentencing and the entry of judgment in his case or on direct appeal, they would have conclusively failed. All the more so under the demanding standard for *coram nobis* relief, Salame's claims should be rejected. *See Fleming*, 146 F.3d at 90 (when considering a *coram nobis* petition, courts must "presume that the proceedings were correct," and "[t]he burden of showing otherwise rests on the petitioner").

17

1.      **The Government Did Not Breach the Plea Agreement**

Salame's claim that the Government breached the plea agreement is wrong on the facts
and the law. Factually, the sequence of events establishes not only that the plea agreement
contained no promises about the investigation of Bond, but also that the plea agreement was
consistent with the parties' plea discussions: the Government made clear in advance of the plea
agreement that it viewed Salame and Bond and the Government's investigations into each as
separate, and that any disposition as to Salame would not conclude the investigation of Bond.
(*See* Ex. 3 at 2). This message was relayed to the attorneys who represented both Salame and
Bond, and was spelled out in no uncertain terms. Specifically, and in order to prevent any
possible ambiguity or unintentional or intentional misapprehension that could lead to some claim
for relief like the one Salame has filed, the Government explained that in light of the attorneys'
continued representation of Bond, the Government "wanted to clarify that before continued
discussions about potential disposition for Ryan [Salame]," it wanted to "make clear that [the
Government] view[s] Ryan and Michelle as separate, resolution of his case will not bear on her
case and investigation of her conduct." (Ex. 3 at 2). Salame and Bond's attorneys relayed that
they understood, and proceeded to negotiate a final plea agreement for Salame.

After Salame's guilty plea, but before his sentencing, the Government confirmed that its
investigation of Bond was ongoing. Although in response Salame and Bond's attorneys
expressed a belief that "this matter was not going to be pursued" (Ex. 4 at 5), after being
reminded of the May 25, 2023 call, during which the Government had made clear that no such
promise—implied or otherwise—was being made, Salame did not seek to withdraw his guilty
plea prior to sentencing, as is required for such a motion under Federal Rule of Criminal

Procedure 11(e), or make any other claim for relief. (*See* Ex. 3). Salame's decision not to move to withdraw his plea or allege a breach prior to sentencing leads inevitably to the inference that these protestations were principally a strategy to forestall Bond's indictment and are advanced now as a strategy to gain the benefit of dismissing a duly returned indictment against Bond or else to undo a sentence Salame evidently views as unfavorable.

Salame's allegations about purported representations made by the Government are therefore demonstrably false and incomplete. But even if his accusations were accepted as true, they would not amount to a breach of the plea agreement, which contained no promises as to Bond and explicitly stated it superseded any prior discussions and that there were no additional agreements between the parties. Plea agreements are reviewed "in accordance with principles of contract law." *United States v. Brumer*, 528 F.3d 157, 158 (2d Cir. 2008). "To determine whether a plea agreement has been breached, [courts] look to the reasonable understanding of the parties as to the terms of the agreement." *Id.* In light of the Government's "advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). A defendant who enters into a plea agreement is generally bound by the agreement's terms. *See In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999) (noting that "a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach").

Salame's plea agreement is unambiguous. It contained no assurance whatsoever that Salame's guilty plea would conclude any investigation of Salame's co-conspirators, or immunize them from prosecution. Salame is bound by the explicit terms of the plea agreement, which spelled out the understanding between the parties:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

(Ex. 1 at 7). Salame, under oath at his guilty plea proceeding, confirmed that *no* promises had been made to him other than what was contained in the plea agreement. (9/7/2023 Tr. at 19 (The Court: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?" Salame: "No, your Honor.")). That confirmation was made in the presence of his attorneys who had represented Salame in plea negotiations with the Government. As the Second Circuit has explained in the context of affirming the denial of a motion to withdraw a guilty plea, in light of Salame's "emphatic statement" that he understood the plea agreement and that no other promises caused him to plead guilty, "it [is] not reasonable to infer that somehow" the defendant "was still relying" on conflicting prior representations by his counsel. *See also Ventura v. Meachum*, 957 F.2d 1048, 1056 (2d Cir. 1992).

Salame acknowledges that even during the April 28, 2023 meeting, during which Salame claims the Government indicated it would cease investigating Salame and Bond's campaign finance scheme if Salame pleaded guilty, the Government emphasized it would not make any promises outside the four corners of any plea agreement. (*See* Ex. 2 at 3; Dkt. 470 at 3). To be clear, and as described in more detail above, the Government never promised that resolution of Salame's case would conclude its investigation of Bond, and it expressly stated otherwise on the May 25, 2023 call. (*See* Ex. 3 at 2). But even if the Government had done so, the plea agreement expressly "supersede[d] any prior understandings, promises, or conditions between this Office

and the defendant." (Ex. 1). It is well settled that a defendant "may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach," particularly where, as here, "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement." *In re Altro*, 180 F.3d at 376; *see also id*. (A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement."); *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004) (same). And yet, Salame's motion relies entirely on what he characterizes as a "implied commitment" or "implied assurances." (Dkt. 470 at 4-5, 11; Salame Decl. ¶¶ 11-12). Indeed, while Salame and Bond's attorneys expressed to the Bond Prosecution Team a "belie[f] that [the Bond] matter was not going to be pursued," they did not claim that any such promise had been made a condition of Salame's guilty plea. (Ex. 4 at 5).

Finally, Salame's behavior confirms that there was no ambiguity in the agreement, and that he understood it contained no promises as to Bond. *See, e.g.*, *United States v. Helm*, 58 F.4th 75, 83 (2d Cir. 2023) (the Second Circuit looks to the "precise terms of the plea agreements and to the parties' behavior" to determine the parties reasonable understanding of the terms of the agreement). On top of telling the Court that no promises had been made to him outside the terms of the plea agreement (9/7/2023 Tr. at 19), Salame never sought to withdraw his plea. Despite expressing a "belie[f]" to the Bond Prosecution Team that the Bond investigation "was not going to be pursued," Salame and Bond's attorneys never communicated a concern about breach of Salame's plea agreement to the FTX Prosecution Team prior to his sentencing or after. (Ex. 4 at 5). And notwithstanding confirmation before his sentencing that the investigation of Bond was ongoing, at sentencing, when he was given an opportunity to speak, he expressed remorse for his

conduct and apologized to the Government, rather than accusing the Government of misconduct, a breach, or bad faith. Thus, even on Salame's terms, his claims fall well short of demonstrating a breach of a plea agreement, particularly where this Court "must presume the proceedings were correct, and the burden of showing otherwise rests on the petitioner." *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000).

Even if Salame could demonstrate a breach—which he cannot—he still cannot establish circumstances compelling relief "to achieve justice." *Foont*, 93 F.3d at 79. Indeed, Salame's claims would have fallen well short even under the plain error standard that would have applied on direct appeal. *See United States v. Rivera*, No. 22-2081, -- F.4th --, 2024 WL 3882099, at *7-8 (2d Cir. Aug. 21, 2024) ("An argument that the government breached a plea agreement is reviewed for plain error if the defendant failed to object in the district court."). Because the Government did not breach an explicit promise in the written plea agreement, and disavowed any promises beyond the four corners of the plea agreement, any error was not plain. Salame also suffered no effect on his substantial rights from any alleged breach. *See id.* at *3 ("To establish plain error, a defendant must demonstrate: (1) error, (2) that is plain, and (3) that affects substantial rights."). On the contrary, he received substantial benefits under the plea agreement, which capped his statutory maximum sentence at 10 years' imprisonment, and also capped his Guidelines sentence, which otherwise would have been much higher. Had he been indicted for the other crimes under investigation, including the campaign finance scheme with Bond (for which she was later indicted), or the bankruptcy fraud scheme for his withdrawal of millions of dollars from FTX during its collapse, his sentencing exposure and Guidelines range would have been much higher. For example, for the unlawful campaign spending on Bond's campaign alone,

Bond faces a statutory maximum of 20 years' imprisonment for the charges in her indictment. (*See* 24 Cr. 494 (GBD), Dkt. 1). The evidence against Salame was also overwhelming, and the Court is familiar with that evidence having presided over Bankman-Fried's trial. Salame's guilty plea allocution established that he committed the offenses, and knew what he was doing was wrong. (9/7/2023 Tr. at 21-23). Despite minimizing his misconduct and backtracking on his guilty plea in his post-sentencing tweets, Salame nonetheless effectively admitted to bankruptcy fraud, while trying to explain it away.[4] While Salame asks the Court to vacate his conviction, or dismiss Bond's indictment, he does not assert that he would have proceeded to trial had he only understood that the Government was making no guarantees about ceasing its Bond investigation. Indeed, perhaps the best indication that the purported breach did not affect Salame's substantial rights is that he made no effort to withdraw his guilty plea after learning that the Government was continuing to investigate Bond, notwithstanding his sworn statement now—evidently inconsistent with his actual conduct—that "[a] significant contributing factor to my accepting the plea arrangement was the understanding that, if I did so, the government would not pursue the campaign-finance charges against Bond." (Salame Decl. ¶ 12).

Finally, this Court should reject Salame's unprecedented request for relief in the form of dismissal of campaign-finance charges against Bond. (*See* Dkt. 470 at 11-12). In the event of a breach, the appropriate remedy is either to enforce the bargain or to allow a defendant to

---

[4] "I didn't try to withdraw 'tens of millions more' - I had 100% of my funds on FTX and queued up various sized withdrawals until one worked (and then I canceled the rest). I also didn't think FTX was bankrupt then, I still don't think it was ever bankrupt even now. But yah not my best moment, i'll admit to that, but I had no money in the bank and everyone was getting lawyers and they wanted a large retainer." Ryan Salame [@rsalame7926], X.com (Aug. 5, 2024), https://x.com/rsalame7926/status/1820579158638108815.

withdraw his plea, and the choice of remedy is generally within the district court's discretion. *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000). But the cases on which Salame relies that contemplate specific performance are cases where the Government breached a promise set forth in the parties' written plea agreement, such as a commitment about the appropriate sentence, in which a court may order a resentencing as the appropriate remedy, rather than a withdrawal of the plea. *Id.* Salame cannot identify any written promise about Michelle Bond in his written plea agreement that this Court should enforce. And he cites no case where the specific performance involved dismissing charges against a third party, especially when no promises about a third party were contained in the plea agreement.

### 2.    Salame's Plea was Knowing and Voluntary

Salame also suggests that his plea was "not truly voluntary" because the Government conditioned ceasing its investigation of Bond on Salame pleading guilty. (Dkt. 470 at 6). He claims that while the appellate waiver foreclosed "a collateral challenge *to his sentence*" it "does not foreclose a challenge to his *conviction*." (Dkt. 470 at 10 (emphasis in original)). But a "defendant who enters a knowing and voluntary guilty plea waives all non-jurisdictional defects," *United States v. Calderon*, 243 F.3d 587, 590 (2d Cir. 2001), and Salame has not shown that his plea was unknowing or involuntary, *see United States v. Delvalle*, 94 F.4th 262, 266 (2d Cir. 2024) ("A plea is involuntary if it is the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weigh his options rationally."). Salame's guilty plea proceeding complied with Federal Rule of Criminal Procedure 11, and Salame made clear that he was pleading guilty because he was in fact guilty. Despite his present claims of coercion, when he was asked by the Court whether "anyone offered

you any inducements or threatened you or anyone else, or forced you in any way to plead guilty," Salame answered "No, your Honor." (9/7/2023 Tr. at 18-19). The Court also asked Salame: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?" (9/7/2023 Tr. at 19). Again, Salame answered: "No, your Honor." In reference to the plea agreement, the Court asked Salame: "Do you understand that by entering into this plea agreement, you are giving up your right to appeal from or to bring any collateral challenge to your conviction or sentence, including but not limited to any appeal or any application under 28 U.S. Code 2255 or 2241, of any sentence equal to or below the stipulated guideline sentence of 120 months of imprisonment?" (9/7/2023 Tr. at 20-21). Salame responded, "Yes, I understand, your Honor."

As described above, the facts establish that Bond's treatment by the Government was not conditioned on Salame's guilty plea: on the contrary, the Government made clear that it was treating Bond and Salame separately, and that any future plea agreement for Salame would contain no assurances as to Bond. (*See* Ex. 3 at 2). Even if Salame somehow misunderstood these crystal-clear disclaimers, or had a mistaken expectation about Bond's investigation, that would not render his plea involuntary. *Cf. Delvalle*, 94 F.4th at 267 ("a defendant's guilty plea is not involuntary simply because he has a mistaken expectation at the time of entering his plea of what his sentence will be, even if his expectation is based on his lawyer's erroneous prediction"). And even if the Government had made promises about Bond—which it did not—that also would not render Salame's plea involuntary. As the Second Circuit has made clear: "Whatever doubts may have at one time been entertained as to 'the constitutional implications of a prosecutor's offer during plea bargaining of adverse or lenient treatment for some person other than the

accused,' it is now clearly established in the Second Circuit that the government may impose conditions which relate to the conduct or treatment of others." *United States v. Clements*, 992 F.2d 417, 419 (2d Cir. 1993); *see also United States v. Marquez*, 909 F.2d 738, 742 (2d Cir. 1990) (agreeing with the unanimous view of other circuits that a plea is not invalid or involuntary if entered "under a plea agreement that includes leniency for a third party," or "in response to a prosecutor's justifiable threat to prosecute a third party if the plea is not entered").

Salame relies on a Ninth Circuit case to argue that offering a third-party benefit in plea bargaining rendered Salame's plea involuntary. (*See* Dkt. 470 at 23 (citing *United States v. Seng Chen Yong*, 926 F.3d 582 (9th Cir. 2019))). This reliance is misplaced. *Seng Chen Yong* held that the "Government may offer a plea agreement to a defendant where a third party receives a benefit from the defendant's decision to plead guilty." *Id.* at 591; *see also id.* ("Every federal court of appeal to consider the issue . . . has held that plea agreements that condition leniency for third parties on the defendant's guilty plea are permissible so long as the Government acted in 'good faith,' meaning it had probable cause to prosecute the third party."). The Ninth Circuit went on to explain that a guilty plea made in exchange for leniency to a third party is involuntary if the government lacked probable cause to prosecute the third party. But that is clearly not the case here, where the Government discussed Bond's status with Salame's attorneys after law enforcement agents executed a judicially-authorized search warrant establishing probable cause that evidence of her criminal activity would be found on her electronic devices, and where Bond was ultimately indicted. Moreover, as described above, Salame received considerable additional benefits in exchange for pleading guilty.

26

Although Salame never made a motion to withdraw his guilty plea prior to sentencing, *see* Fed. R. Crim. P. 11(e), the law on plea withdrawals underscores why Salame's belated protestations are an insufficient basis to vacate his conviction. Prior to sentencing, a defendant may withdraw a guilty plea only if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The Second Circuit has held that district courts confronting such a motion should consider, among other things, the following factors to determine whether a defendant has provided a "fair and just reason" for withdrawing a guilty plea:

> (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea.

*United States v. Rose*, 891 F.3d 82, 85 (2d Cir. 2018); *accord United States v. Doe*, 537 F.3d 204, 210-211 (2d Cir. 2008). Courts "may also look to whether the defendant has raised a significant question about the voluntariness of the original plea." *United States v. Rivernider*, 828 F.3d 91, 104 (2d Cir. 2016).

It is clear that Salame could not have provided a "fair and just reason" for withdrawing his plea prior to sentencing—and thus even more clear that his conviction should not be vacated under the demanding *coram nobis* standard now that it is final. Salame does not assert his innocence and the factual basis for his plea is well established in the record. His current accusations of Government misconduct carry little weight against his contrary statements under oath at his guilty plea. As the Second Circuit has explained in the plea withdrawal context, "[s]olemn declarations in open court" during a plea allocution "carry a strong presumption of

verity," *Blackledge v. Allison*, 431 U.S. 63, 74 (1977), and thus, "a defendant's bald statements

that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw

the guilty plea," *United States v. Torres*, 129 F.3d 710, 715 (2d Cir. 1997). That is particularly

true with the passage of time—"a long interval between the plea and the request [to withdraw]

often weakens any claim that the plea was entered in confusion or under false pretenses." *United

States v. Doyle*, 981 F.2d 591, 595 (1st Cir. 1992). Ultimately, it is Salame who seeks to

"depriv[e] the Government of the benefit of its bargain" once the evidence may have changed

with the passage of time. *United States v. Lopez*, 385 F.3d 245, 255 (2d Cir. 2004). He should

not be permitted to do so.[5]

### D.    The Petition Should Be Denied Without a Hearing

Salame's Petition should be denied without a hearing. As he notes, "the § 2255 procedure

often is applied by analogy in coram nobis cases." (Dkt. 470 at 7 (quoting *Fleming*, 146 F.3d 90

n.2)). "To warrant a hearing, [a § 2255] motion must set forth specific facts supported by

competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing,

would entitle [the movant] to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir.

---

[5] Salame's other post-sentencing conduct underscores that Salame is using the Petition principally as a vehicle to evade the consequences of his actions and avoid the lengthy prison term imposed by the Court. Salame's recent Twitter activity minimizes his guilt (in contradiction of his plea allocution) and shows a contempt for the justice system. These recent tweets include: "I often contemplate how they pressured Nishad into lying about how he viewed his campaign finance contributions. I have some ideas but I'll likely never know the full extent." (July 16, 2024); "Nishad if you're reading this how did they get you to plead guilty to campaign finance violations when I know you had internal and external legal teams, political consultants, and accountants all involved specifically to ensure it was legal?" (August 6, 2024); "Well the biggest is I know for a fact Nishad didn't think he was committing campaign finance fraud and yet he plead guilty to it" (August 14, 2024); "When Nishad finally admits he lied to the government to save himself will I be compensated?" (August 17, 2024); "If you want to know how f*cked up our justice system is watch how little time Nishad and Caroline get after lying to save themselves." (August 18, 2024). (*See generally* https://x.com/rsalame7926).

2013). There is no need for a hearing where the allegations are "vague, conclusory, or palpably incredible." *Gonzalez*, 722 F.3d at 130-31 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). And as Salame acknowledges, "[i]n determining whether the assertions in a § 2255 motion warrant discovery or a hearing, the court must also take into account admissions made by the defendant at his plea hearing …. '[S]ubsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal[.]'" *Id.* at 131 (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). For all the reasons set forth here, Salame has not raised a plausible claim for relief, his allegations are "palpably incredible," and he has not shown that he is entitled to relief even if the Court ultimately accepted the allegations in his declaration. Notably, he has not submitted an affidavit from any of his attorneys claiming that he was made any promises or assurances beyond those in the written agreement, and the claims contained in his own sworn affidavit are not credible on their face, in light of their inconsistency with Salame's actions, the words he spoke at his guilty plea, and contemporaneous records. Under these circumstances, a hearing is unnecessary.

Were the Court to hold a hearing, however, Salame has put in issue the communications between him and his criminal counsel, at least regarding the terms of his guilty plea, and waived the attorney client privilege. The attorney-client privilege "may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (1991). It is, therefore, routine to find an implied waiver where, as here, a defendant claims that he did not knowingly and voluntarily plead guilty, was forced to plead guilty, or otherwise puts at issue the communications with his counsel. *See, e.g.*, *United States v. Anderson*, 201 F.3d 432, at *4 (2d Cir. 1999) (unpublished disposition)

(defendant impliedly waived attorney-client privilege where he used purported discussions he had with his counsel as a basis to repudiate a provision of his plea agreement); *United States v. Arias*, 166 F.3d 1201, at *1 (2d Cir. 1998) (summary order) (defendant implicitly waived the attorney-client privilege when he argued that his attorney had coerced him into pleading guilty). By claiming that the Government made a promise during the April 28, 2023, meeting, Salame necessarily has put at issue his communications with his counsel about (i) what defense counsel said the Government said in their meetings; (ii) what defense counsel told Salame about the scope of the plea agreement; and (iii) what discussions, if any, Salame had with his counsel about whether to move to withdraw his guilty plea or assert a breach of the plea agreement. Thus, while the Court need not conduct additional fact finding to deny Salame's motion, if the Court were to believe further factual development is warranted, based on the present record it may conclude that Salame has impliedly waived the privilege, permitting the Government to interview Salame's counsel or the Court to require counsel's testimony in written or oral form. *See United States v. Gallego*, 944 F. Supp. 309, 322–23 (S.D.N.Y. 1996) (Kaplan, J.) (by moving for a new trial based on ineffective assistance, the defendant "put in issue" and therefore "waived" privilege, and it was appropriate to require former counsel to "prepare drafts of responsive affidavits" and later testify at a hearing).

## **CONCLUSION**

For the foregoing reasons, Salame's petition should be denied in its entirety.

Dated:    New York, New York
          September 5, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

                    By:   s/ Danielle R. Sassoon
                          Danielle R. Sassoon
                          Danielle Kudla
                          Thane Rehn
                          Nicolas Roos
                          Assistant United States Attorneys
                          (212) 637-1115