**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

*v.*

CAROLINE ELLISON,

Case No. 1:22-CR-673 (LAK)

## DEFENDANT CAROLINE ELLISON'S SENTENCING MEMORANDUM

## REDACTED PUBLIC FILING

Anjan Sahni
Stephanie Avakian
Peter G. Neiman
Nicholas Werle
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
anjan.sahni@wilmerhale.com
stephanie.avakian@wilmerhale.com
peter.neiman@wilmerhale.com
nick.werle@wilmerhale.com

*Attorneys for Caroline Ellison*

# Table of Contents

I.   Preliminary Statement ................................................................................................ 1

II.  Caroline's Personal History ..................................................................................... 6

   A.   Childhood ............................................................................................................ 6

   B.   College ................................................................................................................. 9

   C.   Jane Street .......................................................................................................... 12

   D.   Alameda Research .............................................................................................. 15

      1.   Berkeley, California ...................................................................................... 15

      2.   Hong Kong ..................................................................................................... 20

      3.   Nassau, Bahamas ........................................................................................... 24

III. Offense Conduct ...................................................................................................... 30

IV.  Caroline Accepts Responsibility and Cooperates ............................................... 35

   A.   Caroline Discloses The Fraud ............................................................................ 35

   B.   Caroline Assists The Bankruptcy Estate ........................................................... 37

   C.   Cooperation with the United States Government ............................................... 40

   D.   Assistance for FTX Customers, the FTX Debtors, And Other Investigations.......... 46

   E.   Caroline's Efforts To Rebuild Her Life ............................................................. 48

V.   The Sentencing Guidelines And Probation's Recommendation ....................... 49

VI.  A Sentence Of Time Served Is Sufficient To Comply With Section 3553(a) ................. 50

   A.   Caroline's Personal History and Characteristics ............................................... 51

   B.   Nature, Characteristics of the Offense .............................................................. 54

   C.   Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes by the Defendant ............................................................................ 58

   D.   Reflecting the Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment and Compensation for Victims, and Avoiding Unwarranted Sentencing Disparities ......... 60

VII. Conclusion ............................................................................................................... 62

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Gall v. United States*, 552 U.S. 38 (2007)...............................................................................50, 51

*United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006)..........................................59, 60

*United States v. Fogel*, No. 1:17-cr-308-LAK (S.D.N.Y. Nov. 27, 2018)..................................62

*United States v. Gassnola*, No. 1:18:cr-252-LAK (S.D.N.Y. Oct. 7, 2019)..............................61

*United States v. Makov*, No. 1:05-cr-888-LAK (S.D.N.Y. May 20, 2010)................................61

*United States v. Ming He*, 94 F.3d 782 (2d Cir. 1996) .............................................................61

*United States v. Silvestre*, No. 1:14-cr-72-LAK (S.D.N.Y. Feb 23, 2014).................................62

*United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) ...............................................................57

### STATUTES, RULES, AND REGULATIONS

18 U.S.C. § 3553(a) ......................................................................................................6, 50, 51, 62

### OTHER AUTHORITIES

B. Quarmby, *Alameda ex-CEO Caroline Ellison spotted in New York, Twitter users
    claim,* CoinTelegraph.com (Dec. 5, 2022), https://cointelegraph.com/news/
    alameda-ex-ceo-caroline-ellison-spotted-in-new-york-twitter-users-claim...................................46

B. Todd, *Why and how to earn to give*, 80,000 Hours (Mar. 2023),
    https://80000hours.org/articles/earning-to-give....................................................................11

D. Yaffee-Bellany and M. Goldstein, *Inside the Private writings of Caroline Ellison, Star
    Witness in the FTX Case*, N.Y. Times (July 20, 2023) ..................................................45

M. Lewis, *Going Infinite*  (W.W. Norton & Co. 2023)..............................................................45

O. Land, *Who are Caroline Ellison's parents? Fraudster's mom and dad are MIT
    economists*, N.Y. Post (Dec. 23, 2022) .......................................................................46

W. MacAskill, "Effective Altruism: Introduction," *Essays in Philosophy*, Vol. 18:1
    (2017)...........................................................................................................................9

## I.    PRELIMINARY STATEMENT

Caroline Ellison is a young person of enormous talent and promise, with a deep commitment to helping others.  Tragically, she became embroiled in the very serious crimes committed at FTX and Alameda Research.  Caroline blames no one but herself for what she did.  She regrets her role deeply and will carry shame and remorse to her grave.  The goal of this submission is to respectfully provide the Court with context beyond what was discussed at trial, so the Court will have a full understanding of Caroline's life before, during, and after FTX.

One important piece of context at the outset is Caroline's complex relationship with Sam Bankman-Fried.  Caroline met Mr. Bankman-Fried at Jane Street Capital in 2015; he was a junior trader, and she was a summer intern.  In just a few years, Caroline watched Mr. Bankman-Fried found Alameda Research and then FTX, grow FTX into a juggernaut, become one of the world's richest men, share stages with former presidents and prime ministers, appear regularly on television and the cover of magazines and newspapers, and testify before Congress as the personification of cryptocurrency's future.  Caroline moved around the globe at his direction, first to Hong Kong and later the Bahamas.  Far from home and family, Caroline worked long, stressful, Adderall-fueled hours, associating almost exclusively with other employees of Mr. Bankman-Fried.  And Caroline was in an on-again-off-again, sometimes-secret relationship with Mr. Bankman-Fried that she understood at the time was fundamentally unequal.  Deeply unhappy, Caroline repeatedly considered leaving Alameda, but Mr. Bankman-Fried convinced her to stay, telling her she was essential to the survival of the business, and that he loved her (while also perversely demonstrating that he considered her not good enough to be seen in public with him at high-profile events).

Over time, Caroline's moral compass warped.  At Mr. Bankman-Fried's direction, she took actions that she knew to be wrong, helping him steal billions.  She lived in dread, knowing that a

disastrous collapse was likely, but fearing that disentangling herself would only hasten that collapse. When FTX finally collapsed, Caroline felt intense sadness for all the people they had betrayed, but also tremendous relief, because she did not have to go on lying and stealing for Mr. Bankman-Fried.

Of course, it did not have to be this way. As the trial testimony revealed, Caroline was a voice for *not* doing what led to this disaster. Mr. Bankman-Fried asked Caroline in the fall of 2021 to analyze his plan to spend billions of dollars on illiquid "venture" investments, financed by having Alameda take open-term loans from third-party crypto lending desks. Caroline advised Mr. Bankman-Fried that if he did this, any significant turmoil in the cryptocurrency markets would leave Alameda unable to repay its lenders—even if Alameda took FTX customer deposits. Mr. Bankman-Fried ignored Caroline's warning. Mr. Bankman-Fried, Gary Wang, and Nishad Singh proceeded to take billions of dollars in purported "loans" from Alameda. Caroline only learned months later of many of these loans, even though they were taken from Alameda, the company for which she was nominally the co-CEO.

The venture borrowing spree that Caroline advised against led directly to the central crime in this case: the theft of billions of dollars-worth of FTX customer funds. After the cryptocurrency markets stopped their meteoric rise and Alameda's lenders demanded repayment in June 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Caroline met to examine Alameda's financial position, and Mr. Bankman-Fried directed her to take customer funds from FTX to repay Alameda's loans. Caroline did as he instructed. And when Mr. Bankman-Fried told Caroline to lie about it—to Alameda's lenders, to journalists, on Twitter—she did that too.

While Caroline committed serious crimes to further Mr. Bankman-Fried's interests, she notably did virtually nothing to protect her own. Caroline did not take enormous personal loans.

2

She did not receive equity in Alameda Research, and she held only a small amount of equity (less than 1%) in FTX.  While she received significant bonuses at Alameda (consistent with its and her performance), she always kept most of her assets in her FTX.com user account, withdrawing funds almost exclusively to make charitable contributions and to pay taxes.  But after Alameda used FTX customer funds to repay its loans in June 2022, she made no further withdrawals.  Caroline declined to transfer any of her own money out of FTX because she believed that to protect herself while FTX customers remained at risk would be profoundly unfair.  Accordingly, when FTX suspended withdrawals and collapsed, Caroline lost access to the vast majority of her savings.

After years of serving Mr. Bankman-Fried's interests, Caroline reasserted her own in November 2022, when she stopped lying for Mr. Bankman-Fried:  At an all-hands meeting of Alameda employees on November 9, Caroline disclosed the essential facts of and accepted responsibility for the crimes committed at FTX and Alameda, just as she would nearly a year later, on the witness stand at Mr. Bankman-Fried's trial.  Caroline immediately began making amends for participating in those crimes.  She encouraged Mr. Bankman-Fried to let FTX and Alameda declare bankruptcy.  Caroline then worked tirelessly to assist FTX's bankruptcy counsel secure assets.  Caroline voluntarily returned to the United States, retained counsel, and quickly began cooperating with the U.S. Attorney's Office, the Securities and Exchange Commission, and the Commodity Futures Trading Commission, helping them understand what happened at FTX and Alameda.  A little more than a month after FTX declared bankruptcy, Caroline pled guilty, publicly accepted responsibility for her crimes, and apologized for the resulting harm.

From her first meeting with prosecutors, Caroline unflinchingly acknowledged her own wrongdoing, without minimization, blame shifting, or self-pity.  And she time and again proved herself an enormously credible and important cooperating witness.  Caroline would provide her

recollection of an event, and the government would later find documents confirming in minute detail what she had said.  And so the government met with Caroline more than twenty times in advance of trial.  In those meetings, Caroline interpreted Alameda's intentionally cryptic records, recalled key conversations not preserved because of Mr. Bankman-Fried's insistence on ephemeral messaging, and disclosed conduct that not only provided crucial evidence of the crimes the government had been investigating from the day of FTX's collapse, but also allowed the government to charge Mr. Bankman-Fried with crimes it had no inkling of before learning of them from Caroline, such as defrauding Alameda's lenders and bribing Chinese government officials, *see* Presentence Report ("PSR") at 41.

Caroline did all this even as she faced the kind of public attention and scrutiny few people will ever have the misfortune to experience.  Every shred of her online life was relentlessly picked over; Internet trolls constantly speculated on her whereabouts, so she had to conceal her identity whenever she ventured into public; her family members were harassed; news sources shared salacious and unfounded speculation about her sex life; Mr. Bankman-Fried leaked Caroline's deeply private writings to the *New York Times*, which prominently published them; and the psychiatrist she shared with Mr. Bankman-Fried disclosed confidential information from her treatment to a bestselling author, who featured them in the book he released on the eve of trial. As Caroline came and left the courthouse each day of her trial testimony, she was aggressively mobbed by photographers and reporters, ultimately requiring an FBI escort and a line of Marshalls to protect her.

Caroline came through all that undaunted.  Setting aside the media maelstrom enveloping her, she testified over three days at Mr. Bankman-Fried's trial about the defendant's mindset; his management of FTX and Alameda Research; and his illegal schemes to defraud the customers,

investors, and lenders of FTX and Alameda.  Because Caroline had been truthful since she first
disclosed these crimes in November 2022, Mr. Bankman-Fried's counsel was unable to impeach
her on cross-examination.   Her testimony was so devastating to Mr. Bankman-Fried that
substantial portions of the government's closing argument and this Court's comments at Mr.
Bankman-Fried's sentencing quoted Caroline extensively.  *See, e.g.*, Tr.2979-2982 (government
summation, quoting Caroline's testimony about defrauding lenders); Dkt. 426 at 51-52 (Bankman-
Fried sentencing, quoting Caroline's testimony about defendant's attitude toward risk).[1]

Since the trial, Caroline has focused on rebuilding her life and resolving the civil cases and
other consequences arising from her acts at Alameda Research.  Caroline ███████████
███████████ is engaged in volunteer work and writing projects (unrelated to FTX) including
a math textbook and works of fiction.  She is finalizing agreements with the government and the
FTX Debtors that she expects will leave her without anything she earned while employed at
Alameda.[2]  Caroline has also executed a comprehensive settlement with the plaintiffs' steering
committee in the FTX-related multidistrict litigation.  Both the FTX Debtors and the MDL steering
committee have provided letters describing Caroline's ongoing assistance.  *See* Exs. AI (FTX
Debtors), AJ (MDL plaintiffs).   Caroline has also continued to provide information to any
investigations into FTX that have sought her cooperation, including other elements of the
Department of Justice, the SEC, the CFTC, the FTX bankruptcy examiner, and the New York
Attorney General's Office.

---

[1] Citations to "Tr." Refer to the transcript of Mr. Bankman-Fried's criminal trial before this
Court.

[2] We expect these settlements will be consummated before sentencing and will promptly
notify the Court when that occurs.

Caroline now stands before the Court for sentencing. The Probation Department recommends a sentence of time served with three years of supervised release. *See* PSR at 40. The PSR grounds this recommendation in Caroline's extraordinary cooperation with the government, her otherwise unblemished record, and the numerous testimonials of Caroline's honesty and ethical behavior both before she started working at Alameda and since she left Alameda. *See id.* at 40-42. Caroline poses no risk of recidivism and presents no threat to public safety. It would therefore promote respect for the law to grant leniency in recognition of Caroline's early disclosure of the crimes, her unmitigated acceptance of responsibility for them, and—most importantly—her extensive cooperation with the government.

Without in any way diminishing the very serious crimes here, we respectfully submit that the policy goals and interests of justice embodied by the section 3553(a) sentencing factors do not require sending Caroline to prison, and accordingly request a non-custodial sentence.

## II.    CAROLINE'S PERSONAL HISTORY

### A.    Childhood

Caroline Ellison was born in November 1994 in Boston, Massachusetts to Glenn and Sara Ellison. PSR ¶72. Caroline grew up in the Boston suburbs as part of a tight-knit and intensely academic family. PSR ¶73. Both of Caroline's parents are professors of economics at the Massachusetts Institute for Technology, and they did not stop teaching when they left campus. PSR ¶72. Caroline ate dinner with her parents and her two younger sisters each night; they discussed mathematical concepts, debated economic trends, and disentangled correlation and causation. *See generally* Exs. A (S. Ellison), B (G. Ellison), C (A. Ellison), D (K. Ellison).

"Caroline was evidently an unusually gifted child." Ex. L (E. Duflo) at 1. Caroline's parents "taught her to read at about 2½," "[s]he was reading novels by 4 and had surpassed [her mother] in reading speed and comprehension by 5." Ex. A (S. Ellison) at 2; *see also, e.g.*, Ex. K

(C. Snyder) at 1.  Her mother explains that "keeping her in books [as a child] was difficult and expensive." Ex. A (S. Ellison) at 2.  Eventually, her parents would *limit* the time she spent reading because, in Caroline's words, "they wanted me to get a life" and spend time outside with friends. Her parents also resisted teachers' suggestions for Caroline to skip multiple grades, for fear it would impede her social development.  *See* Ex. AA (K. McFarlane).  Caroline's love of literature grew into a passion for writing.  A family friend recalls that during a biennial weekend spent with the Ellisons and other academic families, Caroline, "the oldest, would script and direct a play with the other ten or twelve children, which they would perform for the parents[,] … despite the[ younger children's] sometimes wandering attention." Ex. K (C. Snyder) at 1.  To this day, Caroline loves writing and she entertains her friends by drafting elaborate scripts for role playing games for them to act out.  *See* Exs. G (L. Clark) at 2, M (A. Yedidia).

During Caroline's childhood, her parents twice moved the family to take year-long academic fellowships.  PSR ¶76.  After returning to Massachusetts for good, Caroline felt socially adrift and craving a sense of belonging.  Around this time, Caroline "developed a keen interest in math," and she spent hours with her father "talking through logic puzzles" and learning "rudimentary programming." Ex. A (S. Ellison) at 2.  Caroline found community by joining her middle-school math team.  Caroline spent four hours a week attending team practices, another four hours attending supplemental math classes each Saturday, and even more time attending math competitions against other schools.  Caroline was eventually named captain of her math teams in both middle and high school.  On both teams, Caroline was known for fostering an inclusive culture that "made other girls … want to join," leading to an unusual gender balance for an interscholastic math team. Ex. B (G. Ellison) at 2.  Caroline also became an internationally ranked competitor in

linguistics competitions. *See* Ex. V (A. Hesterberg) (describing Caroline's award for writing the best solution at the 2011 International Olympiad in Linguistics).

As several people who have known Caroline since childhood explain, "Caroline stood out for her independence and determination. She wanted to do everything by herself." Ex. L (E. Duflo) at 1. According to Caroline's mother, "one of her first phrases, betraying an essential aspect of her personality, [was] 'by self.'" Ex. A (S. Ellison) at 1. For example, when Caroline was 16 years old, she asked to spend a summer at a Chinese immersion school in China, after having studied Mandarin for about six years, but her parents could not find any program oriented toward students like her. *See id.* So, Caroline set off on her own for a three-week program designed for adults learning Mandarin for professional reasons. *See id.* Caroline only realized upon arriving in Beijing that she was the only child in the program; though overwhelmed, she thrived. *See id.*

Despite Caroline's brilliance, her friends and family know her as someone "low-key and down to earth," who "has never seemed particularly interested in glamour or being the center of attention." Ex. Q (J. Chevalier). Caroline "stood out in her unfailing kindness," as a person who "consistently helped create positive and compassionate spaces" for others. Ex. AD (D. Wang). Many of the letters written in support of Caroline are from friends who have known her since childhood, and they uniformly describe her as "extremely generous and loyal towards others," who often "expresse[s] her friendship in many small ways," Ex. F (M. Dinsmore) at 2, and who "rarely puts herself or her needs first," Ex. A (S. Ellison) at 4. Several letters describe how Caroline's friends and family were "struck by how much love and support she showed to a close friend around the time of that friend's father's death" by suicide. Ex. F (M. Dinsmore) at 2; *see also* Ex. A (S. Ellison) at 2. In the wake of this tragedy, Caroline recalls that her friend spent so much time at her house that she was thought of as a fourth Ellison sister. Nor was Caroline's support for a friend

in crisis a one-off occurrence. A childhood friend's letter describes Caroline's supportive reaction

when he lost a brother to suicide in 2021:

> Although Caroline and I were not in regular communication at that time, she went out of her way to extend herself and make herself available to me in an extraordinary manner. Those who have experienced loss often report that even close friends and family pull away in the aftermath: not Caroline. Her response was far beyond what I could have expected.

Ex. F (M. Dinsmore) at 2.

**B.    College**

After high school, Caroline moved to Palo Alto to study mathematics at Stanford

University. In the words of Caroline's academic advisor in the mathematics department, "she

thrived" academically. Ex. N (R. Vakil). Caroline's transcript is laden with advanced math and

linguistics courses, and she was accepted to a master's program in computer science. *See id.*

Caroline also developed deep and lasting friendships, as reflected in several letters of support from

her college classmates. *See* Exs. H (████████████), O (████████).

Outside of class, Caroline's most significant activities revolved around Stanford's effective

altruism ("EA") community, which she helped foster. "[E]ffective altruism is the project of using

evidence and reason to figure out how to benefit others as much as possible, and taking action on

that basis…. [E]ffective altruists aim to maximise the wellbeing of all, where … everyone counts

for one, and no-one for more than one." W. MacAskill, "Effective Altruism: Introduction," *Essays*

*in Philosophy* 2, Vol. 18:1 (2017). Caroline recalls that EA was just beginning to gain adherents

at the time; she learned about EA in various online communities devoted to the philosophy of

rationalism, which appealed to her as she moved away from the Catholic faith of her youth. A

friend from one of Caroline's first-trimester courses invited Caroline to join an EA group she was

starting. Caroline was the fifth member; but the small, dedicated group soon grew. Caroline read

deeply in the burgeoning EA literature and started a blog on which she wrote about EA-related topics.

As described in many of the attached letters, Caroline has spent an enormous amount of time throughout her life considering how to live ethically.  Even in "high school … Caroline spoke frequently about moral principles, how to live a good life, and obligations of service to others." Ex. F (M. Dinsmore) at 1.  For many years before attending college, Caroline's Catholic faith framed this question.  She prayed regularly, attended church with her mother and sisters, and was "a devout altar server," Ex. K (C. Snyder) at 1.  But, as her lifelong friend and Confirmation classmate explains in his letter, Caroline began to struggle with her faith late in high school.  *See* Ex. F (M. Dinsmore) at 1.  This was a stressful experience, as Catholicism formed the basis of her moral framework, bound her to her family, and provided her with an important source of community.  This ethical evolution left Caroline "looking for something more intellectually coherent, in her view, than Catholicism seemed to be."  *Id.*  Eventually, "Caroline became interested in [EA]."  Even to her friends and family critical of EA, Caroline's embrace of EA "seemed like the logical outcome of her passion for ethical commitment, one that offered community and purpose in a secular manner."  *Id*.  A close family friend explained that it is "[m]y firm belief … that" Caroline's "move[] from Catholicism to Effective Altruism … was a continuation of her spiritual journ[ey], a serious search for how to live a good and holy life."  Ex. K (C. Snyder) at 1.

Caroline found herself particularly drawn to the EA precept of "earning to give," which "is the idea that instead of working directly to tackle a pressing problem, you take a job where you earn more money than you would have otherwise and donate much of the extra to fund others

doing effective work on those problems."[3]  As described in numerous letters, Caroline began to donate a large portion of her spending money to charity and would carefully research different organizations and causes to determine which contributions would likely have the greatest overall benefit.  Initially, Caroline focused on global health and animal welfare charities (she has been a vegetarian since age 16).  Over time, however, Caroline became increasingly concerned about long-term societal prospects.  As a college friend explains:

> Caroline subscribed to a[n] … esoteric philosophy – that the happiness of people yet to be born is as important as ours today. … Caroline also expressed concern that artificial intelligence would take over the world and cause humanity's extinction.  This worldview led Caroline to believe that her highest and best purpose should be to make as much money as she could while spending those funds on preventing this AI disaster….  [M]any people in Silicon Valley [shared Caroline's concern], including some of its most powerful leaders.

> Ex. G (L. Clark) at 1.

Later, Caroline would devote much of her charitable giving to AI safety efforts.  One painful consequence of Caroline's crimes has been that she has been totally cut off from the EA movement, to which Caroline had been so devoted.

College also led to Caroline's first experiences dating.  Caroline's early relationships presage in certain ways her dynamic with Mr. Bankman-Fried years later.  For instance, when Caroline was a first-year student, there was a fourth-year man who kept asking her out and hanging around; though she was not interested in him, she "wasn't good at saying 'no' to him," and eventually agreed to go out with him.  They dated for several months.  Despite never being enthralled with him, when he eventually broke up with Caroline she was "super upset."  Some of her friends see this relationship as one of several "situations where [Caroline] became involved in relationships that were not particularly good for her."  Ex. H (██████████) at 1.  Caroline's

---

[3]  B. Todd, *Why and how to earn to give*, 80,000 Hours (Mar. 2023), https://80000hours.org/articles/earning-to-give.

close friend from Stanford "remember[s] feeling frustrated on more than one occasion that an otherwise intelligent young woman had what seemed to me to be sub-optimal judgment when it came to romantic relationships." *Id.*

### C.    Jane Street

During her junior year at Stanford, Caroline's burgeoning commitment to EA led her to apply to paid internships, in which she could earn money to donate.  Caroline had no intrinsic interest in finance at the time, but a job in finance seemed to her like one of the best ways to earn significant amounts of money, which she could then give away to the public health and animal rights charities she thought would be most helpful.  *See* Ex. I (S. Fisher) at 2 (explaining that "Caroline planned to donate most of her salary to charity," much to the "exasperat[ion]" of her mother).  After applying to internships at technology and finance companies, Caroline received three offers from financial companies.  She chose to spend her summer at Jane Street Capital, because it seemed like the most fun and interesting of her options.  So, in June 2015, Caroline moved to New York City to spend the summer as a trading intern at Jane Street.

It was during this summer internship that Caroline first met Mr. Bankman-Fried, who had been working as a full-time trader at Jane Street for about a year.  *See* Tr.642:22.  Caroline recalls that she and Mr. Bankman-Fried first met during a mock trading exercise, for which he was serving as a coach.  Caroline knew that Mr. Bankman-Fried—another child of two professors—also subscribed to EA, and they immediately bonded over this shared interest.  Caroline recalls getting to know Mr. Bankman-Fried during a Jane Street-sponsored dinner held at a Brazilian steakhouse, at which they bonded over their mutual vegetarianism.  Caroline developed a crush on Mr. Bankman-Fried during this time.  However, nothing came of these feelings during Caroline's

summer internship.  Mr. Bankman-Fried worked on a different trading desk, so they interacted relatively infrequently.

During her summer internship at Jane Street, Caroline learned how to think like a trader, which meant becoming comfortable with taking risks.  Caroline recalls being "risk averse" when she started, as most people are, but Jane Street created an environment to train interns to think principally about maximizing the expected value, or "EV," of their trading strategies and not to focus on what they might lose.  *See* Tr.694:13-18.  Jane Street inculcated this "risk neutral" mentality in part through formal training, like mock trading sessions; Caroline recalls getting nervous and freezing up, unable to do quick calculations under time pressure during trading simulations.  Jane Street also cultivated a culture of risk taking, whether through games or by constantly betting on little things, like facts people wondered about or had forgotten.  Caroline was familiar with the concept of "expected value" before her summer at Jane Street—"expected value" is a fundamental concept in statistics, a key tool in economic modeling, and an element of EA ethics—but Caroline does not recall casually using the concept of "EV" to structure her thinking before working at Jane Street.  Caroline's training and trading experience at Jane Street taught her to focus only on a trading strategy's EV and not to focus on potential losses.

Caroline enjoyed her summer at Jane Street, which stimulated an interest in finance.  But Caroline recalls being concerned that she would not get a full-time offer.  Caroline arranged to stay at Stanford for a fifth year for a master's degree program in computer science, because this would make her eligible for another Jane Street internship after her senior year.  PSR ¶87.  Caroline again interned at Jane Street in the summer of 2016.  But her worries proved unfounded—within weeks of starting her second internship, Jane Street asked Caroline to forego her master's program and to take a full-time position as an entry-level quantitative trader.  *See id.*  She agreed.

13

Caroline started her first full-time job, as an assistant quantitative trader on the equities desk at Jane Street in fall 2016. *See* Tr.647:19-20. Her responsibilities remained limited during the roughly one-and-a-half years she worked at Jane Street. She contributed to the development and testing of the firm's algorithmic trading models, but Caroline was never responsible for making important trading decisions. Caroline neither managed funds for any client nor allocated Jane Street's proprietary capital. Caroline did not interact with any other external parties, clients, investors, lenders, or trading counterparties. She did not supervise any employees, hire or fire anyone, set any person's compensation, or handle any disciplinary matters. Caroline did not set or enforce any corporate policies, and she had no interaction with legal or compliance functions, other than attending the basic training programs required for all entry-level traders.

Caroline's choice to work in finance surprised many who had watched her grow up. *See, e.g.*, Ex. C (A. Ellison) at 2. "Candidly, I was fairly surprised when I heard that she was planning on going into finance," her uncle writes. Ex. J (M. Ellison) at 2. "I always assumed she would eventually be a professor or go into government and work on something like cryptology." *Id.* Caroline's friends and relatives uniformly insist that Caroline was not motivated to go into finance by getting rich—at least not to use the money for herself. "Growing up, Caroline … never seemed to be interested in being wealthy, buying expensive clothes, jewelry or cars. She actually always seemed to be very conservative about money and never appeared to feel a need to impress anyone in anything outside of academics." *Id.* at 1. A family friend writes: "I have little doubt that Caroline was fully committed to the 'earn to give' philosophy not to generate wealth for herself but to give as much as possible to effective charities." Ex. K (C. Snyder) at 1. Like others, he notes that Caroline's economist-parents "deeply admired her generosity" but were "somewhat distressed that she was giving away most of her [Jane Street] salary each year to charitable causes,"

rather than "save a greater portion to buy a house for herself and provide for her eventual family."

*Id. See also, e.g.*, Ex A (S. Ellison) at 4.

In New York, Caroline's social circle consisted primarily of other Jane Street employees (including Mr. Bankman-Fried), because most of her college friends had remained in the Bay Area. Eventually, Caroline started dating a fellow Jane Street trader who had started around the same time as she. *See* Ex. C (A. Ellison) at 2. Caroline recalls recognizing at the time that this was an unhealthy relationship, but she remembers feeling unable to leave it, largely because they shared a workplace and a primary group of friends. As one of Caroline's close college friends explains:

> "[Caroline] was very serious about the relationship, … [but early on] he said that he did not love her, and that he felt it was unlikely he ever would. Caroline was deeply hurt by this, yet she continued to date him for the better part of a year after that. [Caroline] expressed … that the relationship made her unhappy, but she could not seem to work up the momentum to leave it. It wasn't until the opportunity at Alameda came up that she felt able to break things off with him, and it was not long after that she moved to California. In some ways, it seemed like taking the job at Alameda was an escape from the situation. Her romantic involvement with Mr. Bankman-Fried began within the year."

Ex. H (███████████) at 1-2.

**D.    Alameda Research**

1.    <u>Berkeley, California</u>

In February 2018, Jane Street sent Caroline on a fateful recruiting trip to the Bay Area. While in Berkeley, California, Caroline met up for coffee with Mr. Bankman-Fried, who had left Jane Street to start his crypto trading firm, Alameda Research, several months earlier. *See* Tr.648. During the meeting, Mr. Bankman-Fried explained that trading crypto was a new and exciting business. Mr. Bankman-Fried also described how he had started Alameda Research with other people involved in the EA community, that the company had an EA ethos, and that it was largely funded by wealthy people he knew through the EA movement. Caroline recalls Mr. Bankman-Fried arguing that her joining Alameda Research would be "high EV"—both for her and for the

world—because she had the potential to make a lot more money at Alameda than she could at Jane Street, so she could give more to charity. Caroline was aware of cryptocurrencies, but she was not particularly focused on blockchain technologies or the cryptocurrency sector. Motivated by EA's "earn to give" ethic, Mr. Bankman-Fried's argument made sense to her. As Caroline's sister explains:

> Part of [why Caroline joined Alameda Research] was of course that she thought she would do well at the job and enjoy it, and part was that it would enable her to donate large amounts of money and make the financial system more efficient. A larger part, though, was that she was extremely lonely and was looking for a place to find a new start. At her previous job she had dated a coworker who, after over a year of dating, still was not in love with her. When they broke up, she felt like she had lost the support of her friends, who had been his friends first, and was still forced to see him every day at work. In what seemed to her to be fortunate timing, Sam offered her the job at Alameda, and she took it in large part as a way out of this difficult situation.

> Ex. C (A. Ellison) at 2.

After Mr. Bankman-Fried told Caroline that Alameda Research was having financial success and described its cryptocurrency trading business, Caroline "asked if he wanted [her] to work there[,] and he said yes and gave [her] a job offer. [She] thought about it for a bit and decided to quit Jane Street and move to California to work for him." Tr.648:15-18.

Caroline moved to Berkeley, California and started at Alameda Research as a cryptocurrency trader in March 2018. *See* Tr.648. She was twenty-three. It was her second full-time job. Tr.648:19-20. Nobody could have predicted that in barely three years, Mr. Bankman-Fried would name her Alameda's co-CEO. And it would have been entirely unthinkable to Caroline (or to anyone who knew her) that a little over a year after that, she would be in a courtroom pleading guilty to her role in a multi-billion-dollar fraud.

"Shortly after [Caroline] started, [she] learned"—not for the last time—that Mr. Bankman-Fried had not been honest with her. Alameda "was in much worse shape than [she] realized. Right before [she] had started working there, they had suffered large losses" from errant cryptocurrency

transfers and money-losing trades.    Tr.648:25-649:3.    Mr. Bankman-Fried had previously empowered four people as managers of various parts of the business, and after the losses were detected, Caroline recalls those four people advocated disclosing the losses to the wealthy investors who had lent Alameda Research the capital it used for trading.    Mr. Bankman-Fried refused, saying Alameda would return to profitability.    Eventually, those four employees disobeyed Mr. Bankman-Fried's directives and told the lenders anyway.    As a result, the lenders recalled much of their remaining investment, and (under pressure from Mr. Bankman-Fried) the four managers quit, along with many of Alameda Research's other employees.    Tr.649:3-5.

Mr. Bankman-Fried had not mentioned any of this brewing crisis to Caroline before she left Jane Street and moved across the country to join his company—even though, as he later admitted to Caroline, he had known about it at the time he offered her the job.    *See* Tr.649:6-14. Eventually, Caroline recalls that Alameda recovered the funds lost in the errant transfers and had several months of profitable trading.    Caroline recalls thinking at the time that Mr. Bankman-Fried had ended up being correct and succeeding in business when others doubted him.    Caroline now sees this episode as a missed warning, because it illustrates many of Mr. Bankman-Fried's worst tendencies:  his willingness to lie, his instinct to hide losses and other corporate problems, his unwillingness to consider others' advice, and his insistence on maintaining total control of the company.

Once the immediate crisis passed, Caroline enjoyed her work at Alameda Research for a time.    As a trader, she was responsible for doing research, developing mathematical trading models, and monitoring automated trading systems.    Tr.649:15-19.    She found the cryptocurrency markets interesting, and she liked the fast pace of learning and the quick turnaround from proposing an idea to implementing it.

Caroline initially worked reasonable hours as a cryptocurrency trader. But as her trading skills developed, she was given expanding responsibilities, which dramatically increased her workload. Because "cryptocurrency trading happens 24/7 and is punctuated by unexpected events[,] [s]omeone has to monitor the trading systems at all hours." Ex. G (L. Clark) at 2. In the fall of 2018, Caroline began to feel pressure from Mr. Bankman-Fried to work 80-90 hours per week and to take overnight shifts monitoring the trading systems. As a result, there were several, months-long periods when Caroline would work from 9:00 pm to 9:00 am six or seven days per week. "[T]hose night shifts were hard on [Caroline;] [s]he spent many of them sitting alone, in front of a monitor and a sunlamp, desperately trying to stay awake." *Id.* Her friends would rarely see her. *Id.* She was so busy that, at one point, Mr. Bankman-Fried pressured her not to attend her uncle's funeral after his unexpected death, even though it was being held just a few hours away, arguing that it was more important for her to stay at the office and work. (She ultimately attended the funeral anyway, wanting to support her father during a very difficult time.)

Caroline struggled to keep up, even as Mr. Bankman-Fried pressured her to work more, and to take on more night shifts. Caroline recalls that Mr. Bankman-Fried suggested she obtain a prescription for the amphetamine Adderall to stave off fatigue. Amphetamine use was common at Alameda; Caroline had no trouble obtaining a prescription from the same psychiatrist used by Mr. Bankman-Fried, his brother, and others in his orbit. Over time, Caroline increased the amount and the frequency of her Adderall use. *See* Ex. AM (Reflections on Vacation, Mar. 18, 2022) at 1 ("The amount of adderall I've been taking has crept up slowly over the past couple years from 10 -> 15 -> 20."). In April 2022, while reflecting on why she was feeling bad, and bad about herself, Caroline wondered if "maybe I'm hitting issues with adderall tolerance," because "my usual dose doesn't give me the confidence and motivation it used to [] but also if I try taking more it makes

me jittery/anxious." Ex. AN (Thoughts 4/15) at 1. At the time, she considered "tak[ing] time off work and detox[ing] from adderall." *Id.* at 2. Reflecting now, Caroline believes that this amphetamine use made her more risk-seeking, more focused on the task at hand but less thoughtful and reflective. It narrowed her focus to completing whatever task Mr. Bankman-Fried had assigned her and left her less inclined to step back and think about whether the situation made sense.

Caroline's work relationship with Mr. Bankman-Fried was complicated by her romantic feelings for him. Several months after starting at Alameda, Caroline's crush on Mr. Bankman-Fried returned, and he seemed to reciprocate. Around September 2018, Caroline told Mr. Bankman-Fried about her feelings. He proposed they have sex, but Caroline refused, because he was dating someone else. About a month later, however, Mr. Bankman-Fried's other relationship ended, and a day after that, he began a sexual relationship with Caroline. *See* Tr.650:2-10. From the start, Mr. Bankman-Fried's behavior was erratic and manipulative. He initially professed strong feelings for Caroline and suggested their liaison would develop into a full relationship. But after a few weeks, he would "ghost" Caroline without explanation, avoiding her outside of work and refusing to respond to messages that were not work-related. One day in late 2018, Mr. Bankman-Fried moved to Hong Kong for several months without telling Caroline. When he returned, he apologized and rekindled their relationship, only to ghost her again in the same way a few weeks later. This cycle repeated itself several times. Throughout this period, Mr. Bankman-Fried remained Caroline's boss, retained the title of CEO of Alameda Research, and insisted on keeping their relationship a secret. *Cf.* Tr.684:22-25.

2.    Hong Kong

Starting in late 2018, Mr. Bankman-Fried spent an increasing amount of time in Hong Kong, seeking to build connections with East Asian cryptocurrency companies and to fundraise. *See* Tr.2312 (Bankman-Fried).  Eventually, Mr. Bankman-Fried, Gary Wang, and Nishad Singh obtained investments from Binance and others, and they began building the FTX.com exchange platform.  *See* Tr.2313 (Bankman-Fried).   Caroline was not involved in this effort, or in building the back door that allowed Alameda to borrow from FTX.  *See* Tr.660:8-13.  During this time, Mr. Bankman-Fried occasionally returned to check in on Alameda Research's offices in Berkeley, and Caroline twice visited the growing office in Hong Kong.  Eventually, in the second half of 2019, Mr. Bankman-Fried pressured Caroline and other Berkeley-based employees to move to Hong Kong.  Although Caroline did not want to leave her friends, she relented and moved to Hong Kong in November 2019.  PSR ¶ 76.

In Hong Kong, Caroline lived in a "bubble," centered on Mr. Bankman-Fried.  Ex. F (M. Dinsmore) at 2.  Other than colleagues who also worked for Mr. Bankman-Fried at FTX and Alameda Research, the only people Caroline knew in Hong Kong were some friends who worked in the Jane Street office there—and they were roommates of Mr. Bankman-Fried.  By this time, Caroline was responsible for assigning shifts among the Alameda Research traders, but "she often gave overnights to herself because nobody else wanted to do them."  Ex. G (L. Clark) at 2.  As a friend and colleague recalls, "[i]t became a running joke among those … of us with day jobs that we never knew when or if we would see her."  *Id.*  Caroline's isolation was exacerbated when, soon after moving to Hong Kong, the COVID-19 pandemic set in, causing travel between the United States and Hong Kong to become very difficult.  Caroline's childhood friend described how Caroline effectively disappeared during this time:

[I]t surprised me when, around the time she joined Alameda, Caroline seemed to pull away from many of the people close to her.  Once she moved abroad, she seemed to vanish; I certainly lost contact with her, and I gathered from a number of her friends that she was increasingly isolated in a bubble of people surrounding Sam Bankman-Fried, their work, and effective altruism.  This was especially strange to me because it seemed so out of sync with Caroline's earlier priorities, namely ideas and people.  I had always assumed Caroline would be a professor or perhaps do mission-driven nonprofit work, and instead she was involved in high-risk trading, even though she had never expressed any desire for financial gain to me.  I had always assumed Caroline would be surrounded by family, friends, and community, but instead she was living in seclusion from her natural environment.  The further she went into this bubble, the less she resembled the Caroline I had known before— and the Caroline she is today.

Ex. F (M. Dinsmore) at 2; *see also* Ex. I (S. Fisher).

Caroline's writing from that time reflects the emotional and psychological toll exacted by her work, her isolation, and her complicated relationship with Mr. Bankman-Fried.  In a digital file titled "My Life" that she wrote during the summer of 2020, during her first trip back to the United States after moving to Hong Kong, Caroline described "bouts of feeling lonely" and "bouts of feeling like my life is dark and hopeless":

**This really needs to stop.**  I think my mood for the past couple months qualifies as borderline clinical depression…. It definitely makes me less effective at work.  It also just sucks.  I'm not willing to feel like this long-term and need to do something to stop it, one way or another.

Ex. AL (My Life) at 1.

Caroline identified as "potential culprits" her "work stress," "isolation in Hong Kong," and "Sam."

*Id.*  Caroline continued her "introspection":

I wonder if maybe a lot of stuff traces back to feeling romantically rejected by Sam.

I think when Sam and I are sleeping together, or are in "flirty mode," I feel better about work and life, and don't have the same negative spirals.

A lot of what stresses me out about work is specifically failing Sam, or Sam's disapproval or something.  I get easily upset when he disagrees with me or criticizes me, in a way that I don't think I get upset if other people do the same things.  Maybe I feel like:  Sam is rejecting me for not being good enough, and then everything else he says or does is just rubbing this in.

*Id.* at 3.

Caroline contemplated quitting Alameda Research:

> Part of me feels like all this introspection. this "I have to work through my feelings," thinking about exercise and therapy and whatever are just dumb, when I'm fighting a really uphill battle to be happy or even okay in this situation and I should just quit.

> Partly I'm not sure why I don't want to quit, and I'm worried the reasons to stay are all generated within the framework of "be good enough for Sam" making them suspect.

> *Id.* at 5.

Caroline did not quit, nor did she move back to Berkeley.

Just before her trip to the United States, Caroline recalls Mr. Bankman-Fried asked to visit her apartment for a discussion. After he rambled for a while, Caroline said she had expected him to ask her to start a real relationship. Mr. Bankman-Fried said he wanted to have sex, but that he was not interested in any commitment. Caroline refused. However, as soon as she left Hong Kong, she recalls Mr. Bankman-Fried started messaging and calling her, and he eventually proposed that they begin a real relationship. The two exchanged several more, long messages, with Caroline questioning the wisdom of starting a relationship and Mr. Bankman-Fried professing to love her and saying he wanted to be with her forever. Caroline was eventually convinced, and after she returned from visiting the United States, they started dating. *See* Tr.650:8-9. However, Mr. Bankman-Fried again insisted on keeping their relationship secret. *See* Tr.684:24-25. He rarely agreed to go out or spend time together, and he refused to share with Caroline his thoughts, feelings, or even news of his daily life. Caroline described to a friend her relationship with Mr. Bankman-Fried as "asymmetric," a pattern exacerbated by their lopsided power dynamic at work, where they spent most of their time. Ex. H (██████████) at 2. A college friend recalls "in July 2021, after receiving some kind of work feedback, [Caroline] mentioned, 'having this boss-employee dynamic where Sam tells me I'm doing something wrong just makes our relationship weird." *Id.*

Over the following year, Caroline tried to break up with Mr. Bankman-Fried repeatedly, "but a few words from him would change her mind." *See* Ex. H (███████████) at 2. Her friend describes Caroline as "like someone who says they want to give up smoking but can't seem to stop sneaking cigarettes." *Id.* Caroline "talked about breaking up with him a lot." *Id.* In July 2021, Caroline messaged a college friend about the challenge of leaving Mr. Bankman-Fried:

> There's definitely a part of me that feels relieved by the idea of us breaking up which is maybe a sign that we just should …. It just feels like there are so many worries and questions and confusions right now, and breaking up would just get rid of all of them and things would be simple and easy. But also obviously there's a part of me that feels really sad about it, and like, is avoiding even thinking about not being with him anymore because the idea feels too horrible. Also [to be honest] it would kind of fuck up my whole life, like I work with him, I sit 5 feet away from him, my main friend group is his roommates and their other friends.

*Id.* (quoting message from Caroline).

Caroline did eventually try to break up with Mr. Bankman-Fried, later in summer 2021, when she was about to leave Hong Kong for a trip to the United States. *See* Tr.650:9-10. Caroline recalls planning to take some time to herself, back in the United States, to consider whether to quit Alameda Research. After Caroline broached the topic of ending their relationship, Mr. Bankman-Fried proposed they instead take a "break" to think about it while she traveled. Caroline recalls that Mr. Bankman-Fried had repeatedly said that he did not want to publicly date an employee. So, when Mr. Bankman-Fried messaged her during her trip and proposed making her co-CEO of Alameda, she took this as a positive signal that he might be willing to openly acknowledge their relationship; she decided not to quit and returned to Hong Kong. But after she had gone through Hong Kong's lengthy COVID-19 quarantine process and was able to see Mr. Bankman-Fried again in person, he said he had changed his mind. Caroline recalls him saying that he thought she had been right earlier, and they should just break up. At that point, having just been publicly named

23

co-CEO and getting through Hong Kong's quarantine process, Caroline recalls feeling that she

was stuck again at Alameda Research.  A colleague in Hong Kong recalls:

> In September 2021, when she and Sam broke up, she told me she was miserable.  Of course!
> She worked for a firm owned by her ex-boyfriend, in an industry that valorized him.  "So
> why not move back to Berkeley?"  I asked her.  She was rich, talented and smart.  I thought
> she could do great things.  To this day, I don't know why she didn't, but I wish she had.

Ex. G (L. Clark) at 3.

3.    Nassau, Bahamas

Around the time that Caroline broke up with Mr. Bankman-Fried, he unilaterally decided

to move the joint headquarters of Alameda Research and FTX again—this time to the Nassau, in

the Bahamas.  Again, Mr. Bankman-Fried pressured Caroline to move along with him.  PSR ¶ 76.

This move only deepened Caroline's envelopment in Mr. Bankman-Fried's world.    From

Caroline's perspective, Hong Kong had at least been a big city with many things to do and at least

a few friends who did not work for Mr. Bankman-Fried.  In the Bahamas, Caroline lived on a small

island where the *only* people she knew were employees of FTX or Alameda Research, and the only

activities were working and hanging around the development where they all lived in shared

apartments that Mr. Bankman-Fried had directed the companies to purchase.  Caroline recalls this

move pushed her closer to the other people at FTX and Alameda Research and further cut her off

from the rest of the world.

Caroline's living situation in the Bahamas exacerbated the complicated dynamics between

her and Mr. Bankman-Fried.  Shortly after arriving in the Bahamas, Caroline asked several

colleagues if they wanted to share a house.  But soon thereafter Mr. Bankman-Fried approached

the same people to live with him.  Caroline opposed cohabitating with Mr. Bankman-Fried (they

had just broken up), but it was clear that her FTX colleagues would choose to live with FTX's

CEO if forced to pick between them.  Caroline thus resigned herself to living alone, even though

she predicted this would lead to her being excluded from her principal group of friends in the Bahamas. But then, Mr. Bankman-Fried proposed that he and Caroline resume dating—this time without keeping it secret. *See* Tr.684:25-685:3. Thinking this signaled that Mr. Bankman-Fried was committed to a more normal relationship, Caroline agreed. *See* Tr.650:9-10. Caroline nevertheless recognized quickly that this relationship was still unhealthy: When she told a college friend in December 2021 "they had gotten back together …, she commented, 'Maybe it's a dumb idea.'" Ex. H (▮▮▮▮▮▮▮▮) at 2. Shortly thereafter, Caroline moved into a shared bedroom with Mr. Bankman-Fried at the "Orchid" condo at The Albany. *See* Ex. M (A. Yedidia).

By the time she moved to the Bahamas, Caroline had become wealthy, at least according to her FTX.com user account. *See* Tr.1004:7-10. During the summer of 2021, Mr. Bankman-Fried had appointed Caroline to be co-CEO of Alameda Research, alongside Sam Trabucco, *see infra* pp.54-55. Mr. Bankman-Fried did not increase Caroline's base salary of $200,000, which had remained the same since she was hired. Tr.685:4-9. But Caroline also received twice-yearly discretionary bonuses, composed of U.S. dollars and FTT, deposited into her FTX.com user account. *See* Tr.685:10-22.[4] Caroline was also given the opportunity, along with other FTX and Alameda employees, to purchase locked SRM tokens at a preferential initial price. These SRM tokens soared in value and constituted the bulk of Caroline's wealth at its peak, but they were only useful to Caroline if Mr. Bankman-Fried allowed her to access them: Mr. Bankman-Fried had arranged the transaction so that Caroline could not sell or transfer the locked SRM tokens without his consent. After she was appointed co-CEO, Caroline asked Mr. Bankman-Fried to be given some equity in Alameda Research, but he refused. *See* Tr.686:1-5.

---

[4] As a component of her bonus payments, Caroline also received FTX equity, which she never monetized and is now worthless. *See* Tr.686:9-12.

Mr. Bankman-Fried had sole discretion to set Caroline's bonus.  *See* Tr.687:13-14.  Mr. Bankman-Fried's unpredictable payment of her bonuses would, at times, leave Caroline feeling vulnerable and serve as a reminder of his authority.  For instance, in early 2022, when Caroline was due her bonus for the second half of 2021—her first bonus as co-CEO—she recalls that Mr. Bankman-Fried declined to inform her of the amount or make any payment for months after Caroline understood other Alameda and FTX employees received their bonuses.  Caroline perceived this delay as another stark reminder that, although her title was "Co-CEO," everything at FTX and Alameda was subject to Mr. Bankman-Fried's whim.  *Cf.* Tr.687:12-14 ("[H]e was the person I officially reported to.  He owned the company.  And he was the one who set my compensation and had the ability to fire me if he wanted.").

Despite the value of her FTX.com user account, Caroline never lived an extravagant life. As a colleague who lived with Caroline in the Bahamas explains:

> At the peak of Alameda's success, Caroline lived a comfortable life but not a flashy one. One reason we remained friends despite her seemingly immense wealth was because she never bragged about it. She didn't fly private jets, or sponsor celebrity galas, or buy a yacht. Once she asked me for my thoughts on how she should redecorate her room in the Bahamas. I remarked that the wealthy people we knew in New York hired interior designers and paid tens of thousands of dollars for the service. In the end, she decided that a $150 online design service was good enough for her.

> Ex. G (L. Clark) at 2.

At no point did Caroline buy real estate, vehicles, designer clothing, or other luxury goods.  As her mother explains:

> Caroline … has always shopped at The Gap, wears a threadbare coat and shoes that are falling apart, and rarely chooses to wear jewelry—she finds it wasteful to spend money on luxuries when there are people in the world who do not have enough to eat.  (I have, on multiple occasions, felt compelled to buy her a decent pair of shoes so that she did not permanently damage her feet, even when her net worth was so many times mine.)  While at Alameda, Caroline did not buy lavish gifts for us or much at all for herself, refusing even to purchase a modest apartment or house when she had plenty of money, despite our exhortations that she should do it at least to diversify her portfolio.

Ex. A (S. Ellison) at 4.[5]

And while the Orchid condo was a luxurious apartment, her father's sole visit to the Bahamas left him with the impression that "the super-expensive condo was incongruous with how most in it lived":

> Caroline would spend all day and much of the evening at the office sitting at one of the 15-20 desks arranged in a circle a couple feet from each other in a generic office park. In the evening she and her roommates would often cook and eat together—the Bahamas had few vegetarian options—and then perhaps play some boardgames or open their computers and continue working. Caroline did take pride in her new Honda Civic [provided by the company for her use], having never before (or since) had a car, but her phone might have been her second-most valuable possession.

Ex. B (G. Ellison) at 2.

The only significant purchase Caroline made while she worked at Alameda Research was $10 million in shares in the AI company Anthropic, which she viewed as an investment in promoting the safe development of AI. *See* Tr.685:17-19. This proved to be a good investment; the shares have soared in value since Caroline purchased them. The Anthropic shares provide the bulk of the value of Caroline's anticipated settlements with the government and the FTX Debtors. *See infra* pp.60-61. Caroline also donated millions of dollars to charity, though she took no meaningful steps to publicize those donations, and "none of [it wa]s performative.[6] Ex. A (S. Ellison) at 4; *see* Tr.685:20-22. As her mother explained:

> She does not behave this way for credit or accolades or to shame others—she never draws attention to her choices and, in fact, often operates below the radar. We only know of her charitable contributions, for instance, because occasionally a receipt would arrive in our mail if she did not have a permanent address to send it to, and we asked her about it.

---

[5] Caroline made a $100,000 loan to her parents to assist with home renovations. *See* Tr.685:19-20.

[6] Some of those donations were made to donor-advised funds; to the extent money remained in those donor-advised funds at the time of Alameda's bankruptcy, it has been or soon will be returned to the FTX Debtors. *See, e.g.*, *In re FTX Trading Ltd*, No. 22-11068 (JTD) (Bankr. D. Del. Feb. 29, 2024) Dkt. 8281.

Ex. A (S. Ellison) at 4.

Caroline also did not attempt to amass celebrity or political power—nor did Mr. Bankman-Fried choose to elevate Caroline in his political operation.[7]

Mr. Bankman-Fried also excluded Caroline from the many glitzy events he sponsored and attended and the meetings he had with visiting celebrities, even when they were publicly dating. For instance, shortly before they broke up for the last time, Mr. Bankman-Fried received an invitation to attend the 2022 Met Gala at the Metropolitan Museum of Art in New York; Caroline was excited and asked if they could attend together. Mr. Bankman-Fried told Caroline that was "not going to happen," and he said he did not want to be seen publicly with her. Similarly, when a friend mentioned that she had seen on social media that Mr. Bankman-Fried had attended the 2022 Super Bowl, she was embarrassed to admit that she had not been invited. Even at the lavish, multi-day 2022 "Crypto Bahamas" conference, which occurred around the time of their breakup, Mr. Bankman-Fried did not invite Caroline to attend the events, dinners, and parties he arranged with celebrities and politicians.

In or around late-April 2022, Caroline decided to break up for good with Mr. Bankman-Fried. As before, Caroline "wanted more from [the] relationship but often felt like he was distant or not paying attention." Tr.684:16-17. As always, the personal and professional aspects of their relationship were inextricably intertwined. Mr. Bankman-Fried remained Caroline's boss, and she continued to communicate regularly with him on work-related topics, even as it became increasingly difficult for Caroline to spend time around him. Indeed, in the same conversation in

---

[7] Caroline twice withdrew funds from her FTX.com user account to make donations to political action committees that assisted politicians supportive of pandemic preparation at the recommendation of Mr. Bankman-Fried's brother. However, Caroline donated her own funds in her own name, and she did not leverage those donations to engage with politicians.

which they decided to break up, Caroline discussed how it would be hard for her to continue working for Mr. Bankman-Fried, and that she was feeling burnt out and no longer enjoying her job at Alameda Research. However, Mr. Bankman-Fried talked Caroline into staying. Lurking beneath these conversations was their shared understanding that Mr. Bankman-Fried's strategy— plowing billions of dollars into illiquid "venture" investments, financed by open-term loans—left Alameda Research vulnerable to a crisis of confidence and, ultimately, to its collapse. She recalls Mr. Bankman-Fried telling her that it was a bad idea to quit, that she was very important to FTX and Alameda Research, and that things would get much worse at FTX and Alameda Research if she were not there. In particular, Mr. Bankman-Fried told Caroline that if she quit, it could be interpreted as a signal that there was something wrong with the company. She also recalls Mr. Bankman-Fried also appealed to her EA ethics, arguing that she was "worth more" to the world if she remained at Alameda Research—*i.e.*, working for him. For several months at this point, her co-CEO, Mr. Trabucco had been spending more time on his yacht than working for Alameda Research, (though that fact had been concealed to avoid undermining confidence in Alameda), and so Mr. Bankman-Fried told Caroline that there was no one well positioned to take over as CEO of Alameda Research if she left, no one that he could "trust" as much as he trusted her.

At the time, Caroline felt flattered by Mr. Bankman-Fried's "trust," and she did not want to be responsible for triggering the downfall of Alameda Research and FTX, which Mr. Bankman-Fried suggested might happen if she quit. *See* Ex. E (███████████) at 2 (Caroline "didn't know how to extract herself without feeling like she was letting down her friends and employees."). Caroline now sees his "trust" differently. Caroline now understands that Mr. Bankman-Fried "trusted" that she looked up to him so much, that she had such deep and longstanding feelings for him that she would do things if he asked her to—even things that she knew were wrong. Now,

Caroline perceives that "trust" as an expression of Mr. Bankman-Fried's confidence that he could control her, that she would keep his secrets, that she would be obedient.

Caroline became increasingly unhappy during the summer and fall of 2022, and she eventually had another conversation with Mr. Bankman-Fried about "want[ing] to quit." Tr.1102:2. Caroline recalled that "he told me that I couldn't [quit], that I was too important to keep at Alameda, and he thought I needed to stay at Alameda." Tr.1102:2-4. As Caroline testified, she again declined to resign "[b]ecause I trusted his opinion, and I didn't want FTX and Alameda to collapse. If he thought that my resigning might cause [the companies to collapse], then I didn't want to do that." Tr.1102:6-8.

## III.    OFFENSE CONDUCT

Of course, FTX collapsed anyway. FTX's collapse was immediately precipitated by a crypto-industry website (CoinDesk) posting a copy of Alameda Research's balance sheet on November 2, 2022. *See* Tr.891-893. Although the balance sheet "was dishonest," in that "it understated the true extent of Alameda's risk, … it still showed that Alameda was in a fairly risky position" and that it was more intertwined with FTX than the public previously understood. Tr.893:4-6. The collapse of FTX.com, which followed a massive withdrawal of customer funds from FTX, revealed that Alameda Research had misappropriated customer and investor funds from FTX, misrepresented its financial condition to lenders, and engaged in financial transactions designed to further and to obscure these crimes. Caroline pled guilty to her participation in these crimes.

"[F]rom … the founding of FTX, [Mr. Bankman-Fried] had talked about"—and used— "FTX [as] a good source of capital for Alameda." Tr.718:3-4. Alameda Research "ultimately took around $14 billion" "from FTX customers and used it for [Alameda's] own investments and to repay debts that [it] had." Tr.644:16-645:13.

Alameda Research obtained FTX customer money in two ways: it "received FTX customer funds directly into [its] bank accounts as part of the FTX fiat deposit system," and it "had access to an essentially unlimited line of credit on FTX." Tr.644:21-23. The trial evidence conclusively established that Mr. Bankman-Fried "was the one who set up the systems that allowed Alameda to take the money, and he was the one who directed [Caroline and others] to take customer money" to be used for purposes that he determined. Tr.645:1-3.

*First*, starting "as early as 2020," when Caroline was still just a cryptocurrency trader and Mr. Bankman-Fried was CEO of both Alameda Research and FTX, Alameda began receiving FTX customer fiat deposits into bank accounts owned by deceptively named subsidiaries, including "North Dimension." Tr.654:22-655:3. Caroline was not involved in setting up the North Dimension system, but she eventually supervised the Alameda Research Operations team, which reconciled FTX.com customers' fiat deposits and withdrawals with bank records. *See* Tr.657. By the time Caroline was co-CEO and deactivated the North Dimension system, *see* Tr.1042:19-24, Alameda Research had received billions in FTX.com customer funds via this route, and Alameda had withdrawn some of that money "to other exchanges" for trading, "spent [it] on expenses," "used [it] to repay loans," and "used [it] for investments." Tr.655:14-656:14.

*Second*, Alameda had a secret "line of credit on FTX that allowed [it] to borrow cryptocurrency," *i.e.*, "a setting" in the computer code that ran the FTX.com trading platform "that allowed [Alameda Research] to withdraw coins from [its] account, even if [it] didn't have them …, or to sell them again, even if [it] didn't have them." Tr.658:12-21. Moreover, Alameda Research did not need to post collateral or to pay interest on negative balances, was not subject to margin calls, and was exempt from FTX.com's auto-liquidation protocols. Tr.659:9-660:9. Caroline learned about these features sometime around when Alameda Research's FTX.com account was

first set up.  *See* Tr.660.  As she gained responsibilities, Mr. Bankman-Fried instructed Caroline "to use" Alameda's special line of credit "to make profitable trades that [it] wouldn't have been able to make otherwise" and not "to keep any more money on FTX beyond" what was necessary "so that if customers were withdrawing that [FTX] would be able to process those withdrawals." Tr.661:4-7, 663:17-18.  Mr. Bankman-Fried also directed Caroline and Mr. Trabucco in the summer of 2021 to draw approximately $1 billion from Alameda's special "line of credit" to fund Mr. Bankman-Fried's plan to repurchase from Binance approximately $2 billion in FTX equity. *See* Tr.666-669.

Alameda Research's most significant use of FTX customer funds came in June 2022, when a broad dislocation in cryptocurrency markets led third-party lenders to recall most of the loans they had extended to Alameda.  *See* Tr.753-754.  These loans totaled billions of dollars, and because "the majority of [the] loans were open-term loans, … the lenders could ask for them back at any time and Alameda would have to repay." Tr.754:10-12.  But against Caroline's advice, Mr. Bankman-Fried had used billions of dollars of these open-term loans to make illiquid "investments" and "for loans … to Sam, Gary, Nishad, and other entities owned by Sam," and "Alameda had lost a lot of money in the cryptocurrency market downturn," so Alameda "didn't have the liquid assets to pay all of the money back." Tr.761:14-762:16.  Ultimately, after several conversations that also included Mr. Wang and Mr. Singh, Mr. Bankman-Fried directed Caroline "to borrow money using [Alameda's] FTX line of credit to repay loans when they were called"— *i.e.*, "to use FTX customer funds to repay [Alameda's] loans." Tr.765:8-14.  Caroline accordingly "continued to direct the Alameda settlement team to repay lenders." Tr.766:1-2.

Although Caroline was not generally involved in Mr. Bankman-Fried's efforts to raise capital for FTX from investors, she was aware that FTX was not disclosing to investors the

existence of Alameda's line of credit.  *See* Tr.666:2-4, 937:2-4.  For instance, in 2020, when FTX was undergoing its first audit as part of Mr. Bankman-Fried's plan "to appeal to potential investors," Caroline asked him "whether [Alameda's] line of credit would show up on the FTX audit because [she] was concerned that … it would raise concerns with investors."  Tr.664:11-665:2.  Mr. Bankman-Fried reassured her:  "No, don't worry, the auditors aren't going to look at that."  Tr.664:15-16.

Caroline also was not generally responsible for communicating with FTX customers—she never worked for FTX—but she knew that Alameda's use of FTX customer funds was not disclosed to FTX customers.  *See* Tr.665:21-23, 824:1-5.  When Caroline did make public statements that FTX investors or customers might hear, she followed Mr. Bankman-Fried's directive not to disclose this unlimited line of credit or other special permissions Alameda Research enjoyed.  *See, e.g.*, Tr.936:20-937:1 (testifying about making "false statements on … Twitter and in [a] Bloomberg article").  She understood that the purpose of these lies was to conceal FTX's close relationship to Alameda from its customers and investors.

By contrast, Caroline was at times responsible for communicating with Alameda Research's lenders, so she was most directly involved in carrying out Mr. Bankman-Fried's directives to make fraudulent misrepresentations to Alameda's lenders.  The principal misrepresentations made to Alameda Research's lenders appeared on Alameda Research balance sheets that Caroline prepared in and after June 2022.  On June 18, 2022, following a week in which Alameda had returned billions of dollars in cryptocurrency loans to third parties using FTX customer funds secretly withdrawn from the FTX.com exchange, Caroline met with Mr. Bankman-Fried, Mr. Singh, and Mr. Wang to discuss a request from Alameda's biggest lender, Genesis, for an updated balance sheet.  *See* Tr.783-785.  Genesis's request had left Caroline "very stressed out."

Tr.784:4. She "wanted to reassure [Genesis] about Alameda's financial state, but the facts were that Alameda was in a very bad situation[,] … had very risky positions on[,] and … had been borrowing increasing amounts of money from FTX customers, and [she] didn't want Genesis to know any of that." Tr.784:5-10.

At the meeting, the group "discussed Alameda's most recent balance sheet, and [Caroline] asked what [she] should say to Genesis, and [Mr. Bankman-Fried] gave some suggestions" about other assets "to put on the balance sheet" that "would make [Alameda's] assets look larger." Tr.784:23-785:9. Caroline did "[n]ot initially" make Mr. Bankman-Fried's suggested changes; she "just prepared a … normal balance sheet" and "sent it to [Mr. Bankman-Fried] and said, 'This is our balance sheet, I think it looks bad, I don't think we can send this to Genesis. Do you agree?'" Tr.785:13-18. He agreed and directed Caroline to "prepare some alternative ways of presenting the information and send them to him." Tr.786:15-16. Caroline then "prepared a spreadsheet with seven different alternative balance sheets" by "doing things like combining categories so that it wasn't obvious that some of [Alameda's] assets were being used as collateral[,] … combining FTT with other cryptocurrencies[, and] … netting out assets against liabilities to make [Alameda's] overall leverage and risk look lower." Tr.786:24-787:13; *see* GX44. After Mr. Bankman-Fried reviewed the spreadsheet, he selected one that falsely "ma[de] it look like [Alameda] had plenty of liquid assets to cover [its] open-term loans." Tr.799:14-15. That "alternative" "netted out the exchange borrows"—*i.e.*, FTX customer assets Alameda had taken—"against the related-party loans"—*i.e.*, transfers of assets from Alameda to Mr. Bankman-Fried (and entities he controlled), to Mr. Singh, and to Mr. Wang—and reclassified "the rest [of the exchange borrows as] long-term loans." Tr.800:5-7. Caroline then "sent [the misleading balance sheet] to Genesis … [b]ecause Sam directed [her] to." Tr.800:12-14.

Caroline also posted a series of misleading tweets on November 6, 2022, in response to CoinDesk publishing Alameda Research's balance sheet. *See* GX875. Caroline had been on vacation when the balance sheet was published, and she had declined to provide a comment to CoinDesk. *See* Tr.892-893. When Caroline returned to work in the Hong Kong office on November 6, customer withdrawals were accelerating and Mr. Bankman-Fried started a Signal chat to discuss with Caroline and several others his "thought that [they] needed to do something publicly to address th[e] concern" in the market "around Alameda's balance sheet." *See* Tr.898:15-17. Mr. Bankman-Fried declined to "be the one to tweet," because he did not "want to be associated with Alameda." Tr.898:20-22. Caroline was reluctant to do it "[b]ecause [she] knew that the purpose of such a tweet would be to try to mislead people and give them false reassurance." Tr.898:24-25. Still, after Mr. Bankman-Fried drafted a tweet and Caroline and others revised it, Caroline acceded to Mr. Bankman-Fried's request and "sent the tweet." Tr.900:25.

## IV.    CAROLINE ACCEPTS RESPONSIBILITY AND COOPERATES

### A.    Caroline Discloses The Fraud

Caroline began the process of accepting responsibility for her crimes on November 8, 2022, three days before FTX and Alameda Research declared bankruptcy. At the time, FTX.com was struggling to process customers' withdrawals. That night, following Mr. Bankman-Fried's announcement that Binance intended to acquire FTX, Caroline told several Alameda Research employees in Alameda's Hong Kong office "that FTX had a shortfall of user funds and that this was caused by Alameda borrowing user funds from FTX to repay its prior loans, and it had used those prior loans to make illiquid investments in various different ventures." Tr.1139:10-14 (Drappi). Caroline also refused to lie on a call with the representative of a wealthy investor, Dustin Moskovitz, whom she had contacted at Mr. Bankman-Fried's request: Caroline explained that FTX needed an "emergency investment" of several billion dollars to reopen withdrawals because

Alameda Research had used customer funds to repay loans taken out to finance illiquid venture investments.  Tr.1088:6-1089:4.

On November 9, 2022, at an all-hands meeting of Alameda Research employees, Caroline explained "that Alameda had made billions of dollars of venture investments and had bought back FTX equity from Binance using open-term loans and that when the loans had been recalled, we had to use or we did use FTX customer funds to repay them, which had caused the shortfall." Tr.1093:23-1094:2.  When an employee asked who was involved in this wrongdoing, Caroline responded immediately and truthfully:  "I talked about it with, like, Sam, Nishad, and Gary," GX433E-T, and that the person "[w]ho made the decision on using user deposits" was "Sam," GX433F-T.  *See also* Tr.1150-1151, 1094:10-12.

Caroline made this disclosure "want[ing] to be honest and open in answering [her] employee[s'] questions."  Tr.1095:6-11.  As the government emphasized in its summation, Caroline made these disclosures "before she had ever met with the government, before she knew there was an investigation."  Tr.3127:16-18 (rebuttal summation); *see also* Tr.1008:21-25. Caroline's explanations to her employees (which were soon reported by the *Wall Street Journal*) are striking for many reasons, not least that Caroline forthrightly disclosed the fraud at the heart of FTX and Alameda Research in the same way that the story would come out at trial more than a year later, and she acknowledged her responsibility for those crimes without reservation.  *See* Tr.3127-3128 (government arguing the same in rebuttal summation).

Caroline's acceptance of responsibility at the November 9, 2022 all-hands meeting reflected her relief at being able to stop lying for Mr. Bankman-Fried.  As Caroline testified:

> I never liked misleading my employees. I felt really bad about it, but I felt sort of trapped
> in the summer of 2022, because I was worried that if I revealed Alameda's actual financial
> situation to anyone, including our employees, that the news would get out and that people
> would withdraw their funds from FTX, causing Alameda and FTX to collapse. By the time

of this all hands … meeting in November, it had already happened, so I felt free to be honest with employees at that point, as … I had wanted to before but felt like I couldn't.

Tr.1096:18-1097:2.

Caroline's relief at being able to accept responsibility for her crimes is also evident from a set of messages exchanged between Caroline and Mr. Bankman-Fried on November 7, 2022.  Tr.914:21. Caroline had messaged him that despite the chaos unfolding around them, she was in "the best mood I've been in in like a year."  GX480D.  Mr. Bankman-Fried thought this was "because shit's exciting," but Caroline wrote:  "I think I just had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening, it just feels great to get it over with one way or another."  *Id.*  At trial, Caroline tearfully explained what she meant:

> To be clear, that was overall the worst week of my life.  I had a lot of mood swings during that week and a lot of different feelings.  But one of the feelings I had was an overwhelming feeling of relief because, as I said, this had been something that I had been dreading for so long, for the past several months.  It's something that had been in my mind every day, worrying about what would happen when the truth finally came out.  And **I felt a sense of relief that I didn't have to lie anymore, that I could start taking responsibility and being honest about what I had done, even though I obviously felt indescribably bad about all of the people that were harmed** and the people that lost their money, the employees that lost their jobs, people that trusted us that we had betrayed.

Tr.915:2-14 (emphasis added).

Caroline's statement at the all-hands meeting triggered a wave of resignations across Alameda Research and FTX.  *See, e.g.*, Tr.1151:22-24; Exs. M (A. Yedidia), G (L. Clark).

### B.    Caroline Assists The Bankruptcy Estate

Following her comments at the Alameda Research all-hands meeting, Caroline had several conversations with Mr. Bankman-Fried, urging him to accept others' advice and declare bankruptcy.  Mr. Bankman-Fried resisted the idea, telling Caroline that FTX was not "at that point yet," because he was still waiting to hear whether "other investors" would rescue his companies. Caroline disagreed, telling Mr. Bankman-Fried that this path was "not likely to fix the problem";

she argued to Mr. Bankman-Fried that declaring bankruptcy would be the "best way to ensure that everyone was treated fairly." FTX, Alameda Research, and affiliated companies declared bankruptcy November 11, 2022. *See* Tr.926:17-19.

Her colleagues' resignations left Caroline as one of the only remaining employees at Alameda Research, which faced the enormous task of gathering billions of dollars in crypto, fiat, and other assets held in a tangle of wallets and accounts at exchanges, brokerages, and banks so that these funds could be secured and ultimately returned to customers, lenders, and investors. "Within twenty-four hours of the commencement of the Chapter 11 Cases, Ms. Ellison began assisting the Debtors' bankruptcy advisors by identifying and securing estate assets." Ex. AI (FTX Debtors) at 2. Although Caroline could also have quit, she remained. She did so neither out of loyalty to Mr. Bankman-Fried nor to cover her tracks; she kept working out of a desire to help address the harm caused by her crimes and to assist bankruptcy counsel in preserving as much value as possible for victims. On November 11, 2022, Caroline decided to return from Hong Kong to the United States and went to stay with her parents. During this time, Caroline "assisted the Debtors' advisors in transferring hundreds of millions of dollars of Debtor cryptocurrency assets from third-party exchanges and accounts to secure cold storage wallets" and "provided information regarding the location of the assets, their approximate dollar value, and contact information for individuals who might be able to assist in preserving them for the estate." *Id.* Her father recalls her single-minded focus on assisting the bankruptcy estate secure assets:

> At that point, she set up a makeshift home office and started having multiple calls with the new FTX management. As parents, we urged her to get herself a lawyer and consult with them on what she should or should not be doing with FTX (and otherwise). But she said she was too busy to try to get a lawyer right away. She backed out of one late-evening errand she was going to run with me, telling me that the bankruptcy team wanted her help with getting Alameda's crypto into cold storage, even though that's something she had mostly relied on staff for, and she'd need to pull another all-nighter. When they cut off contact and fired her a day or two later, she understood completely, but was still

disappointed, worried that there was so much that the team taking over didn't know, and wishing they'd known they could trust that she would help out in any way she could to minimize the damage.

Ex. B (G. Ellison) at 3.

John Ray, the current CEO of the FTX Debtor entities, describes Caroline's "early cooperation []as valuable in helping the Debtors' advisors protect and preserve" "hundreds of millions of dollars in Debtor assets for the benefit of creditors … and understand FTX's systems so that they could begin to institute governance and controls." Ex. AI (FTX Debtors) at 1-2.

A few days after the bankruptcy petition was filed, Caroline had a discussion with Mr. Bankman-Fried, who told her that agreeing to file "was the biggest mistake he had ever made," and that he was supposedly trying to transfer assets to the Bahamian government, so the assets did not get into the control of U.S. bankruptcy estate. In their last conversation, Mr. Bankman-Fried asked Caroline to help him "get assets to the Bahamas," but Caroline refused, telling him that she was "not going to help with that" because she was "interested in cooperating with the U.S. government." Indeed, after FTX and Alameda Research engaged U.S. bankruptcy counsel, Caroline exclusively followed their directions to assist in securing assets.

In the nearly two years since the bankruptcy, Caroline has continued to assist the FTX Debtors however she can. For instance, "through … counsel, [Caroline] has also worked with the Debtors' advisors to answer technical questions and provide information regarding private keys to cryptocurrency wallets that contain estate assets, DeFi positions, FTX exchange internal account information, the use of third-party exchanges for pre-petition trading, and pre-petition auditing practices." Ex. AI (FTX Debtors) at 2. Caroline has "also made substantial productions of documents to the Debtors" and continues to cooperate with the Debtors' investigation and litigation of adversary proceedings against recipients of capital from Alameda Research and FTX. *Id.*

39

C.      **Cooperation with the United States Government**

After Caroline returned to the United States and around the time she was officially fired by the Debtors, she retained counsel and began engaging cooperatively with the U.S. Attorney's Office.

On December 8, 2022, Caroline sat for her first of many proffer sessions with representatives from the U.S. Attorney's Office, the Federal Bureau of Investigation, the SEC, and the CFTC.[8]  Even at that early stage, and lacking access to most Alameda Research documents, Caroline described in detail documents and conversations that would feature prominently at Mr. Bankman-Fried's trial.  For instance, at Caroline's first proffer session, she described accurately and in detail the spreadsheet presenting "seven different alternative balance sheets" that she created at Mr. Bankman-Fried's direction for the purpose of "conceal[ing] the things in our balance sheet that we both thought looked bad."  Tr.786:20-25; *see* GX44.  Caroline explained in her first meeting with the government how Mr. Bankman-Fried had selected the "alternative" balance sheet that "ma[d]e Alameda look less risky" by "net[ing] out the exchange borrows against the related-party loans and then mov[ing] the rest to the long-term loans category."  Tr.798:24-800:7.  At the time, neither Caroline nor the government had possession of this document.  Months later, Caroline identified this otherwise-anonymous spreadsheet for the government in a collection of thousands of documents obtained from the Debtors' files.  This spreadsheet became the centerpiece of the government's case against Mr. Bankman-Fried for fraud and conspiracy against the lenders to Alameda Research.  *See* PSR at 41, Tr.784-804 (describing preparation and transmission of the fraudulent balance sheet).  The inability of Mr. Bankman-Fried's counsel to impeach Caroline

---

[8] The government's seizure of Caroline's phone and computer shortly after she returned to the United States created challenges that made it difficult to meet sooner.

regarding this critical spreadsheet reflects that she was totally consistent in her description of its creation, meaning, and use from her very first meeting with the government through the conclusion of her testimony.  *See* Tr.1069-1074.

In a later meeting, Caroline revealed to the Government that Mr. Bankman-Fried had directed the payment of a bribe to unfreeze Alameda Research accounts on cryptocurrency exchanges based in China.  *See* Tr.827-833, 837-843.  Indeed, the Government "would not have been able to charge [Mr.] Bankman-Fried with lender fraud or foreign bribery had it not been for [Caroline's] information."  PSR at 41.

After providing the government with four proffer sessions over a single week, Caroline entered a cooperation agreement with the U.S. Attorney's Office and pled guilty to seven counts before Judge Abrams on December 19, 2022.  Pained at the harm she had helped to cause, Caroline used her plea allocution as an opportunity to describe her crimes in detail, to accept responsibility, and to apologize:

> I am truly sorry for what I did.  I knew that it was wrong.  And I want to apologize for my actions to the affected customers of FTX, lenders to Alameda and investors in FTX.  Since FTX and Alameda collapsed in November 2022, I have worked hard to assist with the recovery of assets for the benefit of customers and to cooperate with the government's investigation.  I am here today to accept responsibility for my actions by pleading guilty.

> Dkt. 19 at 29:2-9.

Caroline simultaneously entered into consent judgments with the SEC and CFTC and cooperated with these agencies.  *See Securities & Exchange Commission v. Ellison*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 23, 2022) Dkt. 15; *Commodity Futures Trading Commission v. Bankman-Fried*, No. 1:22-cv-10503 (S.D.N.Y. Dec. 23, 2022) Dkt. 26.  Pursuant to these settlements, Caroline accepted lifetime bans from working in the securities or commodities industries, from trading securities or certain cryptocurrencies on behalf of others, and from serving as the officer or director of any public company.  *See id.*  These settlements also provided the framework within which

Caroline proceeded to provide both the SEC and CFTC with information to further their investigations of FTX and other players in the cryptocurrency markets.

Over the nine months between her plea and Mr. Bankman-Fried's trial, Caroline worked diligently to assist the government's investigation into the collapse of FTX and Alameda Research. Caroline met with the government more than twenty times to provide information about the operations of Alameda Research and FTX, to review documents and other evidence collected by the government, and to prepare for her trial testimony.[9]   Caroline also helped the government overcome some of the challenges particular to this case:  Mr. Bankman-Fried's use of ephemeral messaging and the poor record-keeping of his companies.  *See* Tr.825:9-19.  Indeed, the most sensitive communications between Mr. Bankman-Fried and Caroline and among Mr. Bankman-Fried, Mr. Singh, Mr. Wang, and Caroline occurred on Signal threads that were devoid of nearly all messages sent before November 2022.  *See, e.g.*, GX1659.

For instance, Caroline reviewed hundreds of documents collected from Alameda Research's cloud storage account to identify documents that reflected Mr. Bankman-Fried's knowledge of Alameda Research's financial position and his intent for Alameda Research to use FTX.com customer deposits.  Caroline also helped the government's forensic experts calculate Alameda's valuation and the extent of Alameda Research's use of FTX.com customer assets over time.  Parsing Alameda Research's poor internal records was complicated by vague titles and unlabeled calculations on any documents reflecting misuse of customer funds.  *See* Tr.843:22-844:7.  This, Caroline testified, was a result of Mr. Bankman-Fried's repeated directive "that [employees] should be very careful about what we put in writing," because "putting things in

---

[9] Caroline also assisted the government by providing numerous factual proffers through counsel.

writing was one of the primary ways that financial firms got in legal trouble." *See* Tr.825:9-12. Alameda documents also tended to "sp[eak] in coded terms about potential criminal activity," such as in connection with the bribe of Chinese officials. Tr.827:6-7; *see, e.g.*, GX64 ("State of Alameda" document referring to the bribe as "negative 150M from the thing?").

Through her review of Alameda Research records, Caroline identified and explained for the government several vaguely worded documents that became so central to the government's case that they were featured in the government's closing argument. *See* PSR at 41. For instance, Caroline identified for the government the "NAV Minus SamCoins" spreadsheet from fall 2021, in which Caroline analyzed the risks involved in Mr. Bankman-Fried's plan to make an additional $3 billion in "venture" investments funded by open-term loans and backstopped by FTX customer deposits. *See* GX36. She also located the spreadsheet with seven "alternative" presentations of Alameda Research's balance sheet, which she had told the government about in her very first interview. *See* GX44. Caroline also identified for the government critical communications with Alameda Research's counterparties, including chats from mid-June 2022 in which crypto lending desks such as Genesis recalled billions of dollars in loans to Alameda Research. *See, e.g.*, GX1647. And because Mr. Bankman-Fried had long required Caroline to prepare Alameda Research's balance sheets, both for internal and external purposes, Caroline was uniquely able to identify, reconcile, and explain balance sheets that conveyed to Mr. Bankman-Fried the scale of Alameda Research's use of FTX.com customer funds and "loans" to Mr. Bankman-Fried, Mr. Singh, Mr. Wang, and Mr. Salame—but concealed those facts from lenders. *See, e.g.*, GX10, GX11, GX19, GX418, GX419, GX460.

As the Court will recall, Caroline testified at trial for nearly three days. Caroline was able to provide the jury with crucial testimony on two aspects of Mr. Bankman-Fried's mental state.

First, Caroline testified credibly and in detail about numerous communications she had with Mr. Bankman-Fried that definitively established his criminal *mens rea*, including his intent to use FTX.com customer funds for his own purposes via Alameda Research's special access.  *See, e.g.*, Tr.666-670 (testifying about Mr. Bankman-Fried's summer 2021 instruction for Alameda Research to use FTX.com customer funds to repurchase FTX equity from Binance); Tr.695-730 (testifying about Mr. Bankman-Fried's fall 2021 decision to fund $3 billion in "venture" investments with borrowed funds); Tr.784-804 (testifying about Mr. Bankman-Fried's instruction to create "alternative" balance sheets for Alameda Research's lenders and to send a dishonest balance sheet to Genesis); Tr.763-766 (testifying about Mr. Bankman-Fried's instruction for Alameda Research to repay third-party loans with FTX.com customer funds in mid-June 2022).

Second, as Mr. Bankman-Fried's romantic partner and confidant, Caroline memorably testified about Mr. Bankman-Fried's private views on issues like honesty, *see, e.g.*, Tr.807 ("He said that he was a utilitarian, and he believed that the ways that people tried to justify rules like don't lie and don't steal within utilitarianism didn't work."); his goals, *see* Tr.650 ("He was also very interested in politics and talked about wanting to use his money to have influence on politics. He said at one point he thought there was a 5 percent chance he would become president some day."); his personal branding strategy, *see* Tr.863:4-7 ("He said he thought his hair had been very valuable … and that it was an important part of FTX's narrative and image."); and his attitude toward risk taking, *see* Tr.695:1-5 ("[I]n the context of thinking about what was good for the world, [he said] that he would be happy to flip a coin, if it came up tails and the world was destroyed, as long as if it came up heads the world would be like more than twice as good.").  Caroline thereby helped the government establish its central rebuttal to Mr. Bankman-Fried's defense of "good faith" mistake, *see, e.g.*, Tr.3035-3039 (defense summation):

While many aspects of this case have been the subject of unusually keen public attention, the press and internet users have been particularly fascinated with Caroline and her role as a cooperator. The media have aggressively speculated about Caroline's personal history, her romantic life, and her physical whereabouts. As this Court well knows, *see* Dkt. 200 (revoking Mr. Bankman-Fried's bail), "that media atmosphere [was] in part a product of [Mr. Bankman-Fried]'s own creation and of his sustained effort to focus the media on Ellison's personal life and private writings," Dkt. 188 at 3 (government's reply in support of detention). For instance, Mr. Bankman-Fried leaked to the *New York Times* several letters that Caroline had written him about their relationship and that the Court accurately described as being of an "extremely … personal and intimate" nature. Dkt. 224 at 37:10-11. Mr. Bankman-Fried did so in a manner "obviously designed to intimidate, harass, and embarrass someone he kn[ew] [wa]s slated to testify against him." Dkt. 188 at 3 (government's reply in support of detention).[10] And Mr. Bankman-Fried's allies have repeatedly conspired to invade Caroline's privacy. On the eve of trial, for instance, a prominent author published a best-selling book that both quoted from other letters Caroline had written Mr. Bankman-Fried about their dysfunctional relationship and detailed aspects of their sexual relationship. *See* M. Lewis, *Going Infinite* 165-166 (W.W. Norton & Co. 2023). Indeed, the book gallingly includes quotes from Caroline's former psychiatrist, who spoke disparagingly about Caroline's psychological makeup and the "issues [Caroline] wanted to talk about" during "session[s]." *Id.* at 139.[11]

---

[10] *See* D. Yaffee-Bellany and M. Goldstein, *Inside the Private writings of Caroline Ellison, Star Witness in the FTX Case*, N.Y. Times (July 20, 2023), https://www.nytimes.com/2023/07/20/technology/ftx-caroline-ellison-bankman-fried.html.

[11] The psychiatrist, Dr. George Lerner, who had treated both Caroline and Mr. Bankman-Fried, has actively supported Mr. Bankman-Fried in his criminal case. *See* Dkts. 201-1 (letter concerning medication), 407-17 (sentencing letter in support of Mr. Bankman-Fried).

The media fixation on Caroline fostered by Mr. Bankman-Fried has also affected Caroline's personal relationships and family members. The press (and others) have hounded Caroline's parents and sisters, showing up on their doorsteps and revealing the locations of their residences on the Internet.[12] Her family members have also been subject to online harassment and threats. Caroline has effectively lived in hiding since December 4, 2022, when the Internet rampantly speculated on her whereabouts after she was spotted buying a tea in New York City, several blocks from the U.S. Attorney's Office.[13] She has been recognized and approached in public on numerous occasions, and as a result is wary of going out in public. In view of this continual feeding frenzy, numerous otherwise-supportive friends declined to file sentencing letters on Caroline's behalf, explaining they were afraid that even court-ordered sealing would not protect them from doxing.

### D.    Assistance for FTX Customers, the FTX Debtors, And Other Investigations

Caroline has sought to make amends by assisting not just the U.S. government and the FTX Debtors, but *any* entity seeking to investigate the collapse of FTX or recover value for victims. For instance, shortly after Caroline finished testifying in Mr. Bankman-Fried's criminal trial, Caroline reached a comprehensive stipulation of settlement with FTX's customers who are plaintiffs in the multidistrict litigation currently pending before Judge Moore in the Southern District of Florida. *See In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla. Mar. 27, 2023) Dkt. 565-2 at 3-46 (stipulation of settlement, dated Jan. 23, 2024).

---

[12] *See, e.g.*, O. Land, *Who are Caroline Ellison's parents? Fraudster's mom and dad are MIT economists*, N.Y. Post (Dec. 23, 2022), https://nypost.com/2022/12/23/who-are-caroline-ellisons-parents-fraudsters-parents-are-mit-economists.

[13] *See* B. Quarmby, *Alameda ex-CEO Caroline Ellison spotted in New York, Twitter users claim*, CoinTelegraph.com (Dec. 5, 2022), https://cointelegraph.com/news/alameda-ex-ceo-caroline-ellison-spotted-in-new-york-twitter-users-claim.

Pursuant to this proposed class action settlement and subject to approval from the U.S. Attorney's Office, Caroline provided the MDL steering committee with information and documents that supported their filing an amended complaint against people and entities that facilitated the FTX fraud.  *See, e.g.*, *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-3076 (S.D. Fla. Feb. 16, 2024) Dkt. 492-1 at 115-123 (Declaration of Caroline Ellison Regarding Deltec Bank and Trust).  For instance, Caroline provided the MDL plaintiffs with documents and a declaration describing, in detail, how the Bahamian Deltec Bank and Trust provided Alameda with a clandestine line of credit of approximately $2 billion.  *See* Ex. AJ (MDL plaintiffs) at 2.  Moreover, in settling, Caroline sought to preserve her assets for disposition through the forfeiture process, as ordered by this Court and administered by the Department of Justice.

Caroline is also in the process of finalizing a settlement with the FTX Debtors of the adversary proceeding brought against her in the Bankruptcy Court; that settlement will resolve all the Debtors' claims against her and will establish a framework for her "ongoing cooperation" with the Debtors' litigation, investigation, and asset tracing work.  Ex. AI (FTX Debtors) at 2.  Under the contemplated settlement, Caroline will continue to "mak[e] herself available to testify as needed, voluntarily provid[e] documents and information, review[] and clarify[] documents, locate[] and retriev[e] assets, and answer[] questions from the Debtors' advisors."  *Id.*  In connection with this agreement, Caroline anticipates that the FTX Debtors may soon notice her deposition in multiple adversary proceedings regarding companies into which Mr. Bankman-Fried made "venture" investments via Alameda Research entities.

Caroline has similarly assisted the independent examiner appointed by the FTX Bankruptcy Court, including by voluntarily sitting for multiple interviews about Alameda Research and its relationship to FTX.US.  *See* Ex. AK (FTX Bankruptcy Examiner).  Caroline also

provided information to the New York Attorney General's Investor Protection Bureau to assist with a crypto-related investigation.  And throughout this case, Caroline has provided information to the SEC and CFTC to assist their investigations of regulatory violations related to cryptocurrency market manipulation, the FTX fraud, and FTX.US's regulatory compliance. Finally, Caroline has also met with other prosecutors at the U.S. Attorney's Office and in the broader Department of Justice to provide information on other people and entities under investigation, including people who enabled and profited from the FTX fraud, people involved in routing Alameda Research's funds into the U.S. campaign finance system, and cryptocurrency market participants involved in other potential criminal activities.

### E.    Caroline's Efforts To Rebuild Her Life

Since FTX collapsed in November 2022, Caroline has sought new ways to contribute positively to society (in addition to her cooperation with investigations of FTX and Alameda Research).  Caroline's repeated efforts to find a paying job have been unsuccessful because of her notoriety and the uncertainty surrounding her criminal case.  Caroline has therefore focused instead on direct service, volunteering more than 700 hours to community organizations, ███████████ ████████████.  Throughout 2023, Caroline █████████████ she volunteered regularly at a soup kitchen and food pantry, taught adult literacy classes, fostered rescue dogs, served as a volunteer tax preparer for low-income taxpayers, and helped to deliver meals to individuals with chronic illnesses.  *See* Ex. AG (█████████); *see also* Exs. B (G. Ellison), A (S. Ellison), F (M. Dinsmore) at 1-2; PSR ¶79.  ████████████, Caroline has volunteered at least weekly at various organizations to assist low-income people with income tax preparation, to provide GED tutoring in math, to send books to prisoners, and to distribute groceries at a local food pantry.  *See* Exs. AH (████████), AF (██████████████), E (████████) at 1;

PSR ¶79. ███████████ describes her evident passion for performing this direct service to others:

> It has been very good to see Caroline involved in these grounded, positive impact activities. I do not claim to understand everything that went wrong at Alameda and FTX, but it seems clear to me that the extreme level of abstraction was a catalyst for bad decisions. Spending time face-to-face with and befriending real, concrete people that don't necessarily have exactly the same background as her has obviously been very healing.

> Ex. E (█████) at 1.

Caroline has also spent a significant amount of time writing. In particular, she has collaborated with her parents and another professor on a math enrichment textbook for advanced high school students. *See* Exs. B (G. Ellison) at 4, A (S. Ellison), AB (C. Avery). Caroline has also written a novel (unrelated to the facts of this case). *See* Ex. A (S. Ellison) at 5.

Since Alameda Research collapsed, Caroline has been fortunate to draw on a stable and loving support network, including her family and many friends from childhood, who had lost touch with her while she was employed at Alameda Research, *see, e.g.*, Ex. F (M. Dinsmore). Caroline has also drawn comfort from a new partner, ████████████████████████████ ███████████████████████████; PSR ¶76-77. Caroline's friends recognize her new partner as supportive and a positive, grounding influence:

> In October 2022, I learned that Caroline was dating a close friend of mine, someone I had known for five years. I was very happy for her. I said that he was a vast improvement over her ex. I was being sardonic and genuine. Her new partner is honest and has integrity; he finds even the small white lies of corporate politics distasteful. I have known him to be kind, intelligent and empathetic. He has quietly supported her this last year. I believe that this new and kind environment will be good for her.

> Ex. G (L. Clark) at 3.

## V.    THE SENTENCING GUIDELINES AND PROBATION'S RECOMMENDATION

Caroline does not object to the Guidelines calculation of offense level 43 with a criminal history level of I, as set forth in the presentence report. Of the 43 offense level points, 30 levels are attributable solely to the loss table. *See* PSR ¶55. As the Court has noted "there's really no

empirical basis" for the loss table's structure and the Court is not "in any way bound" by the Guidelines calculation. Dkt. 426 at 6:19-23 (Bankman-Fried sentencing). Indeed, even setting aside the issue of cooperation, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Here, the Guidelines sentence of life imprisonment, reduced to the statutory maximum of 1,320 months, is eminently unreasonable.

Notwithstanding the astronomical Guidelines range, the Probation Department's PSR recommends a sentence of time served on each of the counts, and a three-year term of supervised release on each count, all to run concurrently. *See* PSR at 40. The Probation Department does not recommend imposing a fine. *See id.*

## VI.    A SENTENCE OF TIME SERVED IS SUFFICIENT TO COMPLY WITH SECTION 3553(A)

The Court's sentencing decision must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. These factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>> A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> B. to afford adequate deterrence to criminal conduct;
>> C. to protect the public from further crimes of the defendant; and
>> D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [by the United States Sentencing Guidelines];
> (5) any pertinent policy statement [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In considering these factors, the Court must make an independent sentencing determination based on "an individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and impose a sentence that is "sufficient, but not greater than necessary, to comply with" these factors, 18 U.S.C. § 3553(a).

Caroline is acutely aware that "this was a very serious crime," and she recognizes that justice demands that for each defendant, "the judgment has to adequately reflect th[at] seriousness." Dkt. 426 at 56:18-20 (Bankman-Fried sentencing). Indeed, Caroline was the first person in this saga to accept responsibility for their crimes, doing so even before FTX had declared bankruptcy, and she has repeatedly expressed intense remorse for her role. *See, e.g.*, *supra* pp.37, 41. Telling the truth in that Alameda Research all-hands meeting enabled Caroline to extricate herself from the "trap[]" of Mr. Bankman-Fried's influence, Tr.1096:20, and Caroline jumped wholeheartedly into helping to bring victims compensation and justice for the harm she and her co-conspirators have caused.

It is therefore respectfully submitted that, in light of Caroline's immediate and extraordinary cooperation in this case, as well as her personal history and the mitigating factors concerning her role in the offense, sentencing Caroline to time served with a term of supervised release would be "sufficient, but not greater than necessary" to achieve the objectives of the section 3553(a) sentencing factors.

### A.  Caroline's Personal History and Characteristics

Caroline's friends, family members, and former colleagues uniformly recognize Caroline to be a generous, loyal, and conscientious person who thinks deeply about how she can act ethically to have a positive effect on the world. Prior to working at Alameda Research, Caroline does not appear ever to have been in any trouble, whether at home, school, or work. *See, e.g.*, PSR ¶88

("Ellison …[has] never had any disciplinary issues."); *id.* ¶¶66-71 (reflecting no prior criminal justice involvement). The attached letters brim with testimonials to and examples of Caroline acting in a kind and unselfish manner toward her colleagues, her friends, and the world at large. *See generally supra* pp.6-12.

The letters also confirm Caroline's commitment to utilitarian ethical principles, and they describe behaviors reflecting that she understands utilitarianism to require generosity and self-sacrifice, not as a justification to self-aggrandizement or dishonesty. A former colleague recalls a small example of Caroline's sincerity:

> I've spent many nights trying to reconcile the person I know with what I've learned about Caroline during the criminal proceedings. Looking back, I conclude that she valued her own feelings and desires too little. Why else would she work all those night shifts? Once, her great-uncle took us on a tour of Napa Valley in his vintage four-seater Cessna. Before I could say anything, she eagerly jumped into the back and offered me the front seat. She knew that I loved small airplanes. **She said it was the utilitarian thing to do, since I would enjoy the [seat] more**.
>
> Ex. G (L. Clark) at 2-3 (emphasis added).

The record uniformly supports Caroline's testimony that she joined Alameda Research in the first place principally from a desire to earn money to give to charity, not a desire to live an extravagant life, accumulate personal wealth, burnish her public persona, or obtain power. *See supra* pp.15-16.

It is a cruel irony that Caroline's zeal to maximize her positive impact on the world led her to trust and to follow Mr. Bankman-Fried, who attracted Caroline in significant part through his espousal of EA principals and his deployment of utilitarian arguments. At Mr. Bankman-Fried's sentencing, the Court rightly criticized him for treating the world like a "game," for "betting on expected value," and for "viewing the cost of getting caught, discounted by probability … against the gain of getting away without getting caught." Dkt. 426 at 53:16-22. Caroline does not share his worldview. Unlike Mr. Bankman-Fried, Caroline has never suggested that utilitarianism

justifies lying or stealing, and she always thought that his professed "risk neutrality" was dangerous and counseled Mr. Bankman-Fried not to take such extreme risks. *See, e.g.*, Tr.807:8-809:2, Tr.973-974.

Caroline never adopted Mr. Bankman-Fried's ethical views—debating these philosophical issues was a fixture of their time together—but their multifaceted relationship undoubtedly influenced her. After repeatedly advising Mr. Bankman-Fried not to take certain risks and then watching them work out—*e.g.*, building FTX, investing in Solana—Caroline came to increasingly defer to his judgment, even when she knew that what he was proposing was wrong. Her sister describes Caroline as having been "almost in awe of how smart he was," and "[s]he always deferred to him a good deal, both because he was in reality very smart, and also … because he was so good with words, with coming up with arguments quickly and making Caroline feel irrational if she disagreed." Ex. C (A. Ellison) at 3. As Caroline testified, working with Mr. Bankman-Fried "made me more willing to do things like lie and steal over time." Tr.807:22-23. She continued: "When I started working at Alameda, I don't think I would have believed it if you told me that a few years later I would be sending false balance sheets to our lenders or taking customer money, but over time it was something that I became more comfortable with when I was working there." Tr.807:23-808:2.

Caroline's honest explanation of the FTX and Alameda Research fraud during the November 9, 2022 all hands meeting represents not just a pivotal moment in this case—her renunciation of Mr. Bankman-Fried's conspiracy and the beginning of her acceptance of responsibility and cooperation with the appropriate authorities. It is a signal moment in Caroline's life and represents her return to the honest and law-abiding life she led before joining Alameda Research.

B.        **Nature, Characteristics of the Offense**

Caroline served as co-CEO, then CEO of Alameda Research.  But her title belied her actual authority.  As the Court remarked at a sidebar shortly after Caroline left the stand, there was "absolutely no doubt [that Mr. Bankman-Fried] owned the company," and the evidence was overwhelming that Caroline, "the ostensible co-CEO or CEO, r[an] all these decisions through him.  He was obviously the boss."  Tr.1129:3-6.  The government proved at trial that Caroline's "CEO" title was an aspect of Mr. Bankman-Fried's fraudulent scheme.  Specifically, in summer 2021, Mr. Bankman-Fried concluded that "it was important to separate Alameda and FTX more optically and not have him be too officially associated with Alameda," so he appointed Caroline to be the public face of Alameda Research as co-CEO.  Tr.683:16-18.  Caroline continued to "handle[] a lot of day-to-day decisions and responsibilities" for Alameda's market making and proprietary trading businesses, but Caroline "would always ultimately defer to [Mr. Bankman-Fried] if he thought that [Alameda] should do something."  Tr.687:6-9.

Mr. Bankman-Fried unilaterally ran the aspect of Alameda's business that most directly led to its crisis.  As Caroline testified, Mr. Bankman-Fried told Caroline in late 2021 "that he was thinking of making $3 billion more of venture investments," funded by billions more in open-term loans from third-party lending desks.  Tr.703:9-11.  Caroline performed a scenario analysis, embodied in a spreadsheet titled "NAV Minus SamCoins," GX36, and concluded that "making $3 billion more of venture investments and funding that with open-term loans would put Alameda in a significantly riskier position and make it much less likely or almost impossible that we would be able to pay off [its] loans if all of [the] loans were called at once."  Tr.703:18-22.  The analysis assumed that in such a scenario, "Alameda would take FTX customer funds, if they were available, to repay [its] loans."  Tr.705:9-10.  Caroline advised Mr. Bankman-Fried that even if Alameda

Research were to take FTX customer funds, "there was no way we would be able to" repay the loans. Tr.725:19-20. Mr. Bankman-Fried did not dispute Caroline's conclusions, but "he said that he wanted to do it" because "it was high expected value," Tr.704:25-705:1.

Mr. Bankman-Fried and the "FTX Ventures" team implemented this plan in 2021-2022 by routing FTX customer funds and the proceeds of open-term loans through Alameda Research and into "several entities that had Alameda in the name." Tr.869:15-20. Nevertheless, Mr. Bankman-Fried called the investment fund "FTX Ventures" because "he wanted to associate himself more with the venture investing but he didn't want his name associated with Alameda's name." Tr.731:19-25. Caroline was not (to her knowledge) an officer of most of those "ventures" entities, and she generally had no material involvement (and no actual decision-making authority) over the billions of dollars in "ventures"-related spending from Alameda's coffers. Indeed, Mr. Bankman-Fried and his FTX Ventures team stonewalled for months Caroline's requests for information on what these funds had even been used for, leading her to undertake in the summer and fall of 2022 an effort "to track loans that were made by Alameda to related parties and entities." Tr.889:21-22. Through her effort, Caroline and her team tracked down more than $8 billion in payments from Alameda Research to those ventures-related entities, companies Mr. Bankman-Fried had decided to acquire, political lobbying organizations, and FTX executives—billions of dollars to Mr. Bankman-Fried and entities he controlled, hundreds of millions of dollars each to Mr. Singh and Mr. Wang, and $35 million to Ryan Salame. *See* Tr.889-891; GX41.

Caroline did not take any such loans from Alameda Research.[14] Nor did Caroline personally receive ownership of any supposed "venture" investments. *Compare, e.g.*, Tr.640:14-

---

[14] A $3.5 million loan from Alameda was made in Caroline's name "for a gambling company that some people at FTX wanted to start," and she "never really saw or used the money," because "[i]t went straight to … this gambling company." Tr.689:1-7.

17 (Wang); *but see supra* n.14. These facts distinguish Caroline from all the other defendants indicted in connection with the crimes committed at Alameda Research and FTX. *See* Tr.688:18-689:7; GX41 (spreadsheet listing intercompany and founder loans). All of Caroline's compensation during her time at Alameda Research was paid to her at Mr. Bankman-Fried's discretion. Caroline did not pay herself any compensation or use corporate funds to purchase any assets for herself. And Mr. Bankman-Fried pointedly refused to allow Caroline to acquire any equity in Alameda Research, which was at all relevant times owned entirely by Mr. Bankman-Fried and Mr. Wang. *See* Tr.685:23-686:8.

Caroline also was not charged with participating in the campaign finance conspiracy alongside Mr. Bankman-Fried, Mr. Salame, and Mr. Singh. *See generally* Dkt. 8 (indictment). That distinction reflects that Caroline did not make any political donations on behalf of others, and she did not direct Alameda to fund any political donations on her behalf.

As the government argued in closing, Mr. Bankman-Fried's "relationship with Caroline … was important … to understand why he chose her as his front and as his deputy": She was "[h]is girlfriend, the person who deferred to him…—in that relationship [Mr. Bankman-Fried] had all the power." Tr.3123:11-16 (rebuttal summation). Caroline testified about how their "personal and professional relationships affect[ed] each other," and that she was "an unequal partner in [their] relationship" because "the whole time [they] were dating he was also [her] boss at work." Tr.684:13-14, 934:14-21.

Caroline was also woefully (and obviously) unprepared to take on the responsibilities of running a multi-billion-dollar trading firm. Before starting at Alameda (at age twenty-three), Caroline's only prior full-time job was as an entry-level trader at Jane Street. *See supra* pp.12-14. At Jane Street, Caroline had no experience supervising employees, handling client funds,

allocating proprietary capital, managing financial risks, negotiating loan agreements, preparing financial reports, or assessing legal compliance.  *See id.*  Nor did Caroline—who studied highly abstract mathematics, linguistics, and computer science—ever receive any formal training in business, law, compliance, or risk management beyond basic introductory sessions offered to all new hires at Jane Street.  Caroline's relative ignorance on these topics was obviously unhelpful when she faced pressure from Mr. Bankman-Fried to further and to conceal his illegality.

Mr. Bankman-Fried exacerbated this situation by refusing to provide Caroline and her co-CEO, Mr. Trabucco, with any personnel or resources that would have helped them assess Mr. Bankman-Fried's problematic instructions.  For instance, when Caroline and Mr. Trabucco hired a lawyer from outside the company to serve as Alameda Research's general counsel, Daniel Friedberg fired the attorney (on what Caroline understood to be Mr. Bankman-Fried's behalf) a few days after he arrived in the Bahamas, because that attorney had raised questions about the links between Alameda Research and FTX.  *See* First Amended Complaint, *Alameda Research LLC v. Friedberg*, No. 23-AP-50419-JTD (Bankr. D. Del. Jan. 22, 2024) ¶¶181-184.  Caroline also recalls that Mr. Bankman-Fried would react negatively when an employee expressed fear or raised concerns about legal issues, isolating that person by cutting him or her out of important conversations and chat threads.  Having seen this dynamic play out repeatedly, Caroline worried that if she questioned Mr. Bankman-Fried about what they were doing, he would cut her out of his life and companies in the same way.

Caroline has never wavered in accepting responsibility for what she did at Alameda Research and has always "truthfully admitted the conduct comprising the offense[s] of conviction and truthfully admitted … additional relevant conduct."  *United States v. Singh*, 877 F.3d 107, 120 (2d Cir. 2017).  Mr. Bankman-Fried did not coerce Caroline to commit crimes on his behalf, and

Caroline could have refused to follow Mr. Bankman-Fried's directions.  However, Mr. Bankman-Fried's decision to install Caroline as the putative co-CEO of Alameda Research and his exploitation of his emotional power and corporate authority are relevant context in understanding Caroline's participation in these crimes.

### C.    Affording Adequate Deterrence to Criminal Conduct and Protecting the Public from Further Crimes by the Defendant

Caroline's participation in the criminal conspiracies at Alameda Research is a dramatic departure from her otherwise law-abiding nature.  She poses no risk of recidivism.  Sending Caroline to prison is entirely unnecessary, either for specific deterrence or to safeguard the public.

Caroline is unlikely to reoffend because she did not commit these crimes out of greed.  The most powerful evidence that Caroline did not act from avarice is that she did nothing to protect herself from the collapse of FTX and Alameda Research, even though she knew as well as anyone but Mr. Bankman-Fried what was likely to happen.  Although Caroline was aware for years that Alameda Research was secretly using FTX customer funds, she nevertheless kept substantially all her assets in her FTX.com user account.  Strikingly, Caroline never transferred any of her holdings off of FTX.com after June 2022, by which point she knew that Alameda Research likely could not pay back its FTX.com "borrowing."  Nor did Caroline make any significant purchases after (or before) that point (other than the Anthropic investment, made in early 2022 to advance AI safety).  Caroline declined to protect her own funds from FTX's collapse because she believed it would be unfair to shield herself while FTX's customers' funds were in danger.

Caroline similarly could have insulated herself from criminal jeopardy had she left Alameda Research after she broke up with Mr. Bankman-Fried in late April 2022.  To that point, Caroline was similarly situated with her co-CEO, Mr. Trabucco, who has never been charged.  But Caroline stayed not out of greed, but out of misplaced duty, believing Mr. Bankman-Fried's

warning that her departure might precipitate a crisis of confidence in Alameda Research—and by extension, in FTX.  Caroline's sister recalls her describing her reasons for staying, even though "she would often cry about how overwhelmed she felt:

> First, if she had left, either someone else would have been saddled with all of the work she had, or the company would have completely fallen apart....  From an outsider's perspective, it seemed like she should prioritize her own happiness and leave the company behind, but she viewed the company and the others there as just as important, and … she felt she would be betraying her friends if she did leave.

> Ex. C (A. Ellison) at 2.

Caroline's reasons for staying obviously do not absolve the criminal acts she took as Alameda Research sank further into financial oblivion.  Yet her reasons for staying should inform whether she acted from greed, lust for power, or another motivation that creates a risk she would reoffend.

Finally, Caroline's settlements with the SEC and CFTC—not to mention her ruined reputation—further reduce the need to incarcerate her to protect the public or achieve specific deterrence.  *See United States v. Adelson*, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006) (holding that a "reputation ruined by … conviction" and a bar on serving as a public company officer or director reduce the need to incarcerate a fraud defendant to achieve specific deterrence).  Pursuant to those settlements, Caroline is barred for life from working in the traditional finance industry or trading cryptocurrencies on behalf of anyone else.  *See supra* pp.41-42.  Caroline is also banned from serving as an officer of any public company.  These regulatory judgments therefore make it exceedingly unlikely that Caroline could ever again occupy a position of trust where she could commit another financial crime.

**D.      Reflecting the Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment and Compensation for Victims, and Avoiding Unwarranted Sentencing Disparities**

As the Court observed in sentencing Mr. Bankman-Fried, the fraud committed at FTX and Alameda Research "was a very serious crime." Dkt. 426 at 56:19-20. Caroline has never sought to minimize its harm or her role.

The evidence shows that Caroline was not motivated by greed and did not take steps to personally profit at the expense of customers. Unlike others, she held no equity in Alameda, almost no equity in FTX, did not take substantial personal loans to obtain equity stakes in venture investments, and did not misuse corporate funds for political contributions in an effort to become politically powerful. Unlike others, Caroline never bought real estate, yachts, or other luxury goods using her own funds, let alone Alameda or FTX's money. And critically, after Caroline learned that Alameda's borrowing would likely lead to distress at FTX, she did not withdraw *any* money from her FTX.com user account. In doing so, Caroline consciously left herself vulnerable to losing almost all of her savings generated while working at Alameda Research—just like FTX customers.

Once settlements with the government and the FTX Debtors are finalized, Caroline expects she will not retain any financial benefit she obtained from working at Alameda Research. This constitutes a significant punishment, since "[i]n the case of financial fraud, … an important kind of retribution may be achieved through the imposition of financial burdens." *Adelson*, 441 F. Supp. 2d at 514. Through her anticipated settlement with the FTX Debtors, Caroline will also surrender any claim to the assets held in her FTX.com customer account, so unlike ordinary FTX customers who will receive more than 100 cents on the dollar for their petition-date account balances, she will recover nothing through the bankruptcy process. Caroline also has no reasonable prospect of

rebuilding her financial position. She has been rendered effectively unemployable in the near term by the notoriety arising from this case, and the reputational harm is not likely to abate any time soon. And through her civil settlements with the SEC and CFTC, Caroline has accepted lifetime bans from the only industries she has ever worked in: finance and crypto. These personal, financial, and career consequences constitute substantial forms of punishment that reduce the need for the Court to order her incarceration.

Finally, sentencing Caroline to time served would promote respect for the law, because it would incentivize people involved in a fraud to do what Caroline did: publicly disclose a fraud, immediately accept responsibility, and cooperate immediately with civil and criminal authorities. The Court has already communicated the seriousness of these crimes in sentencing Mr. Bankman-Fried and Mr. Salame, and it remains to sentence Mr. Wang and Mr. Singh, who were partners with Mr. Bankman-Fried in owning and operating FTX.com. But Caroline "provide[d] important information for ongoing investigations and … furnish[ed] the most damaging testimony against the accused at trial, … which [wa]s key to winning convictions" of other FTX executives. *United States v. Ming He*, 94 F.3d 782, 787 (2d Cir. 1996). In recognition of Caroline's substantial assistance, the Probation Department has accordingly recommended a non-custodial sentence for Caroline. While this case is distinct in the size of the fraud, this Court has repeatedly sentenced cooperators in significant fraud cases to time served or other non-custodial sentences in recognition of "the considerable value of [their] cooperation with the government," where it was "was essential … to making th[e fraud] case, and [so] served a real public interest." *United States v. Gassnola*, No. 1:18:cr-252-LAK (S.D.N.Y. Oct. 7, 2019) Dkt. 24 at 10:15-18 (sentencing fraud cooperator to time served with two months' home detention); *see also, e.g.*, *United States v. Makov*, No. 1:05-cr-888-LAK (S.D.N.Y. May 20, 2010) Dkt. 1495 (sentencing to probation a

cooperator, who paid $10 million in forfeiture, was cross examined at trial for two days, and who was a partner in a business that sold illegal tax shelters, where co-defendants were sentenced to as much as 10 years' incarceration); *United States v. Fogel*, No. 1:17-cr-308-LAK (S.D.N.Y. Nov. 27, 2018) Dkt. 83 (sentencing to time served a cooperator in an insider trading case); *United States v. Silvestre*, No. 1:14-cr-72-LAK (S.D.N.Y. Feb 23, 2014) Dkt. 24 (sentencing to time served a cooperator in a "very serious" health care fraud whose cooperation "started right away" and was "extraordinarily valuable"). Moreover, because many other cooperators in complex fraud cases have received time-served sentences in this district, a non-custodial sentence would not create any unwarranted disparities.

## VII.    CONCLUSION

The Probation Department has recommended that the Court sentence Caroline to time served with a period of supervised release. In light of Caroline's contrition, her immediate and complete acceptance of responsibility, her extraordinarily impactful cooperation—with the U.S. Attorney's Office, with the SEC and CFTC, with the FTX Debtors, with the MDL plaintiffs, and with other official investigations—and her three days of credible testimony at Mr. Bankman-Fried's trial, the section 3553(a) sentencing factors do not require sending Caroline to prison. Rather, a sentence of time served with a period of supervised release would be sufficient, but not greater than necessary to fulfill the objectives of sentencing.

Dated:  New York, New York
          September 10, 2024

                              Respectfully submitted,

                              */s/ Anjan Sahni*
                              Anjan Sahni
                              Stephanie Avakian
                              Peter G. Neiman
                              Nicholas Werle
                              WILMER CUTLER PICKERING

HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
anjan.sahni@wilmerhale.com
stephanie.avakian@wilmerhale.com
peter.neiman@wilmerhale.com
nick.werle@wilmerhale.com

*Attorneys for Caroline Ellison*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 10, 2024 the foregoing document and its exhibits were served electronically to all parties of record by the CM/ECF system and that I caused sealed copies of the foregoing document and its exhibits to be served by email to counsel for the government.


<u>/s/ Anjan Sahni</u>
Anjan Sahni

September 10, 2024