O9C3SALM

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            22 CR 673 (LAK)

5    RYAN SALAME,

6                   Defendant.

7    ------------------------------x    Motion

8                                       New York, N.Y.
                                        September 12, 2024
9                                       10:00 a.m.

10

11   Before:

12                   HON. LEWIS A. KAPLAN,

                                        District Judge
13

14                       APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     DANIELLE SASSOON
17   NICOLAS ROOS
     DANIELLE KUDLA
18   NATHAN REHN
          Assistant United States Attorneys
19
     SCHAERR JAFFE, LLP
20        Attorneys for Defendant
     H. CHRISTOPHER BARTOLOMUCCI
21   BRIAN FIELD

22

23

24

25

O9C3SALM

1          THE DEPUTY CLERK:  United States v. Salame.

2     Government, are you ready?

3          MS. SASSOON:  Yes.  Good morning, your Honor.

4     Danielle Sassoon for the United States.  I'm joined by my

5     colleagues AUSAs Nicolas Roos, Thane Rehn, and Danielle Kudla.

6          MR. BARTOLOMUCCI:  Chris Bartolomucci for the

7     defendant Ryan Salame who is here today, and with me is my

8     colleague Brian Field.

9          THE COURT:  Good morning.

10          We are here this morning because Mr. Salame, through

11     counsel, filed a document called something like petition for a

12     writ of error *coram nobis* or alternatively *audita querula*, and

13     then made an application, which is unresolved as yet, to

14     withdraw that petition.

15          In the application, Mr. Salame claims that there was

16     an unwritten condition of his entry of a plea of guilty,

17     namely, that his -- I don't know how to refer, but I'll say

18     friend -- Michelle Bond would not be further investigated, and

19     thus prosecuted.  And he sought to vacate his conviction and to

20     enjoin the government from proceeding against Ms. Bond, which

21     it has done.  She is now under indictment for campaign finance

22     violations relating, as I understand it, to her candidacy for

23     Congress in I believe the First Congressional District in New

24     York.

25          Rule 11 of the Federal Rules of Criminal Procedure

O9C3SALM

```
1    requires that before the Court accepts a plea of guilty, the

2    Court must address the defendant personally in open court, and

3    during that address, the Court must inform the defendant of

4    various rights and determine that the defendant understands

5    them.  When Mr. Salame pleaded guilty, in September of 2023,

6    that was done.

7           Before the Court may accept a plea of guilty, Rule

8    11(b)(2) provides that it must address the defendant and

9    determine that the plea is voluntary, and did not result from

10   force, threats, or promises, other than promises in a plea

11   agreement.  That was done in the case of Mr. Salame's guilty

12   plea, which the Court accepted.

13          The Court was informed that there was a plea

14   agreement, it was in writing, it was marked as an exhibit, it

15   was placed in front of Mr. Salame, and Mr. Salame -- and we'll

16   get to this in more detail later -- testified under oath that

17   there were no promises or assurances, except as stated in the

18   letter, which of course said nothing about Ms. Bond.

19          He now says something different.  It therefore raises

20   the possibility that the Court incorrectly accepted the guilty

21   plea on the basis of representations that were made to it under

22   oath that were, to use a neutral term, inaccurate, and thus

23   places the validity of the conviction of Mr. Salame in issue.

24          The petition that was filed was supported by a

25   declaration made under penalties of perjury of Mr. Salame, and
```

O9C3SALM

1    it is in a variety of respects ambiguous and quite likely

2    internally inconsistent, putting aside questions of accuracy.

3           So I want to begin this morning by asking some

4    questions of Mr. Salame about the statements he made in that

5    declaration under penalties of perjury.  And it would be

6    helpful if counsel would give him a copy of it for ease of

7    reference, if he doesn't have it already.

8           MR. BARTOLOMUCCI:  The defendant has a copy of his

9    declaration, your Honor.

10          THE COURT:  Mr. Salame, in paragraph 6, you wrote and

11   swore as follows:  "During an April 28, 2023, videoconference

12   call with my counsel, Assistant United States Attorney Danielle

13   Sassoon read from prepared talking points and explained that,

14   although she could not put this condition within the four

15   corners of the agreement, as she said is often the practice of

16   the office," and the quote is attributed to Ms. Sassoon "if we

17   conclude" the investigation, "as to me" the word "me" is in

18   brackets, a substitute for what was supposedly said, "that

19   would conclude" and the next word in the declaration is "the,"

20   but the "e" is in brackets to indicate that Mr. Salame was not

21   claiming that Ms. Sassoon uttered the word "the," rather that

22   she uttered a word starting with the letters T-H and which he

23   changed for the context "facet of the investigation" into Bond.

24          My first question, Mr. Salame, is were you present

25   during that videoconference call?

O9C3SALM

1          THE DEFENDANT:  I was not, your Honor.

2          THE COURT:  So whatever you said about it in

3    paragraph 6 is based on things people told you; is that right?

4          THE DEFENDANT:  It is based on what my lawyers

5    communicated to me; yes, your Honor.

6          THE COURT:  Did they communicate to you in writing or

7    otherwise?  Or both?

8          THE DEFENDANT:  Both, your Honor.

9          THE COURT:  And what writing?

10         THE DEFENDANT:  There are messages and then there is a

11   memorandum that was written up at the end of January that

12   further solidifies that.

13         THE COURT:  That further solidifies what?

14         THE DEFENDANT:  That statement.

15         THE COURT:  What statement?

16         THE DEFENDANT:  The statement that you just read, that

17   was relayed to me.

18         THE COURT:  So the purported quotations of what you

19   claimed under oath Ms. Sassoon said were not words that you

20   heard.  They are something that somebody else wrote and

21   repeated to you, presumably.  Is that right?

22         THE DEFENDANT:  That is correct, your Honor.

23         THE COURT:  You didn't say that in this declaration,

24   did you?

25         THE DEFENDANT:  No, your Honor.  I apologize.

O9C3SALM

| | |
|---|---|
| 1 | THE COURT:  Yeah, well, and these communications to |
| 2 | you, when did they occur? |
| 3 | THE DEFENDANT:  The memorandum, which was written by |
| 4 | my lawyers, was on January 29. |
| 5 | THE COURT:  Of what year? |
| 6 | THE DEFENDANT:  Of '24. |
| 7 | THE COURT:  So seven months at least after the alleged |
| 8 | videoconference; yes? |
| 9 | THE DEFENDANT:  Yes, but there are a number of |
| 10 | communications before.  I just don't remember the exact date. |
| 11 | THE COURT:  And you, I would assume, don't remember |
| 12 | the exact words either; is that right? |
| 13 | THE DEFENDANT:  No, not the exact words. |
| 14 | THE COURT:  So that's right. |
| 15 | THE DEFENDANT:  Correct. |
| 16 | THE COURT:  In the phrase attributed to Ms. Sassoon, |
| 17 | "As to me, that would conclude the facet of the investigation |
| 18 | into Bond." |
| 19 | Was there some reason you didn't put the words "into |
| 20 | Bond" in your declaration since that was the whole point of |
| 21 | this application? |
| 22 | THE DEFENDANT:  I -- I -- I'm not sure, your Honor. |
| 23 | THE COURT:  Did you write this declaration? |
| 24 | THE DEFENDANT:  No, your Honor. |
| 25 | THE COURT:  Who did? |

O9C3SALM

1            THE DEFENDANT:  My lawyers, your Honor.

2            THE COURT:  Who?

3            THE DEFENDANT:  My two lawyers next to me, your Honor.

4            THE COURT:  So not the lawyers who were allegedly on

5    the conference call, right?

6            THE DEFENDANT:  Correct, but they were in consultation

7    with these lawyers.

8            THE COURT:  How do you know?

9            THE DEFENDANT:  Because my lawyers told me, your

10   Honor.

11           THE COURT:  Which lawyers?

12           THE DEFENDANT:  These lawyers told me that they spoke

13   to the Mayer Brown lawyers, your Honor.

14           THE COURT:  That they spoke to them.

15           THE DEFENDANT:  Correct.

16           THE COURT:  Eight months after the fact.

17           THE DEFENDANT:  Correct, your Honor.

18           THE COURT:  Now, paragraph 7 says, and I quote and

19   this is your words, "My lawyers who also represented Bond took

20   Sassoon's assurance to mean that if I pleaded guilty, the U.S.

21   attorney's office would be unlikely to pursue the campaign

22   finance charges against Bond, and my counsel communicated the

23   government's statements to both Bond and me."

24           The word "assurance" is a characterization, right?

25           THE DEFENDANT:  Yes, your Honor.

O9C3SALM

| | |
|---|---|
| 1 | THE COURT:  Had there been an assurance, it wouldn't |
| 2 | have been unlikely that they would pursue charges against |
| 3 | Ms. Bond.  It would have been forbidden by the agreement. |
| 4 | Isn't that true? |
| 5 | THE DEFENDANT:  Yes, your Honor. |
| 6 | THE COURT:  So you understood it was a matter of |
| 7 | likelihood, whatever it was, if there was anything. |
| 8 | THE DEFENDANT:  Very strong likelihood.  Yes, your |
| 9 | Honor. |
| 10 | THE COURT:  Who said it was strong? |
| 11 | THE DEFENDANT:  The Mayer Brown lawyers, your Honor. |
| 12 | THE COURT:  So it was their opinion. |
| 13 | THE DEFENDANT:  Can you repeat the question, please? |
| 14 | THE COURT:  It was their opinion. |
| 15 | THE DEFENDANT:  Yes, your Honor.  I relied on my |
| 16 | lawyers' opinion. |
| 17 | THE COURT:  So, you never heard Ms. Sassoon say |
| 18 | anything, right? |
| 19 | THE DEFENDANT:  No, I've never spoken to Ms. Sassoon, |
| 20 | your Honor. |
| 21 | THE COURT:  Whatever was communicated to you by your |
| 22 | lawyers, it was an opinion as to the likelihood they would |
| 23 | prosecute Bond, not whether or not it was possible; isn't that |
| 24 | true? |
| 25 | THE DEFENDANT:  I would argue that's not entirely |

O9C3SALM

| 1 | accurate, your Honor, but I understand what you're saying. |

1   accurate, your Honor, but I understand what you're saying.

2         THE COURT:  Is it true or is it not true?

3         THE DEFENDANT:  My lawyers believed the inducement was

4   accurate and real and relayed that to me strongly.

5         THE COURT:  Believed it was accurate.  What does that

6   mean?

7         THE DEFENDANT:  They believed that the statements that

8   were made by the government reflected that charges against

9   Ms. Bond would not be pursued if I pled guilty.

10        THE COURT:  In paragraph 8, you wrote that your

11  lawyers conveyed to you that they took the statements, whatever

12  exactly they were, seriously.

13        Is that what they told you in words or in substance?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Now, when you pleaded guilty on

16  September 7 of 2023, you remember that you were under oath,

17  sworn to tell the truth.

18        THE DEFENDANT:  Yes, your Honor.

19        THE COURT:  Starting at page 19 of the transcript, the

20  following occurred:

21        The Court:  Did you enter into that agreement -- that

22  is the letter agreement that was before you at the time -- of

23  your own free will?

24        Answer:  Yes, your Honor.

25        Is that true?

O9C3SALM

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  The Court:  Did you do so only after

3  reading it and consulting fully with your attorneys?

4          Answer:  Yes, your Honor.

5          Was that true?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  Question by the Court:  Has anyone made

8  any promises, other than whatever is set forth in the plea

9  agreement, that induced you to plead guilty?

10          Answer:  No, your Honor.

11          Was that answer true?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  And you knew at the time you made it that

14  it was untrue.  Is that your testimony today?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  And you did it to induce me to accept your

17  plea of guilty, right?

18          THE DEFENDANT:  Yes, your Honor.  Well, accept my plea

19  of guilty, yes.

20          THE COURT:  Yes.

21          At page 20.  Question:  Do you understand that by

22  entering into this plea agreement, you are giving up your right

23  to appeal from or to bring any collateral challenge to your

24  conviction or sentence, including, but not limited, to any

25  appeal or any application under 28 U.S. Code 2255 or 2241 of

O9C3SALM

any sentence equal to or below the stipulated guideline

sentence of 120 months of imprisonment?

        Answer:  Yes, I understand, your Honor.

        Was that true?

        THE DEFENDANT:  Yes, your Honor.

        THE COURT:  Did you knowingly and voluntarily give up

whatever rights you otherwise would have had by that answer?

        THE DEFENDANT:  Yes, your Honor.

        THE COURT:  And then you proceeded to explain in your

own words what you did in connection with the acts charged in

each count of the information.

        As to Count One you said:  "Between the fall of 2021

and November of 2022 midterm elections, I made political

contributions in my name that were funded by transfers from the

bank accounts of an Alameda subsidiary.  During this time, I

made tens of millions of dollars in campaign contributions to

candidates for public office and political action committees

while at the time these funds were categorized in both my own

and Alameda's ledgers as loans.  I understood then that the

loans would eventually be forgiven, and I never intended to

repay them.  I understood throughout this process that the

donations in question were for the benefit of initiatives

primarily introduced to me by others, which were supported by

Sam Bankman-Fried.  I further understood that FEC reporting

would state that I, rather than Alameda, made these political

O9C3SALM

1    contributions.  At the time I knew it was prohibited by

2    campaign finance laws to make contributions in my name with

3    money that was not my own."

4            Was that true when you stated it?

5            THE DEFENDANT:  Your Honor, if I may say, I'm not

6    looking to withdraw my plea agreement.

7            THE COURT:  I got that.

8            THE DEFENDANT:  Okay.

9            THE COURT:  Anymore.

10           Was that true when you said it?

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  Is it true today?

13           THE DEFENDANT:  Yes, your Honor.

14           THE COURT:  Then with respect to Count Two, which

15   charged a conspiracy to operate an unlicensed money

16   transmitting business in violation of federal law, you

17   explained and stated as follows:

18           "In late 2019 through 2021, while acting in the role

19   of Alameda's head of settlements, I and others at FTX and

20   Alameda used bank accounts owned and operated by Alameda and a

21   subsidiary of Alameda to help facilitate FTX customers' fiat

22   transactions through a bank primarily located in California

23   which were then manually credited and debited on FTX customers'

24   accounts by Alameda personnel acting under my management.  I

25   understood that Alameda and FTX were for-profit businesses, and

O9C3SALM

1    while at the time I was unaware that licensure was required, it

2    is now clear to me that neither Alameda nor its subsidiaries

3    properly sought registration or licensing that would allow

4    these entities to act as money service businesses."

5         Was that statement true when you made it?

6         THE DEFENDANT:  Yes, your Honor.

7         THE COURT:  Is it true now?

8         THE DEFENDANT:  Yes, your Honor.

9         THE COURT:  I want to go back for a moment to the

10   declaration.  In paragraph 10, you said, and I'm quoting: "I

11   signed the agreement," meaning the written plea agreement,

12   "even though it did not mention the condition regarding Bond,

13   and included a boilerplate integration clause stating that the

14   writing 'supersedes any prior understandings, promises or

15   conditions between this office and the defendant.'"

16        Do you think you don't bear responsibility for signing

17   legal documents and making statements under oath that you

18   regard as boilerplate?

19        THE DEFENDANT:  I'm not sure the proper way to answer

20   that, but no, I do not believe I bear no responsibility.

21        THE COURT:  And you used the phrase or the word

22   "boilerplate" in an attempt to diminish the seriousness of the

23   untruth you told under oath that induced me to accept your plea

24   of guilty.  Isn't that right?

25        THE DEFENDANT:  I did not draft this declaration, your

O9C3SALM

1   Honor.  But I don't know the purpose of the word "boilerplate"

2   there.

3           THE COURT:  You think you could hazard an opinion,

4   since you professed to sign this under oath and adopted that

5   term?

6           THE DEFENDANT:  Yes, then, your Honor, yes.

7           THE COURT:  Yes what?

8           THE DEFENDANT:  Yes, the term "boilerplate" was used

9   there to minimize what you just said, your Honor.

10          THE COURT:  Did you regard the oath that was

11  administered to you on September 7 boilerplate?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  Now, you've spoken in this declaration of

14  whatever it is that Ms. Sassoon said in April of 2023, which

15  you didn't hear, as a "condition" or an "assurance."  In

16  paragraph 11, you described it differently.  You said it was

17  implied.

18          Which was it?

19          THE DEFENDANT:  Your Honor, it felt like an assurance

20  at the time it was conveyed to me.  Sorry for the use of

21  "implied" here.

22          THE COURT:  It felt like an assurance.

23          THE DEFENDANT:  As you noted, your Honor, I was just

24  being relayed the communications between my counsel and the

25  government.  I was not on any direct communications with the

O9C3SALM

1    government.

2            THE COURT:  But you nevertheless used the word

3    "implied."

4            THE DEFENDANT:  Correct, your Honor, yes.

5            THE COURT:  When you did so, you thought that was

6    accurate.  Is that true?

7            THE DEFENDANT:  Yes, your Honor.  Though I prefer the

8    word "assurance," but yes --

9            THE COURT:  I'm sure you would.

10           But there was no assurance, was there?

11           THE DEFENDANT:  Your Honor, it was communicated to me

12   as if there was an assurance.

13           THE COURT:  And so your lawyer said we have an

14   assurance that we think means it is unlikely that Bond will be

15   prosecuted.  Right?

16           THE DEFENDANT:  They went much further than

17   "unlikely," your Honor, but yes.

18           THE COURT:  "Unlikely" was the word you used in

19   describing their communications to you.  Isn't that true?

20           THE DEFENDANT:  That is the word that was used in

21   here; yes, your Honor.

22           THE COURT:  And that's because you thought it was

23   accurate.

24           THE DEFENDANT:  Okay, your Honor.

25           THE COURT:  No, not okay.  Yes or no?

O9C3SALM

1          THE DEFENDANT:  As I noted, I believe "assurance" was

2     a more proper term to use for this than "unlikely."

3          THE COURT:  Now, according to documents submitted by

4     the government, within four weeks of the videoconference that

5     you related in this declaration, the government told your

6     lawyers that it would not be stopping the investigation of

7     Bond, and any impression or understanding that your lawyers had

8     from whatever had gone before was superseded.

9          You are aware of that, right?

10          THE DEFENDANT:  That is a slight mischaracterization

11     to what was presented, but I am aware of what you're

12     referencing; yes, your Honor.

13          THE COURT:  Tell me in your own words.

14          THE DEFENDANT:  I was told the inducement was so

15     strong, it was the strongest inducement my lawyers had ever

16     heard in their 20-plus years as both government prosecutors and

17     on the defense, that they were required to walk back the

18     language slightly to ensure it wasn't too far.

19          THE COURT:  And you knew, when you signed this

20     declaration that you submitted recently, that the language,

21     whatever it may have been, had been walked back over a year

22     earlier; isn't that true?

23          THE DEFENDANT:  Yes, your Honor, but --

24          THE COURT:  But you didn't mention it in your

25     declaration, did you?

O9C3SALM

```
 1                THE DEFENDANT:  No, your Honor.

 2                THE COURT:  That created quite a misleading

 3   impression; isn't that true?

 4                THE DEFENDANT:  Yes, your Honor.  I guess.

 5                THE COURT:  And that was the point, wasn't it?

 6                THE DEFENDANT:  No, your Honor.

 7                THE COURT:  Mr. Bartolomucci, you've asked for

 8   permission to withdraw this application with prejudice.  Would

 9   you explain to me what you think that means?

10                MR. BARTOLOMUCCI:  Your Honor, we're not seeking any

11   relief from this Court.  We filed a notice of withdrawal which

12   we understand your Honor has not accepted.

13                We would request that to withdraw the petition with

14   prejudice, meaning that Mr. Salame would not raise this issue

15   again in this court or in any other court.  That's what we mean

16   by with prejudice.

17                THE COURT:  So these factual allegations are withdrawn

18   and will not be reasserted anywhere.  Is that correct?

19                MR. BARTOLOMUCCI:  What I just said, your Honor, is

20   that we would --

21                THE COURT:  I want an answer to my question.

22                MR. BARTOLOMUCCI:  We would not assert these

23   allegations or seek relief based upon them in any court.

24                THE COURT:  Ms. Sassoon, let me hear from you about

25   this, please.
```

O9C3SALM

1          MS. SASSOON:  On the issue of withdrawing?

2          THE COURT:  On the issue of the meaning of the words

3     "with prejudice."

4          MS. SASSOON:  I understand that to mean that at no

5     point now or in the future will Mr. Salame assert a claim that

6     his plea was involuntary or invalid or unknowing or that the

7     government breached the plea agreement, whether that's in a

8     2255 motion, 2241 motion, a *coram nobis* petition, a petition

9     for writ of *audita querula*, or any other procedural vehicle and

10    that he --

11         THE COURT:  In this or any other court.

12         MS. SASSOON:  In this or any other court.

13         I don't take it to have implications for claims that

14    Bond may intend to raise in her proceeding.  But I think it

15    would preclude him from putting in an affidavit in support of a

16    claim that she would make to dismiss her indictment or against

17    the prosecution in her proceeding.

18         THE COURT:  Do you agree, Mr. Bartolomucci?

19         MR. BARTOLOMUCCI:  Well, your Honor, again, we would

20    not assert this claim in this court or any other court.  If

21    Mr. Salame were asked to give testimony on this subject matter,

22    for example, if he were subpoenaed, I think he would be duty

23    bound to testify.  So, I think with prejudice wouldn't preclude

24    him from speaking to this issue when asked.

25         MS. SASSOON:  Your Honor, that's unsatisfying because

O9C3SALM

1    to the extent that he is going to claim before another court in

2    a different type of proceeding that there is some defect or

3    invalidity of this plea, it should be litigated here, because I

4    think we can very clearly vindicate that this is a valid plea,

5    that there was no breach, and that he entered this plea

6    knowingly and voluntarily, never moved to withdraw prior to

7    sentencing, didn't raise a claim on direct appeal, and has

8    offered no explanation for that, if he's to be credited that he

9    believed there was this strong inducement and assurance to

10   plead guilty.

11             MR. BARTOLOMUCCI:  Your Honor, if I may speak to that.

12   Mr. Salame will not assert any claim in this court or any other

13   court.  I don't represent any other parties.  I don't know what

14   any other parties might do.  But I don't think I can bind

15   Mr. Salame not to give testimony when properly called upon to

16   do so.  I don't think I have the power to withdraw this

17   petition with prejudice and gag him from speaking about this in

18   other fora.

19             THE COURT:  No, of course not.  At least as to

20   compulsory process.  But let's take another -- just give me a

21   minute to find the right piece of paper.

22             MS. SASSOON:  Your Honor, I think that then does bear

23   on whether they should be permitted to withdraw, because --

24             THE COURT:  Of course.

25             MS. SASSOON:  Okay.

O9C3SALM

1           MR. BARTOLOMUCCI:  Your Honor, may I add one thing.

2           Because Mr. Salame doesn't seek relief from this Court

3    and doesn't intend to press this claim in any other court, we

4    would agree or stipulate that he would not voluntarily testify

5    to facts relating to this matter, unless required to do so

6    through proper compulsory process.

7           Because we're not going to seek relief, he doesn't

8    intend to volunteer facts or testimony in support of the claim

9    that might be made by anyone else.

10          THE COURT:  Here's my problem with that.  My problem

11   with that is that you are asking me to let stand a conviction

12   and sentence that I now know is based on false testimony before

13   me during the plea allocution.  And that may be a big problem.

14          MR. BARTOLOMUCCI:  Your Honor, I have a slightly

15   different take on that.  I think Mr. Salame's testimony to you

16   at the plea was not false.

17          THE COURT:  He thinks it was.

18          MR. BARTOLOMUCCI:  Well, I think Mr. Salame may have

19   something else to add to that, if we could allow him to

20   complete the record on that matter.

21          Please, Mr. Salame.

22          THE COURT:  No, wait a minute.  I'm still running this

23   courtroom.

24          MR. BARTOLOMUCCI:  I thought you were implicitly

25   permitting it.

O9C3SALM

1          THE COURT:  I was looking to see if the government had

2     something to say.

3          MS. SASSOON:  Your Honor, I wanted to respond to what

4     you said about testimony that you now know is based -- a plea

5     you now know is based on false testimony.

6          The government would resist that characterization.

7     Mr. Salame is now claiming it was false testimony.  But it's

8     the government's position that at the time when he said that,

9     under oath, it was because he knew there was no promise and no

10    condition of the plea agreement.  And he is now, a long time

11    later, after Ms. Bond has been indicted, manufacturing this

12    claim, based on information that didn't come close to amounting

13    to a promise, as you can see from the declaration he's

14    submitting even now.

15         So, the government does not credit what he's saying

16    today that at the time he knew what he was saying was false.

17    It is the government's view that when he said that at the time,

18    it was because he well understood that there was no promise

19    outside the plea agreement.  And I can elaborate on many

20    reasons why we think that when he said it at the time, that's

21    what he believed.

22         THE COURT:  All right.  Mr. Bartolomucci, the

23    government has submitted an e-mail from Ms. Sassoon to others

24    in the U.S. attorney's office concerning the content of a

25    telephone conversation that is said to have occurred on May 25,

O9C3SALM

2023.  It is Exhibit 3 to the government's papers.

          Does Mr. Salame stipulate that this e-mail accurately
summarizes the conversation with his counsel on May 25, 2023?

          MR. BARTOLOMUCCI:  No, I can't agree to that, your
Honor, because the record is mixed on this point.  In
particular, I would point your Honor to Exhibit 4 at page 2.
This is one of these e-mails.  This is from his prior counsel,
his other counsel.  That says "Our notes do not reflect that
disposition with Mr. Salame not resolving the investigation of
Ms. Bond's conduct."  And furthermore, Exhibit 6 at 4, the
notes say -- these are the handwritten notes -- "No records of
FTX team walking back.  No notes that it was walked back, quick
call."

          So there was at least a disagreement between the
government and other counsel about whether it was walked back.

          THE COURT:  Well, that's an inaccurate
characterization, Mr. Bartolomucci.  What it says is not that
it didn't happen.  It was that the former law firm didn't have
notes.

          MR. BARTOLOMUCCI:  And by implication that they were
not accepting the representation that it was walked back.

          THE COURT:  Boy, you have a generous view of
implications.  I don't share that view.  It said what it said.
They're lawyers, they're experienced lawyers, they're careful
lawyers.

O9C3SALM

1          All right.  I am going to take this under advisement

2     and I'll communicate further.  In any case, I surely retain

3     jurisdiction with respect to the possibility of sanctions.

4          Okay.  Thank you.

5          MS. SASSOON:  One matter for the record, your Honor.

6     I've communicated with the marshals, and although the Court

7     ordered a surrender date of October 13, that is a Sunday.  So

8     they requested that the Court move it forward to the Friday,

9     which is October 11, 2024.

10          THE COURT:  Mr. Bartolomucci?

11          MR. BARTOLOMUCCI:  I believe Mr. Salame wanted to make

12     one last statement to complete the record in these proceedings,

13     your Honor.

14          THE COURT:  There may be a further opportunity on

15     another occasion.

16          MR. BARTOLOMUCCI:  Thank you, your Honor.

17          (Adjourned)

18

19

20

21

22

23

24

25