**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| UNITED STATES OF AMERICA |
| *v.* |
| GARY WANG |

Case No. 1:22-CR-673 (LAK)

## <u>DEFENDANT GARY WANG'S SENTENCING MEMORANDUM</u>

Ilan Graff
Alex B. Miller
FRIED, FRANK, HARRIS,
 SHRIVER & JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859 8931
ilan.graff@friedfrank.com
alex.miller@friedfrank.com

*Attorneys for Gary Wang*

**Table of Contents**

I.      Introduction ............................................................................................................. 1

II.     Gary's Personal History ........................................................................................ 4

    A.  Childhood ............................................................................................................ 4

    B.  College ................................................................................................................ 6

    C.  Early Professional Life ...................................................................................... 8

    D.  Alameda Research / FTX ................................................................................... 9

III.    Offense Conduct ................................................................................................. 14

IV.     Gary's Cooperation ............................................................................................ 19

    A.  Federal Law Enforcement ................................................................................ 20

        1.  Gary's Immediate Assistance ..................................................................... 20

        2.  Gary's Pre-trial Cooperation ...................................................................... 21

        3.  Gary's Trial Testimony ............................................................................... 26

        4.  Post-trial ...................................................................................................... 28

    B.  NYAG ............................................................................................................... 29

    C.  FTX Debtors .................................................................................................... 29

    D.  FTX MDL Plaintiffs ........................................................................................ 31

    E.  Gary's Efforts to Rebuild a Productive Life ................................................... 31

V.      Sentencing Guidelines ....................................................................................... 34

VI.     A Non-Custodial Sentence is Appropriate ........................................................ 35

VII.    Conclusion ......................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CFTC v. Wang,*
    22 Civ. 10503 (PKC) (S.D.N.Y. Dec. 20, 2022) ..................................................25

*SEC v. Wang,*
    22 Civ. 10794 (PKC) (S.D.N.Y. Dec. 19, 2022) ..................................................25

*United States v. Kumar,*
    10 Cr. 13 (DC) ..................................................44

*United States v. Cotellessa-Pitz,*
    10 Cr. 228 (LTS) ..................................................43

*United States v. Tzvetkoff,*
    10 Cr. 336 (LAK) ..................................................44

*United States v. Friehling,*
    09 Cr. 700 (LTS) ..................................................43, 44

*United States v. Gassnola,*
    18 Cr. 252 (LAK) ..................................................44

*United States v. Glass,*
    07 Cr. 159 (LAK) ..................................................44

*United States v. Lipkin,*
    10 Cr. 228 (LTS) ..................................................43

*United States v. Powell, et al.,*
    24 Cr. 38 (D.D.C.) ..................................................25

*United States v. Bankman-Fried,*
    22 Cr. 673 (LAK) ..................................................6, 41

**Statutes**

18 U.S.C. § 3553(a) ..................................................34

18 U.S.C. § 3553(a)(7) ..................................................41

U.S.S.G. § 5K1.1(a) ..................................................34

U.S.S.G. § 5K1.1(a)(1) ..................................................39

U.S.S.G. § 5K1.1(a)(2) ...................................................................................................39

U.S.S.G. § 5K1.1(a)(3) ...................................................................................................40

U.S.S.G. § 5K1.1(a)(5) ...................................................................................................39

**Other Authorities**

Jen Wieczner, *What Does Sam Bankman-Fried Have to Say for Himself? An
   interview with the disgraced CEO*, New York (Dec. 1, 2022),
   https://nymag.com/intelligencer/article/sam-bankman-fried-ftx-interview.html ...................22

*U.S. Attorney Damian Williams Recounts Importance of Speed in the FTX Case*,
   FRAUD CONFERENCE NEWS (June 24, 2024),
   https://www.fraudconferencenews.com/home/2024/6/24/us-attorney-damian-
   williams-recounts-the-importance-of-speed-in-the-ftx-case....................................................24

Luc Cohen, *Sam Bankman-Fried prosecutor says coder's cooperation sped up
   case*, Reuters (April 2, 2024, 3:27 PM) .........................................................................2

*Statement of U.S. Attorney Damian Williams on the Conviction of Samuel
   Bankman-Fried* (Nov. 2, 2023), https://justice.gov/usao-sdny/pr/statement-us-
   attorney-damian-williams-conviction-samuel-bankman-fried ...............................................23

We respectfully submit this submission on behalf of Zixiao (Gary) Wang, who is scheduled to appear before this Court for sentencing at 10:00 am on November 20, 2024.  Gary pled guilty to a four-count Information as a result of his participation in aspects of FTX's fraud on its customers and investors.  Gary was the first defendant to cooperate with the Government and the one who stands convicted of the smallest share of misconduct.  As the Government has recognized, Gary first learned of the fraud after it was well underway having been lied to and deceived by Sam Bankman-Fried.  Gary is profoundly remorseful and has taken extraordinary steps to assist the Government and others working on behalf of FTX victims.  For these reasons and those set forth below, we respectfully request that the Court impose a time-served sentence.

## I.    INTRODUCTION

Less than one week after FTX's collapse, Gary sat in a conference room with thirteen lawyers, agents, and investigators from the Department of Justice (DOJ), Securities and Exchange Commission (SEC), and Commodity Futures Trading Commission (CFTC).  Gary had started sharing information through counsel days earlier and appeared for his first of many virtual and in-person meetings with the Government just hours after arriving from the Bahamas.  Unlike other cooperating witnesses with whom prosecutors would later meet, Gary did not have full visibility on the crimes the Government was investigating.  He had not known Alameda Research was taking FTX customer money until after the scheme was well underway.  He had not lied to lenders.  He had not falsified FTX revenues.  He could not speak to the exotic web of financial transactions that resulted in his co-defendants' pleas to money laundering and campaign finance offenses.  He had not received bonuses or sought compensation beyond his $200,000 annual salary.  But Gary knew FTX's code.  And in the days and weeks that followed, he unraveled and deciphered it for the

Government, as part of whole-hearted cooperation that prosecutors have publicly recognized as having radically accelerated their work.[1]

Gary's cooperation was not prompted by a law enforcement knock at his door.  His near-immediate decision to assist the Government was motivated by deep remorse for the conduct in which he had participated and a determination to do whatever he could to help make things right. Gary's quiet resolve was reflective of the character he has demonstrated throughout his young life, both before he became professionally intertwined with Sam Bankman-Fried and since he removed himself from Bankman-Fried's orbit.  Gary swiftly accepted responsibility for what he had done and has engaged in sustained and impactful cooperation with the DOJ, SEC, CFTC, the Office of the New York State Attorney General (NYAG), the FTX Debtors, the Independent Bankruptcy Examiner, and the FTX Multi-District Litigation (MDL) Plaintiffs.

As this Court knows, and as further described below, Gary's trial testimony was a cornerstone of the Government's successful case against Bankman-Fried.  Gary was the first cooperating witness called, and he testified powerfully over three days.  Gary detailed how Bankman-Fried directed him and Nishad Singh to afford Alameda special functionality on FTX and explained how he later learned that Bankman-Fried and others had exploited those features to steal FTX customer funds.  Gary described confronting Bankman-Fried and shared how Bankman-Fried falsely assured him that Alameda's collateral appropriately offset all withdrawals.  Gary will regret the devastating impact of his misplaced reliance on Bankman-Fried for the rest of his life.

---

[1] Luc Cohen, *Sam Bankman-Fried prosecutor says coder's cooperation sped up case*, Reuters (April 2, 2024, 3:27 PM), https://www.reuters.com/legal/sam-bankman-fried-prosecutor-says-coders-cooperation-sped-up-case-2024-04-02/ ("'Without [Gary Wang's cooperation], would we have found it? Probably,' [AUSA Thane] Rehn said at a discussion hosted by law firm Wilson Sonsini. 'But it would have taken a software expert weeks or even months.'") (alterations added).

Gary's fidelity to truth has not wavered since he first met with the Government. He has been forthright and unflinching in his account. As a result of his timely and truthful cooperation, Gary proved effectively unimpeachable by defense counsel. Unsurprisingly, the Government featured his testimony prominently in its summations.

Gary's cooperation did not end with Bankman-Fried's conviction. Separate and apart from his assistance to the individuals and entities noted above and detailed below (including support for the FTX Debtors that helped preserve approximately $800 million in estate assets), Gary has made himself available to testify at two other trials in this district. He has met with the Government and Federal Bureau of Investigation (FBI) special agents to assist efforts to use FTX's database to advance other pending investigations. In a further, extraordinary step, Gary has worked with the Government to design and build a new software tool to detect potential financial fraud in public markets and, at prosecutors' direction, is currently developing a separate tool focused on identifying illicit activity on crypto exchanges.

Although Gary's primary focus has been on supporting recovery for those harmed by his conduct, he has also sought to build a modest life for himself and his family. FTX's collapse left Gary unemployed and an object of international condemnation. He has endured media scrutiny and online harassment by those who distorted his understated humility and low public profile to falsely cast him as the secret mastermind of FTX's downfall.[2] Having come from modest means,

---

[2] *E.g.*, Pete compute/acc (@ProfitFry), X (Nov. 11, 2022, 1:16 AM) ("I mean truly though who the fuck is Gary Wang? Like is Sam a Chinese asset? I mean his story and FTX origin is definitely like wtf this guy lays it all out just askin the simple stuff"), https://x.com/ProfitFry/status/1590951525735882572; WF (@WhaleFUD), X (Dec. 15, 2022, 8:23 AM) ("Most of you have probably never heard the name [Gary Wang] before. He was media-shy, and prone to work odd hours. Bankman-Fried became a more public figure, but according to sources within the company, Wang was the mastermind"), https://x.com/WhaleFUD/status/1603378462307516416 (alteration added); Marc Cohodes (@AlderLaneEggs), X (Oct. 12, 2023, 9:49 AM) ("Gary Wang the CCP operative and

received no bonus payments, and lived on his annual salary, Gary was left with no financial resources and an urgent need to find a new job. For the past two years, Gary has lived with his mother. He has secured and sustained full-time employment as a software engineer. He has married his longtime girlfriend and is expecting his first child later this month.

Gary knows the choices that led to his sentencing have sharply constrained his professional horizons. But he has never aspired to fame or the trappings of wealth that others who have appeared before this Court for sentencing embraced. Gary wants nothing more than to lead a quiet life, in which he continues to try to right the wrong in which he participated, and nurture the growing family that relies on him for financial and emotional support.

Of all the cooperating witnesses in this case, Gary pled to the fewest counts, because he had the most limited role in the offense conduct. He was the first to cooperate. He received no bonus payments, obtained orders of magnitude less money from FTX and Alameda than his co-defendants, and never changed his simple lifestyle. We respectfully submit that in light of Gary's individual circumstances, the nature of his participation in the offense, and his prompt and extraordinary cooperation, a non-custodial sentence is sufficient but not greater than necessary to serve the interests of justice.

## II.    GARY'S PERSONAL HISTORY

### A.    Childhood

Gary was born in Beijing, China, the only child of Qiang Wang and Bing Xiao. Presentence Investigation Report (PSR) ¶ 63, ECF No. 514. He was a quiet and compassionate

---

@SBF_FTX partner was a 'special advisor' at Sequoia. Why has no No One and I mean NO ONE in the MSM pulled on this string?"), https://twitter.com/AlderLaneEggs/status/1712465519583117427.

boy, "filled with care for the world." Ex. A (Q. Wang) at 1. As an illustration of how early his concern for others surfaced, his mother recounts:

> When [Gary] was around 7 years old, he went to the park with my parents, his grandparents. On the way home, he told them that he was tired and couldn't walk any further. His grandfather said, "Then I'll carry you." But Gary replied, "No, you're older and must be tired too. What if you carry me and fall? I'm young, so I'm not afraid of falling, but if you fall at your age, it won't be good."

Ex. B (Xiao) at 1 (alteration added). Gary's understated selflessness was a recurring theme throughout his young life. *See id.* at 2 (noting that "help[ing] those in need" is "something he has always done.") (alteration added). In this regard, Gary benefitted from outstanding role models, his loving, dedicated parents, with whom he remains close and who "cherish[]" and regard him as an extension of their own lives. Ex. A (Q. Wang) at 1; PSR ¶ 65. His father recalls that Gary was always "an idealist" and "naive, believing in the goodness of everyone around him." Ex. A (Q. Wang) at 1. Gary's trusting nature would play a key role in shaping his conduct at issue here.

When Gary was seven, his parents moved from Beijing to Fargo, North Dakota, where his father was studying to become a civil engineer.[3] PSR ¶ 64. The next year they moved again, this time to St. Paul, Minnesota, where Gary's father attended the University of Minnesota. *Id.* For a time, Gary and his parents divided their lives between Minnesota and North Dakota, while his mother completed an engineering program at North Dakota State University. *Id.*

Gary demonstrated an early aptitude for math and science and "spent nearly all his free time and summers engrossed in computer science and coding." Ex. A (Q. Wang) at 1. Despite the inherent disruption and instability of so many moves at a young age and the "challenges of adapting to a new language and culture," Gary continued to shine academically. PSR ¶ 65. By the time Gary reached "middle school, he was already registering for college-level courses in

---

[3] Gary became a U.S. citizen in 2020. PSR ¶ 67.

calculus and computer programming." Ex. A (Q. Wang) at 1. As a high school freshman in Minnesota, he was a member of the All-State Math Team. PSR ¶ 65. The following year, after yet another move (this time to New Jersey), Gary continued to accumulate accolades as "'an exceptional and dedicated student, whose distinctions included being a finalist at the USA Computing Olympiad in 2009, 2010, and 2011; a USA Biology Olympiad Semifinalist in 2010; and a Finalist at the North American Computational Linguistics Olympiad in 2011." *Id.*; *see also* Ex. A (Q. Wang) at 1 (noting Gary's "numerous awards in national science and coding competitions."). Notwithstanding all the time that Gary dedicated to academics, his selflessness never wavered. Gary's parents were particularly proud of the recognition he received for community service, including "when he received a community contribution award as a volunteer at the local library during his school graduation." Ex. A (Q. Wang) at 1.

It was during high school that Gary first met Bankman-Fried, at a summer math camp. *See* Tr. 310:22-23.[4] Another attendee at that camp recalls Gary having stood out in a highly competitive group both for his exceptional coding talents and his trademark modesty, noting that Gary "carrie[d] his savant-like abilities with a quiet grace, embodying rare humility in groups of high-performers." Ex. G (Kalinich) at 1 (alteration added). After serving as the president of his high school math team senior year, Gary graduated Cherry Hill East High School in 2011 and moved to Cambridge, Massachusetts, to start college at MIT. PSR ¶¶ 65-66, 75.

## B. College

At MIT, Gary shouldered a rigorous course load, majoring in math with computer science. PSR ¶¶ 66, 76. Given his family's modest means, Gary spent his summers in paid "internships to

---

[4] Citations to "Tr." refer to the trial transcript in *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y.).

cover his living expenses, including his rent." Ex. A (Q. Wang) at 1. In school and at summer jobs, he remained focused on building and refining his computer programming skills.

Gary also continued to develop into a young man who wanted to make the world a better place and "care[d] deeply about doing the right thing." Ex. D (Benjamin) at 1 (alteration added). He sought out volunteer opportunities, including helping to "organize extracurricular educational programs at MIT for middle and high school students" and "teach extracurricular math classes to underprivileged middle school students at a local public school." PSR ¶ 66. Without fanfare, Gary also "quietly decided for environmental and ethical reasons to become vegetarian." Ex. D (Benjamin) at 1 ("He didn't make a big deal about it or flaunt his morals. I only learned about his choice a month later when I noticed he wasn't eating meat and asked him about it.").[5]

Gary also forged relationships with MIT classmates who remain some of his closest friends. *See* Ex. D (Benjamin) at 1; Ex. E (Yedidia) at 1; Ex. F (Grazian) at 1; Ex. G (Kalinich) at 1. Although Gary was shy, his friends came to know him as "funny, kind, and gentle," *see* Ex. E (Yedidia) at 1, the type of person who, "[i]f you were having a bad day . . . might quietly notice, and check in on you," Ex. D (Benjamin) at 1 (ellipsis added); *see also* Ex. F (Grazian) at 1 ("I have consistently been struck by Gary's kindness."); Ex. G (Kalinich) at 1 ("[Gary] has demonstrated trustworthiness, generosity, and fairness in all of my interactions with him.") (alteration added). Like his parents before them, Gary's college friends also recognized him as "very trusting and, at times, naive," a person who "always acts in good faith" and so is predisposed to assume "that others are too." Ex. D (Benjamin) at 1. One of those friends was Bankman-Fried, who would prey on Gary's trusting nature to involve him in the FTX fraud.

---

[5] Consistent with his other ethical commitments, Gary has never used illegal substances, at college or otherwise. PSR ¶ 74.

At MIT, Gary and Bankman-Fried renewed their summer camp friendship. Tr. 310:22-311:3. The two were roommates and shared friends in common. Even then, however, they were very different people. *E.g.*, Ex. E (Yedidia) at 1 ("Nobody who knew Sam, I think, found it incongruous that Sam eventually became a billionaire; Sam's ambitiousness was apparent even from when he was in college. But Gary never seemed at all to be drawn to material success the way that Sam was."). After college, Bankman-Fried and Gary parted ways, with Bankman-Fried pursuing a career in finance at Jane Street in Manhattan and Gary staying in New England, having accepted a job as a software engineer at Google. Tr. 188:1-5; PSR ¶¶ 66, 79.

### C.    Early Professional Life

Gary's entire pre-Alameda professional life consisted of the three years he spent at Google. PSR ¶¶ 66-67. None of his work related to finance, nor did he otherwise obtain visibility on or experience with regulated financial markets. Gary was fortunate to earn almost $200,000 a year, which he considered "more than he could reasonably spend." *Id.* ¶ 79; Ex. E (Yedidia) at 1. So, Gary spent it on others. He "used part of his first year's income to help pay off the mortgage on his parents' house so they could move to a new home closer to their work." PSR ¶ 66; *see also* Ex. A (Q. Wang) at 1-2 ("He was . . . selfless in supporting us, helping with our house mortgage after getting a job at Google, rather than saving money for himself.") (ellipsis added).

Gary also donated to non-profits, sending "roughly 15% of his income to animal charities, including The Humane League" to support its commitment to ending animal abuse. PSR ¶ 66. True to form, Gary did not advertise his philanthropy. Even his father only learned of his contributions to animal and environmental protection organizations when he stumbled on donation receipts in Gary's room. Ex. A (Q. Wang) at 1.

### D.    Alameda Research / FTX

Gary might have built a career at Google.  But in 2017, Bankman-Fried re-entered his life.
Tr. 312:9-12.  One fall weekend, Bankman-Fried traveled to Boston to convince Gary to start a
cryptocurrency trading firm with him.  *Id.*  Gary was persuaded.  In exchange for leaving his job
at Google, moving to Berkeley, California, and writing the new firm's computer code, Gary
became a 10% owner of what Bankman-Fried named Alameda Research (Alameda).  *See* Tr.
312:24-25, 314:8-12, 316:7-10.  Gary was just 24 years old.  Tr. 312:7-8.

The division of labor was clear from the outset:  Bankman-Fried ran the company.
Tr. 314:6-7.  Gary wrote code.  Tr. 314:8-12.  Neither Gary's role nor his compensation would
change from the day Alameda was founded through FTX's declaration of bankruptcy.

After about two years at Alameda, Bankman-Fried again approached Gary about starting a
new crypto trading platform: FTX.  Tr. 318:14-18.  Gary agreed.  Tr. 321:22-23.  Although he and
Bankman-Fried were nominally co-founders, the vast asymmetry between their responsibilities
remained.  Tr. 322:5-7.  Bankman-Fried and other FTX and Alameda leaders (including some of
Gary's co-defendants) oversaw public and investor relations, media appearances, fundraising,
trading strategy, lobbying, and campaign contributions.  *See* Tr. 323:5-14; *see also* Tr. 2941:6–16
(Gov't summation); Tr. 1306:1–21 (Singh testimony that Gary was uninvolved in "[m]arketing,
raising from investors, sort of running a lot of Alameda's trading, things like endorsement deals,
high level business decisions.").  Gary simply wrote the code Bankman-Fried instructed him to
write.  Tr. 322:8-323:3.  Consistent with the sharp disparity in their roles, Gary's ownership stake
was substantially smaller than Bankman-Fried's.  *See* Tr. 324:3-8.

Between 2019 and 2022, Gary's work for FTX took him from California, to Hong Kong,
and ultimately to the Bahamas.  PSR ¶ 78.  While others embraced public-facing roles and the

attendant media spotlight, Gary never stopped coding.  As FTX grew, Gary's grueling schedule remained constant, as he frequently worked through the night and was often "exhausted from the long hours of work and from being on call."  Ex. E (Yedidia) at 1; *see also* Tr. 213:3-12 (Adam Yedidia's testimony that he was so concerned about Gary's overwork and exhaustion that he instituted a rule not to wake Gary up at night to repair the code).  In contrast to other trading platforms, FTX "ha[d] a surprisingly small group of developers, with comparable operations usually employing hundreds of developers."  Ex. G (Kalinich) at 2 (alteration added).  "Gary was the only one able to work on the most difficult problems that [FTX] customers demanded solutions to," and "[h]e often worked through the night in order to develop the solutions they wanted."  *Id.* (alteration added).  Gary never took vacation, and those closest to him "could feel his oppression and exhaustion from his job, even though he rarely complained."  Ex. C (Chen). at 2.  Shortly after Adam Yedidia joined FTX in 2021, Gary confided in him that "he felt burn[t] out."  Ex. E (Yedidia) at 1 (alteration added).

Despite concerns from Yedidia and others, Gary's mounting struggles entirely escaped Bankman-Fried's notice.  Bankman-Fried was too busy curating his own growing international celebrity and seemed to view Gary as one more tool to be exploited.  "Gary doesn't need friends or social interaction," he once blithely remarked.  Ex. C (Chen) at 2.  Pushed to his limits, Gary considered leaving, but "was afraid of what would happen to FTX if he left—the company's development team at the time was extremely small, and he was the only capable site reliability engineer at FTX."  Ex. E (Yedidia) at 1; *see also* Ex. A (Q. Wang) at 2 (noting that Gary was "feeling over tired" but "stayed on out of loyalty to his coding work for the new system update.").  Lost in his own coding world, Gary drifted ever further from Bankman-Fried.  By the time FTX

moved to the Bahamas, Singh was the software engineer who sat next to Bankman-Fried.  Gary was relegated to a seat several desks down.

Gary did not supervise or oversee other software engineers.  *See* Tr. 323:5-14; Tr. 1307:20-25 (Singh).  Nevertheless, and despite his own crushing schedule, he was generous with his time when they needed his support or guidance.  *See* Ex. I (Lincoln) at 1 ("[Gary] doesn't speak much unless he needs to.  But, he did have words for me when I needed them.") (alteration added); Ex. C (Chen) at 1; *see also* Ex. G (Kalinich) at 1-2 ("While working at another company post-college, I reached out to Gary for guidance with a particularly difficult technical problem confounding our team, and he generously shared his valuable time and exceptional expertise.  My team was astounded by his brilliance in offering us a solution for an issue that we had struggled with for weeks.").

Gary did not help found FTX or participate in the conduct at issue here out of pursuit of personal financial gain.  For the duration of his Alameda and FTX employment, Gary received a $200,000 annual salary, with no commission and none of the lavish, multimillion-dollar bonuses that his co-defendants received.  PSR ¶ 78; Tr. 323:24-324:2, 685:10-22; Tr. 1309:20-23, 1513:10-15 (Singh).  Wholly unconcerned with wealth, Gary wore cheap clothing, typically "free promotional T-shirts on top and a pair of cheap jeans on the bottom."  Ex. C (Chen) at 1; *see also* Ex. B (Xiao) at 1 ("[Gary] is someone who doesn't like to spend time or money on clothing or appearance.") (alteration added).  As his mother explains, "[t]he suit he bought when he was in his high school symphony orchestra is the same one, which he still wears today."  Ex. B (Xiao) at 1-2.  In fact, it was the suit that Gary wore for all three days of his testimony at Bankman-Fried's trial.

Gary's indifference to personal wealth extended beyond his compensation. Gary often "didn't even bother to request reimbursements for work-related expenses." Ex. A (Q. Wang) at 2. While some of his FTX colleagues (including Bankman-Fried, Caroline Ellison, and Singh) often traveled by private jet, Gary flew economy. *See* Ex. H (Sun) at 1 ("I remember when we flew off the island to attend a friend's wedding. As I was finding our seats, my kids shouted in astonishment, 'Gary is in economy, like us!'"); Ex. C (Chen) at 1 ("Gary continued his lifestyle: preferring public transportation, flying economy class, and enjoying street food."); Ex. G (Kalinich) at 2 ("Even as Gary appeared to accumulate immense wealth as a result of his equity stakes in FTX and Alameda, he never altered his lifestyle in terms of dress, spending, or luxury items."). Throughout his Alameda and FTX tenure, Gary also quietly "continued to donate annually to animal welfare charities with his personal salary." Ex. C (Chen) at 1. Tellingly, as FTX's collapse loomed, Gary worked feverishly to expedite customers' access to their assets, *e.g.*, Tr. 451:22-24, but, unlike some of his co-defendants, did not explore falsely concealing loans for which he had signed or withdraw his own limited funds from his FTX account, *cf.* Tr. 1460:20-1461:18 (Singh's testimony regarding the "fictitious transactions" he had proposed to Bankman-Fried in November 2022, designed to create a fraudulent record that Singh "had paid off th[e] amount that [he] owed") (alterations added), *and* Gov't Salame Sentencing Submission at 10, ECF No. 436 (describing former FTX executive Ryan Salame's November 2022 withdrawal of more than $5 million from his FTX account).

Gary similarly eschewed fame. He played no role in marketing FTX and "declined every media interview arranged by the PR team and Sam Bankman-Fried." Ex. C (Chen) at 1; *see also* Ex. G (Kalinich) at 2 ("[W]hen *Forbes* wished to feature Gary as one of the richest people in its spring 2022 article 'The World's Youngest Billionaires 2022: 12 Under Age 30,' Gary refused to

be interviewed or provide any comment. While many aspire to be included on such lists, Gary turned down their persistent requests."). As one of Gary's former colleagues succinctly puts it: "From what I observed, Gary didn't seek fame or fortune. He seemed to find joy in his own geeky world and in the simplicity of life." Ex. H (Sun) at 1; *see also* Ex. D (Benjamin) at 2 ("I video chatted with Gary often when FTX was doing well. Nothing about him had changed."); Ex. G (Kalinich) at 2 ("He remained the same simple, quiet guy over the entire fifteen years I knew him, choosing to work very hard during the vast majority of his waking hours and otherwise spent his time alone, with his girlfriend, or with a handful of longtime friends.").

While at FTX, Gary met Yiling (Cheryl) Chen, to whom he is now married. PSR ¶ 68. The two first connected in 2019, and in May 2021, Gary overcame his shyness to ask her on a date. Ex. C (Chen) at 1. Although Cheryl saw that Gary was superficially "socially awkward, shy, and not good with words," *id.* at 1, she also saw past that, and came to know and love him as a compassionate, funny, and deeply respectful young man, with an abiding commitment to making the world a better place, *see id.* at 1-3. Gary had always found joy in coding, but Cheryl "brought a deeper sense of love into his life at just the right time." Ex. A (Q. Wang) at 2. The two built a relationship marked by laughter and love. *E.g.*, Ex. C (Chen) at 1-2; Ex. I (Lincoln) at 1; Ex. D (Benjamin) at 1-2; Ex. H (Sun) at 1. They got engaged in 2022.

Even as FTX collapsed, Cheryl remained a source of love and support. Gary's father recounts "th[e] dark night when we received a phone call from the Bahamas. With a trembling voice, Gary reassured us by saying, 'I have Cheryl now.'" Ex. A (Q. Wang) at 2; *see also* Ex. B (Xiao) at 2 ("I am deeply grateful to his then-girlfriend, now his wife and soon-to-be mother of his child, for her unwavering support and encouragement."). When Gary's flight took off from the Bahamas to pursue cooperation, Cheryl was seated in the economy-class seat next to him.

### III.    OFFENSE CONDUCT

As the Government explained in its summation, Gary "had no real role in the business" and "no involvement in the spending."  Tr. 2941:9-10 (Gov't summation).  Gary wrote code. Specifically, at Bankman-Fried's direction, Gary wrote code that gave Alameda Research special privileges on the FTX platform, including the ability to have a negative balance, a $65 billion line of credit, and an exemption from the platform's auto-liquidation feature.  Tr. 353:5-22, 364:2-24 (allow negative); Tr. 397:22-398:10 (line of credit); Tr. 373:9-14, 493:17-24 (auto-liquidation).

Crucially, as the Government has acknowledged and the evidence at trial showed, when Gary wrote that code, he had __*no idea*__ Bankman-Fried would exploit the features to steal customer funds.  Bankman-Fried did not even *inform* Gary (let alone coordinate with him) before the exploitation began.  In contrast to Ellison, to whom Bankman-Fried specifically explained that Alameda was taking FTX customer funds, Gary only learned Alameda was drawing on those funds because he happened to conduct an unrelated database query.  *Compare* Tr. 653:12-21, 654:2-6 (Ellison), *with* Tr. 376:18-377:19 (Wang).  In other words, despite having developed relevant FTX code features, Gary was *not* an architect of the fraud and only learned of the offense conduct after it was already well underway.  Gary similarly did not participate in conversations with lenders or investors or have more than glancing visibility on the lies Bankman-Fried and Ellison were telling them.  He also did not seek compensation beyond his annual salary or understand (as some of his co-defendants did) that the loan documents company lawyers presented him to sign could serve to conceal the proceeds of criminal misconduct.

At its core, Gary's crime was one of misplaced trust and naïve deference: after learning that customer money was being taken, Gary continued to develop and maintain the FTX platform, and allowed Bankman-Fried to allay his well-founded concerns.  That is not to diminish the

seriousness of Gary's offense, for which he has accepted full responsibility and feels deep remorse. It is only to distinguish his conduct from other FTX insiders who had either or both earlier and greater visibility on the fraud scheme.

More specifically, in late July 2019, Bankman-Fried spoke with Gary and Singh about instituting an "allow negative" feature on FTX. *See* Tr. 358:17-359:9. Bankman-Fried explained to Gary that the feature was necessary to allow FTX employees to pay FTX-related expenses and that he wanted "the expense payments to happen even if those accounts did not necessarily at the time have the . . . balance[] to pay for those expenses . . . since most of those were used for bookkeeping purposes." Tr. 359:6-9 (alteration and ellipses added). Singh implemented the relevant code change (on which Gary had contemporaneous visibility), and two Alameda Research accounts were among the accounts on which allow negative was immediately enabled. *See* Tr. 358:9-16, 360:16-362:17. Bankman-Fried did not suggest to Gary that the new feature could or would be used to transfer FTX customer assets to Alameda, nor did he advise Gary when those transfers began.

Gary first learned Alameda was taking FTX customer money by happenstance. In late 2019 or early 2020, he queried FTX's database to check Alameda's balance. Tr. 376:17-21. Gary saw that Alameda's negative balance of approximately $200 million dollars exceeded FTX's roughly $150 million revenue. Tr. 376:18-377:19. Gary was surprised to see those numbers, since he had previously overheard Bankman-Fried telling an Alameda trader that Alameda could only withdraw from the FTX exchange as long as those withdrawals did not exceed FTX's revenue.[6] Tr. 375:4-15.

---

[6]    Consistent with Gary's exclusion from business and financial matters generally, Bankman-Fried had never discussed the matter with him directly.

Gary immediately asked Bankman-Fried about the discrepancy.  Tr. 377:5-7.  Had Gary's supposed friend been honest with him, events might have unfolded very differently.  But Bankman-Fried instead insisted that Gary's calculation had been faulty because Gary had failed to include the value of Alameda's FTT.  Tr. 377:8-12, 20-25.  With the benefit of hindsight, Gary understands—and explained to the jury—the fundamental flaws in Bankman-Fried's reasoning: if Alameda had actually sold its FTT, it would have cratered the FTT market and, in any event, "Alameda was withdrawing U.S. dollars and other cryptocurrency and not FTT."  Tr. 379:6-13. But Gary had no financial background; Bankman-Fried did.  Gary played no role in either FTX's or Alameda's business operations; Bankman-Fried did.  And so, Gary made the defining mistake of his young life: he trusted Bankman-Fried.  Tr. 380:10-13; Tr. 541:20-542:5.

This crucial lapse in Gary's judgment is the through line of his participation in the offense conduct.  Gary also thought that Bankman-Fried was telling him the truth when he asked him to increase Alameda's line of credit, purportedly because, in its capacity as an FTX market maker, "Alameda [wa]s having issues placing orders because it d[id]n't have enough collateral."  Tr. 398:6-10 (alterations added).  Gary was similarly trusting when Bankman-Fried repeatedly told him "to make sure that Alameda's account [was] never liquidated on FTX," Tr. 373:9-14 (alteration added); Tr. 493:17-24, accepting at face value that the exemption was intended "to protect customers from clawbacks," Tr. 494:9-12.  Gary failed to disable Alameda's special privileges, after he later became aware that Bankman-Fried and other co-defendants were using these privileges to withdraw customer funds and representing to investors that no such privileges existed.  He also continued to maintain FTX's overall digital infrastructure after learning that FTX customer assets were being stolen.

Although it does not excuse Gary's participation in the offense conduct, his sharply limited visibility on Alameda's theft of FTX customer funds provides important context on his role. Gary's late 2019 or early 2020 conversation with Bankman-Fried about Alameda's "borrowing" put him on limited notice that Alameda had accessed some FTX customer assets. But it was almost **_two years_** before Gary had any further contact with or visibility on Alameda's theft. Tellingly, neither Bankman-Fried nor Ellison shared that information with Gary. It was only because Gary happened to query the FTX database in late 2021 (less than a year before FTX's collapse) that he learned Alameda had accessed "around $3 billion" in customer funds. *See* Tr. 400:3-11.

As Gary's belated discovery of the scope of Alameda's borrowing reflects, for the vast majority of the relevant time period, Bankman-Fried and Ellison kept Gary entirely out of the loop on the particulars of Alameda's accessing of FTX customer assets and the purposes for which those funds were used. Gary was never asked to do (and never did) anything that was deceptive on its face. Unlike Ellison, Gary was not enlisted to develop false financial statements. *Cf.* PSR ¶ 28. Unlike Singh, Gary did not falsify FTX revenue for auditors. *Cf.* PSR ¶ 26. And unlike both Singh and Salame, Gary was not a conduit for funneling FTX money into campaign contributions. *Cf.* PSR ¶¶ 34, 36.

Despite not having engaged in deceptive conduct himself, Gary was also on notice of some of the lies Bankman-Fried told investors. Gary never spoke to the media, had no public-facing social media presence, and had vanishingly rare contact with investors.[7] Nevertheless, because of FTX's open floor plan in Hong Kong,[8] he sometimes overheard Bankman-Fried speak with

---

[7]    On several occasions, Gary was asked to share technical information with an investor. He never made misrepresentations as part of those limited conversation.

[8]    As noted above, when FTX transitioned to the Bahamas, Gary was moved to a desk farther from Bankman-Fried.

journalists and investors and tell them that Alameda did not receive special treatment on FTX.  Tr. 400:16-404:19.  When Gary heard some of these conversations, he did not yet know Alameda was exploiting its special privileges to withdraw customer money.  But given his awareness of Alameda's unique functionality on the FTX platform, he knew these representations were untrue. *See* PSR ¶ 43.

Bankman-Fried was not the only person at FTX whom Gary trusted.  While Gary was at FTX, company lawyers repeatedly presented him with loan agreements and associated promissory notes.  Tr. 325:14-22; Tr. 577:10-15.  These loans cumulatively totaled more than $200 million. Tr. 326:1-4.  Crucially, as the Government has recognized, ***none*** of this money flowed to Gary personally, and he had ***no knowledge*** that these transactions were other than lawyer-sanctioned, ordinary-course business activity.  Tr. 326:8-15; *see also* Tr. 610:1-3, 11-13 ("I remember the lawyer telling me it was for some investment in this or that, but I don't remember what any of those were. *** I was given them to sign, they said it was for an investment, and I believed them and they wanted me to sign, so I just signed it.") (ellipsis added).

In contrast to Bankman-Fried, Ellison, Salame, and Singh, Gary did not seek to translate his FTX affiliation or participation in the offense conduct into material goods or personal gain. Although Gary was an equity holder in both FTX and Alameda, he never took steps to convert that equity into real estate or other liquid assets, spent lavish sums on himself or others, or sought compensation beyond his $200,000 annual salary.  This was consistent with his lifelong indifference to material wealth.  *See* Ex. A (Q. Wang) at 1-2; Ex. B (Xiao) at 2; Ex. C (Chen) at 1; Ex. D (Benjamin) at 2; Ex. E (Yedidia) at 1; Ex. G (Kalinich) at 2; Ex. H (Sun) at 1; *see also* PSR ¶ 66.  For their part, Gary's co-defendants all cultivated reputations for philanthropy while also spending lavishly on themselves.  *See, e.g.*, Tr. 685:10-22 (Ellison's testimony regarding the $10

million Alameda bonus that she invested in a startup); Tr. 1577:7-1578:8, 1614:23-1615:18 (Singh's testimony regarding his "egregious, unnecessary, and selfish" purchase of a $3.7 million-dollar home in September 2022).  By contrast, Gary never sought personal loans or received bonuses of any kind.

The only money Gary ever received beyond his salary during his five years at Alameda and FTX was an *unsolicited*, one-time loan of $1 million that Bankman-Fried sent to Gary's FTX account after Bankman-Fried learned Gary was anxious about interest payments on company loans for which Gary had cosigned.  *See* Tr. 324:21-325:6.  All but $200,000 of that money remained in Gary's FTX account when the company declared bankruptcy.  Tr. 325:4-6.  Fearing that his then-fiancée, Cheryl, might have nowhere to seek refuge in the event of a conflict between the United States and China, Gary had briefly loaned her $200,000 to help her purchase a small property in the hopes of securing legal residency in St. Kitts.  *See* Tr. 583:14-25; Ex. C (Chen) at 1.  Cheryl soon repaid Gary, and he used that money to pay taxes.  Ex. C (Chen) at 1.

## IV.    GARY'S COOPERATION

Gary's cooperation began almost immediately after FTX collapsed.  He was the first cooperating witness to share information with the Government, the first to meet with federal prosecutors, and the only one who had been fully debriefed when Bankman-Fried was indicted. His efforts have since included more than twenty meetings with federal law enforcement and a series of similar sessions with New York State authorities, the FTX Debtors, the Independent Bankruptcy Examiner, and the FTX MDL Plaintiffs.  Gary testified for three days at Bankman-Fried's trial and has made himself available to testify at two other trials in this district.  He has also taken the perhaps unprecedented step of collaborating with prosecutors to develop a software

tool aimed at identifying fraud in public markets and is working on a companion tool aimed at similar misconduct in crypto-markets.

From the moment Gary began cooperating, he has been relentlessly honest. His account has been repeatedly borne out by the evidence, including evidence that was unavailable to either Gary or the Government at the outset of his cooperation. Against this backdrop, prosecutors took the extraordinary step of publicly crediting the impact of Gary's cooperation months in advance of sentencing.[9]

### A.    Federal Law Enforcement

#### 1.    Gary's Immediate Assistance

Gary decided to cooperate within hours of FTX's collapse. Notably, he did so from the Bahamas, at a time when Bankman-Fried and others seemed to believe the Caribbean nation represented a safe refuge from U.S. prosecution. Driven by deep contrition and a desire to make amends, Gary made himself immediately available to the FTX Debtors (including helping preserve approximately $800 million in estate assets, as described below) and instructed his counsel to begin relaying information to the Government while he prepared to travel to the United States. *See* Tr. 624:7-8 (Q: "Who reached out to who? A: My lawyers reached out to the government."). Booking that flight proved unexpectedly complicated.

Despite Bahamian authorities advising Gary that he was entitled to have his passport returned, Bahamian law enforcement was repeatedly unavailable for days when his local counsel attempted to retrieve it. *See* Tr. 592:21-24 ("I was told that they were canceling the interview, and I was going to get my passport back."); Tr. 593:15-20 (describing difficulty getting passport back from the Bahamian police). Accordingly, Gary had to present himself at the U.S. embassy and

---

[9] *See supra* note 1.

request an emergency passport.  Gary could easily have used these challenges to delay his cooperation and wait to see how the Government's investigation developed.  But he did not.  Gary wanted to do the right thing and to start doing it as soon as he possibly could.  So, having finally secured a passport on November 16, 2022, Gary took the earliest available flight, landed at JFK late that night, and showed up for his first proffer the very next day.  *See* Tr. 594:1-5.

                2.       <u>Gary's Pre-trial Cooperation</u>

On November 17, 2022, Gary became the first cooperating witness to meet with the Government.  Thirteen lawyers and investigators from the U.S. Attorney's Office for the Southern District of New York (SDNY), FBI, SEC, and CFTC attended his proffer, with six more joining remotely.  At that initial meeting, Gary voluntarily surrendered his laptop and two phones, which contained voluminous data, including the FTX codebase and relevant company Slack and Signal communications.  *See* Gov't Letter at 4-5, ECF No. 237 (describing the volume of Slack data on Gary's laptop).  That lengthy session in a crowded conference room marked the formal beginning of Gary's intense and impactful cooperation.

Gary was the first FTX insider to whom prosecutors had access.  It would be weeks before Ellison met with prosecutors, following the FBI's execution of a search warrant at her home, and months before Singh's cooperation agreement was executed.  *See* Tr. 926:25-927:11 (Ellison); ECF Nos. 90-96 (Singh's February 2023 plea).  Over a series of lengthy proffers in late November and early December 2022, Gary meticulously outlined the FTX code's functionality, with particular attention to the special features he would later describe at trial and how those aspects of the code differed from Bankman-Fried's public representations.  As this Court may recall from Gary's trial testimony, his knowledge of the code was encyclopedic.  Gary deftly described nuances of the code's functionality and pinpointed for the Government descriptors and identifiers

they could use to access relevant code features and the FTX database.  In later sessions, the Government made Gary's laptop available to him, and he was able to show them precisely how the FTX platform worked—a clear, step-by-step account that was entirely consistent with his earlier descriptions and which the Government had Gary reprise from the witness stand at trial.

Before the Government had access to the FTX code or internal company communications, Gary alerted them to facts of which prosecutors were otherwise unaware that were later corroborated by company records and other witnesses.  For instance, before even arriving in the United States, Gary previewed through counsel the "Korean friend," that is, the FTX user account in which Bankman-Fried had concealed Alameda's $8 billion liability, and of which Gary only first learned *after* FTX's collapse.  *See* Tr. 453:20-455:25.  In early proffer sessions, Gary was able to recall more details about what specifically Bankman-Fried had said about that account post-collapse and precisely when in the frantic days of November 2022 Singh had sent Gary information about it.  This information helped the Government locate important evidence of Bankman-Fried's fraud.  Indeed, on the same November day that Gary described the "Korean friend" account to prosecutors, Bankman-Fried falsely denied any wrongdoing to a reporter and blamed FTX's losses in part on a "historical accounting artifact . . . which basically resulted in a stub account that was hard to find."[10]

Gary's cooperation played out amidst unusually stressful circumstances, under the harsh glare of the media spotlight and amidst widespread public opprobrium.  *See, e.g.*, *supra* note 2.  Moreover, because Gary had never accumulated liquid wealth, he found himself not only

---

[10] Jen Wieczner, *What Does Sam Bankman-Fried Have to Say for Himself? An interview with the disgraced CEO*, New York (Dec. 1, 2022), https://nymag.com/intelligencer/article/sam-bankman-fried-ftx-interview.html.

unemployed but with virtually no financial resources.  *See* PSR ¶ 80.  Since Gary was unable to afford his own housing or a Manhattan hotel, every proffer meant "a five-hour round-trip bus ride to New York" from his parents' home to the U.S. Attorney's Office.  Ex. C (Chen) at 3. Nevertheless, Gary was unfailingly eager to share any information that would help advance the Government's investigation.

Given his quiet nature, Gary may have spoken more words in government conference rooms during this roughly three-week period than he had in the three years preceding FTX's collapse.  Strikingly, not a single syllable proved inconsistent with the Government's evidence or suggested a desire on Gary's part to shield or minimize his own role in the offense conduct.  His precision and consistency were evident on cross-examination, as Bankman-Fried's counsel failed to identify any material difference in Gary's account over time.

We expect the Government's sentencing submission will more fully describe the scope and impact of Gary's assistance.  But at a public forum earlier this year, a member of the prosecution team had cause to reflect on the importance of Gary's swift and successful cooperation.  According to press reports, Assistant U.S. Attorney Thane Rehn explained: "Without [Gary Wang's cooperation], would we have found it?  Probably . . . But it would have taken a software expert weeks or even months."[11]  Gary's singular role in accelerating Bankman-Fried's prosecution is all the more significant, given the DOJ's repeated emphasis on the importance of speed in helping maximize this enormously high-profile case's deterrent impact and promotion of respect for law.[12]

---

[11] *See supra* note 1.

[12] *E.g.*, Press Release, SDNY, *Statement of U.S. Attorney Damian Williams on the Conviction of Samuel Bankman-Fried* (Nov. 2, 2023), https://justice.gov/usao-sdny/pr/statement-us-attorney-damian-williams-conviction-samuel-bankman-fried ("When I became U.S. Attorney, I promised we would be relentless in rooting out corruption in our financial markets.  This is what relentless looks like.  This case moved at lightning speed – that was not a coincidence, that

Mapping the timeline of this case's cooperating witnesses' engagement with the Government onto the calendar of Bankman-Fried's prosecution illustrates the degree to which Gary's cooperation was essential to Bankman-Fried's indictment and arrest. The Government indicted Bankman-Fried on December 9, 2022. Dkt. 1. At that point, prosecutors had completed four lengthy proffers with Wang. *See* Tr. 596:11-19. Ellison's first meeting with prosecutors was on December 8, 2022, and Singh was not signed up as a cooperating witness until the following February. *See* Tr. 926:25-927:11 (Ellison); ECF Nos. 90-96 (Singh). In other words, Wang was the only cooperating witness who had been fully debriefed when the Government decided to indict Bankman-Fried and seek his overseas arrest.

Gary's early assistance extended beyond helping the Government accumulate evidence of the FTX fraud. In the days and hours before Bankman-Fried's December 12, 2022 arrest, Gary reviewed a series of photographs of Bankman-Fried, drawn from the media appearances Bankman-Fried was then regularly conducting. By identifying the specific apartment and room from which Bankman-Fried was broadcasting, Gary helped the Government coordinate with Bahamian authorities to ensure Bankman-Fried's arrest proceeded smoothly and safely.

On December 19, 2022, Gary executed his cooperation agreement with SDNY. He then appeared before the Honorable Ronnie Abrams and pled guilty to four counts. PSR ¶ 7. Gary

---

was a choice."); Rhona Scoggins, *U.S. Attorney Damian Williams Recounts Importance of Speed in the FTX Case*, Fraud Conference News, at 01:34 (June 24, 2024), https://www.fraudconferencenews.com/home/2024/6/24/us-attorney-damian-williams-recounts-the-importance-of-speed-in-the-ftx-case ("[T]he best way to ensure that justice was served in the U.S. courtroom was to achieve primacy, and primacy was achieved through speed. So we indicted the case three and a half weeks after FTX collapsed . . . [W]e were able to . . . bring a substantial case very quickly [that] resulted in a guilty verdict a year to the day that FTX collapsed, and I think it sent a message to the world and to other people who were thinking about ripping off investors that if you do this, not only may you get caught, but you may find yourself in a prison with lightning speed.") (alterations and ellipses added).

24

simultaneously entered into settlement agreements with the SEC and CFTC, further formalizing his cooperation with those agencies. *See* Consent of Def. Zixiao ("Gary") Wang, *SEC v. Wang*, 22 Civ. 10794 (PKC) (S.D.N.Y. Dec. 19, 2022); Cooperation Agreement, *CFTC v. Wang*, 22 Civ. 10503 (PKC) (S.D.N.Y. Dec. 20, 2022). Pursuant to those settlement agreements, Gary faces, among other things, a ban on serving as a director or officer of a securities issuer and potential financial penalties.

Between his December 2022 guilty plea and October 2023 trial testimony, Gary remained actively engaged with SDNY prosecutors and other federal enforcement authorities as they continued to investigate the FTX fraud and, later, prepare for the Bankman-Fried trial. In addition to hours upon hours spent poring over FTX's code with SDNY, the SEC, and the CFTC, Gary also sat down with prosecutors from the DOJ's National Cryptocurrency Enforcement Team and the U.S. Attorney's Office for the District of Columbia, who were investigating a November 2022 hack of the FTX platform.[13] His continued cooperation further reinforced both the depth and breadth of his familiarity with FTX's code and database and the limitations of his awareness of virtually all other aspects of FTX and Alameda's operations. As described above, and among other things, Gary had no visibility on the particulars of Alameda's accessing FTX assets, Bankman-Fried's illicit dealings with the Chinese government, or violations of campaign finance law by Bankman-Fried, Singh, and Salame.

In total, Gary met with the Government eighteen times before trial, in addition to continuing to provide information to prosecutors through counsel. *See* Tr. 606:11-20.

---

[13] In February 2024, federal prosecutors indicted three individuals in connection with that hack. *See United States v. Powell, et al.*, 24 Cr. 38 (D.D.C.).

3.    Gary's Trial Testimony

As this Court knows, Gary was the first cooperating witness the Government called, and he testified over three trial days.  At the outset of his testimony, Gary clearly and candidly acknowledged his own culpability in the FTX fraud.  Tr. 304:12-310:7.  He then took jurors on the same detailed tour of FTX's code and functionality on which he had earlier escorted prosecutors. *See* Tr. 305:15-306:16; Tr. 335:21-341:9, 349:20-350:12, 351:20-352:8, 355:13-359:16, 365:10-367:9, 370:12-373:17, 374:10-375:2, 386:6-10, 410:13-413:3, 482:12-18, 483:8-10.  Gary exposed false statements that Bankman-Fried had made on Twitter and elsewhere and explained precisely how those representations had distorted reality.[14]  *See* Tr. 401:9-403:13, 459:10-463:12.

Gary's testimony also offered a crucial insider's perspective on FTX's chaotic final days in the Bahamas.  *See* Tr. 451:14-471:8.  His account included details of Bankman-Fried's false public statements, Tr. 459:10-463:12, as well as Gary's own efforts to expedite customers' ability to recover their funds, Tr. 451:22-24, 452:23-454:6.  It also featured a memorable illustration of the lengths to which Bankman-Fried had gone to conceal the fraud from others in the company, which, as noted above, Gary had flagged for prosecutors early on: Gary described how Bankman-Fried had asked him to compare customers' total balances with the assets that FTX had in its hot wallets.  *See* Tr. 453:5-12.  Gary was pleasantly surprised to learn that the two "were approximately equal."  Tr. 453:16-19.  When Gary reported his calculation to Bankman-Fried, Bankman-Fried immediately asked if Gary was "including our Korean friend."  Tr. 453:22-25.  Gary had no idea

---

[14] Among other things, Gary described Bankman-Fried's lies about the FTX insurance fund and explained how the insurance fund number posted online were larger than the insurance fund's actual size.  *See* Tr. 408:25-412:13.  As reflected in the evidence at trial, the deceptive insurance code was written by Singh in March 2020.  *See* GX 600 ("nishadsingh1 committed on Mar. 2 2020").  Gary was visiting his parents in the United States at the time and, because COVID delayed his return to Hong Kong, did not become aware of the change for many months.

what Bankman-Fried meant.  Tr. 454:1-3, 455:21-25.  Moments later, Singh sent Gary an account ID for an account that, unbeknownst to Gary, had been reassigned from Alameda to a Korean man with no discernible FTX or Alameda affiliation.  Tr. 454:1-455:20.  As Gary explained, that account contained Alameda's concealed balance: "[a]round negative $8 billion."  Tr. 456:22-457:1.

Finally, Gary described Bankman-Fried's last-ditch efforts to transfer FTX assets to the Bahamas, whose regulators Bankman-Fried perceived as "more likely to let him stay in control of the company, compared to the U.S."  Tr. 470:24-471:3.  As with so much of FTX's management to that point, Gary was excluded from the substantive discussions about the transfer and left waiting outside while "[Bankman-Fried] and his lawyers and his dad went and met with B[aha]mian regulators."  Tr. 466:9-16.  Following that meeting, Gary honored Bahamian regulators' directive that he transfer assets to Bahamian wallets.  *See* Tr. 467:12-470:23.  Having been excluded from Bankman-Fried and his father's meeting with Bahamian regulators, and played no role in Bankman-Fried's apparent eleventh-hour effort to regain control of FTX,[15] Gary understood this transfer to be compelled by Bahamian law.  *See id.*; *see also* PSR ¶ 23 (noting that Gary was not present for the Bahamian regulator meeting and transferred the assets at issue only after being directed to do so by the regulators).

Gary's cross-examination was notably uneventful.  Absent other means of impeaching Gary's testimony, Bankman-Fried's counsel was left to insinuate that the speed and thoroughness of Gary's cooperation somehow undercut his credibility.  *See, e.g.*, Tr. 594:1-5 ("Q: And you left

---

[15] Gary had no personal incentive to resist the bankruptcy and had been up through the previous night helping the FTX Debtors secure hundreds of millions of dollars that hackers had sought to steal from the platform.  *See infra* Section IV.C.  He has since worked tirelessly to assist the FTX Debtors in their efforts to recover FTX customer assets.  *See infra* Section IV.C.

the Bahamas on November 16, correct?  A: Yes.  Q: And the very next day you met with the

prosecutors, isn't that right?  A: Yes.").  The Government's rebuttal summation compellingly

distilled the degree to which Gary's immediate and whole-hearted cooperation made him the poster

child for countering any argument that his and other cooperators' testimony was other than entirely

truthful:

> [T]he defense wants you to believe that none of these cooperators helped the defendant
> commit crimes and that they all pleaded guilty even though none of them actually thought
> they were doing anything wrong at the time.  Now think about that.  And let's take Gary
> Wang as an example.  By this argument, Gary Wang leaves the Bahamas days after FTX
> declares bankruptcy, less than a week later comes to meet with the government, no one at
> that point has been charged with any crimes, and he confesses to all sorts of things that he
> didn't do.  In that very first meeting, he pleads guilty to a host of crimes he didn't commit,
> he exposes himself to penalties for things he never did, and then he comes up here and he
> lies to you.  That makes no sense.

Tr. 3125:3-15 (Gov't rebuttal summation).  Gary's precise and cogent testimony was a key

component of the Government's case, as reflected by the frequency with which prosecutors cited

it in their principal and rebuttal summations.  *See* Tr. 2914:11-12, 2922:19-2923:1, 2924:1-8,

2927:17-2928:19, 2929:14-19, 2932:7-21, 2941:6-13, 2941:21-2942:5, 2968:10-12, 2970:19-

2971:7, 2974:1-5, 2985:25-2986:5, 2986:10-2987:4, 2995:2-4, 2996:8-13, 3009:4-12 (Gov't

summation).

### 4.    Post-trial

Gary's cooperation with federal law enforcement did not end with the jury's verdict.  At

SDNY's request, he has twice made himself available as a potential trial witness in unrelated trials

in which the FTX platform's functionality was at issue.  He has also met with prosecutors and the

FBI to support law enforcement efforts to identify evidence of any third-party criminal behavior

reflected in the FTX database.

Perhaps most remarkably, at SDNY's direction, and on his own time, Gary has built an

entirely new software tool aimed at helping law enforcement identify potential fraud in public

markets. The tool was developed and refined in close coordination with experienced fraud prosecutors and reflected Gary's considerable programming talents. Gary hopes his efforts can help mitigate harm to future victims and ensure swift accountability for perpetrators of financial fraud. For similar reasons, he is currently working, at prosecutors' direction, to develop a software tool aimed at identifying illicit conduct on crypto-markets.

### B.    NYAG

In addition to his far-reaching cooperation with federal law enforcement, Gary has also sought to assist state efforts to investigate potential illegal behavior on FTX. As the NYAG explains, Gary "promptly replied to [their] outreach and volunteered to cooperate with [their] investigation." Ex. N (NYAG) at 1 (alterations added). He has shared information through counsel and met with Assistant Attorneys General and investigators from NYAG's Investor Protection Bureau three times (twice in person and once virtually) in connection with a non-public investigation. *Id.* State prosecutors have found Gary to be "forthcoming, cooperative, and flexible" and note that he "has assisted in advancing [their] investigation, including by helping [them] identify additional sources of information, documents, and evidence." *Id.* (alterations added). They look forward to his continued cooperation. *Id.*

### C.    FTX Debtors

Gary began helping the FTX Debtors immediately after the bankruptcy declaration. As current FTX CEO John J. Ray III sets forth in his sentencing letter, Gary provided "assistance in protecting and preserving FTX assets from a cybersecurity breach" in the first hours of bankruptcy. Ex. J (Ray) at 2. After a group of hackers "leveraged the chaos" of the bankruptcy declaration "to loot over $400 million in estate assets," Gary jumped onto "an overnight call during which he assisted in preserving approximately $800 million dollars in estate assets by helping the Debtors'

advisors move susceptible assets from compromised wallets to secure cold storage." *Id.* Gary's "early assistance was vital in ensuring that assets were preserved for the benefit of creditors, and his expertise and knowledge of the FTX system helped prevent further dissipation of estate assets." *Id.*

As Gary's wife Cheryl explains, the decision to assist the FTX Debtors through that initial bankruptcy crisis came at a personal cost to Gary and stemmed from his commitment to doing the right thing:

> When the building was about to collapse, everyone was afraid and wanted to leave, including Gary. He was scared but also wanted to remedy the situation, so he stayed in the Bahamas to assist the liquidation team. The same day that FTX declared bankruptcy, FTX was hacked. The media speculated that it was an inside job and screenshots of Gary's GitHub [coding] activity at that time circulated, but the truth was that he was sitting beside me, and as the only developer left, Gary immediately got onto a video call with the U.S. team to transfer the remaining FTX assets to secure cold wallets to prevent further loss. He never defended himself against the rumors.

Ex. C (Chen) at 2-3 (alteration added). Gary's dedication to supporting efforts to recover assets for FTX victims has persisted. During the early months of the FTX bankruptcy, Gary participated in a series of conversations "with the Debtors' advisors, during which he answered technical questions relating to the FTX code and database, the identification of cold wallets, how custodial account balances could be retrieved and updated, and how the FTX liquidation system functioned." Ex. J (Ray) at 2. Through counsel, Gary also separately "answered specific questions the Debtors' advisors posed relating to many investigations and adversary proceedings, and executed a declaration in support of one such adversary proceeding." *Id.* His tireless efforts have been animated by the same remorse that drove his cooperation with law enforcement, as he has embraced every opportunity to help make victims whole.

Gary is in the process of finalizing a settlement with the FTX Debtors, pursuant to which he "will turn over to the Debtors substantially all of his remaining assets after satisfying his

forfeiture obligations, and will provide ongoing cooperation, including by making himself available to testify as needed, voluntarily providing documents and information, reviewing and clarifying documents, locating and retrieving assets, and answering questions from the Debtors' advisors." Ex. J (Ray) at 2. He is eager to continue his work to maximize victims' recovery.

Gary similarly made himself available to Robert J. Cleary, the Bankruptcy Court-appointed independent Examiner for the FTX bankruptcy proceedings. In addition to providing information through counsel, Gary participated in two lengthy meetings with Mr. Cleary and his team. Ex. K (Cleary) at 1. Mr. Cleary considered Gary's information both "credible and useful" in executing his duties. *Id.*

### D.    FTX MDL Plaintiffs

Gary's commitment to helping maximize recovery for FTX victims is also reflected in his cooperation with the FTX MDL Plaintiffs. As with the FTX Debtors, Gary's ability to assist was limited by his lack of involvement with FTX's business and finances and corresponding lack of visibility on the intricate web of transactions that the FTX MDL Plaintiffs seek to unravel. Nevertheless, MDL Plaintiffs' counsel were struck by the sincerity of Gary's remorse, as he sat with them for hours to provide information, which they considered "very helpful" to their case. Ex. L (MDL Plaintiffs) at 1 (expressing their hope that this Court "will consider Mr. Wang's expressed remorse and significant assistance to MDL Plaintiffs" when imposing sentence).

### E.    Gary's Efforts to Rebuild a Productive Life

The defining feature of Gary's post-FTX life has been the extensive and ongoing cooperation detailed above. But he has also taken important steps to return to being a productive member of society. Thanks to his loved ones' support, Gary is employed, married, and days away from the birth of his first child.

Since returning from the Bahamas, Gary has lived with his mother.[16]  He has fully complied with all terms of pretrial release.  PSR ¶ 12.  Gary and Cheryl married in a small ceremony in January 2023.  *Id.* ¶ 68.  As one of the few attendees notes, "[i]t was beautiful and inspiring to see Gary and Cheryl's devotion to each other, even in very difficult circumstances."  Ex. F (Grazian) at 1; *see also* Ex. G (Kalinich) at 2 ("Cheryl . . . shares his values and they are completely devoted to one another.") (ellipsis added).  Gary and Cheryl are expecting a son on November 27.  PSR ¶ 68.  Gary is a devoted husband who has "accompanied [Cheryl] to every pre-natal check-up" and thrown himself into "extensive research and reading to better prepare for [Cheryl's] pregnancy and the arrival of [their] child."  Ex. C (Chen) at 2 (alterations added).  Cheryl describes his beaming face when they first saw their son on the ultrasound and explains how when she needed to "exercise more during pregnancy, he would do prenatal Pilates with me, follow YouTube workouts, and use funny moves to make [her] laugh."  *Id.* (alteration added).  When she was understandably "depressed and anxious about the future, he would act as [her] emotional outlet, accepting and empathizing with all [her] emotions and comforting [her]."  *Id.* (alterations added).  In short, Gary is committed to doing whatever he can to support his growing family.

Gary has already taken an important step toward being able to provide for Cheryl and his son financially.  As described above, Gary's FTX income had been limited to his annual salary.  Accordingly, after returning to the United States, "he spent day and night sending emails in search of a new job to pay the living costs and necessary legal expenses."  Ex. A (Q. Wang) at 2.  In February 2023, he secured employment as a staff software engineer at Polycam, which "make[s] 3D imaging technology for a variety of industries."  Ex. M (Polycam Leadership) at 1 (alteration

---

[16] Gary's father has spent much of this period in Beijing caring for his own mother, Gary's grandmother, who suffers from dementia.  PSR ¶ 63.

added).  Gary "works tirelessly every day because he feels the weight of responsibility to be a devoted husband and father." Ex. A (Q. Wang) at 2; *see also* Ex. F (Grazian) at 1 ("Gary is . . . committed to being the best father he can be.") (ellipsis added).  Notably, Gary's work includes support for "forensics companies, criminal investigators, and justice professionals who seek to faithfully preserve evidence."  Ex. M (Polycam Leadership) at 2.

Gary was fully transparent with Polycam about this case.  *See* PSR ¶ 77.  As Polycam's leadership explains in their sentencing letter, although they had no relationship with him when he first applied for a job, the company's "faith in Gary's character has been wholly validated and rewarded in a way that we could not have imagined at the time."  Ex. M (Polycam Leadership) at 1.  Over the past two years, Gary has distinguished himself as a "humble and helpful" colleague, who "never seeks attention or praise," and is "a true cooperator, in everything he does, and in every sense of the word" as well as "one of the most talented, hardworking, and team-oriented collaborators imaginable."  *Id.* at 1-2; *see also id.* at 2 ("Gary's talent, dedication, and character stand to benefit any community in which he finds himself - professional or otherwise."); Ex. I (Lincoln) at 1 ("His brilliance as a developer is hard to overstate.").  Gary's co-workers have seen his efforts to prepare for parenthood, and share his friends and family's sense that he will be a "loving and supportive father."  Ex. M (Polycam Leadership) at 2.

Gary will experience the personal and reputational consequences of his crimes and conviction for the rest of his life.  But through determination and hard work, he has carved out a life for himself and his loved ones.  On the precipice of parenthood, he wants nothing more than "to raise a healthy child" and "keep working to support his family."  PSR ¶ 71.

## V.    SENTENCING GUIDELINES

In determining an appropriate sentence, the Court should consider the factors set forth in 18 U.S.C. § 3553(a), including: "the nature and circumstances of the offense and the history and characteristics of the defendant;" the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, adequately deter criminal conduct, protect the public from the defendant's potential recidivism, and "avoid unwarranted sentencing disparities;" and "the need to provide restitution to any victims of the offense."  18 U.S.C. § 3553(a).

When, as here, the Government is expected to move for the defendant to be sentenced as a cooperating witness, the Court should also consider the non-exhaustive list of factors set forth in § 5K1.1 of the U.S. Sentencing Guidelines, including:

(1)    the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2)    the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3)    the nature and extent of the defendant's assistance;

(4)    any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;

(5)    the timeliness of the defendant's assistance.

U.S. Sent'g Guidelines Manual (U.S.S.G.) § 5K1.1(a).  We respectfully submit that a sentence of time-served for Gary would be sufficient but not greater than necessary to achieve all relevant sentencing goals.

## VI.    A NON-CUSTODIAL SENTENCE IS APPROPRIATE

Gary is a profoundly remorseful first-time offender who has led an otherwise productive and law-abiding life.  He was the least involved of any defendant in the offense conduct, as reflected in both the trial evidence and the limited counts to which he pled.  He received none of the lavish bonuses showered on his co-defendants and never sought to live beyond his $200,000 annual salary (a substantial portion of which he donated to charity).  He was the first FTX insider to cooperate and someone whose efforts prosecutors have already recognized as having had an outsized impact on Bankman-Fried's prosecution.  He has worked tirelessly to help recover FTX customer assets and sought new ways of using his unique skills to support the Government's efforts to combat financial fraud.  He has secured and sustained employment, complied with all conditions of release, and tried to build a quiet and meaningful life for himself and his family.  He is a devoted son, friend, husband, and soon-to-be-father, who presents *zero* risk of recidivism.  We respectfully submit that a custodial sentence would disrupt his ongoing cooperation, leave his family without financial support, create an unwarranted sentencing disparity between Gary and Singh, as well as similarly situated cooperating witnesses in other cases, risk deterring future cooperation, and be otherwise greater than necessary to satisfy the statutory sentencing purposes.

As described above, Gary's life before he began working with Bankman-Fried was a true American success story.  A first-generation immigrant, he absorbed his engineer parents' work ethic and earned his place at MIT.  Despite his academic prowess, Gary was then, as he is now, a model of humility, who sought out opportunities to serve his community and people in need and consistently impressed those close to him with his kindness and consideration.  There was nothing performative, insistent, or attention-grabbing about Gary's concern for those less fortunate than him.  Gary was not looking to make a splash or build a brand and never sat for an interview about

35

his desire to do good.  Like he did so much else, Gary kept his dietary, volunteer, and philanthropic choices quiet.

Tragically, Gary's compassion and kindheartedness made him trusting to the point of naivete.  Bankman-Fried preyed on that quality, and Gary's resulting deference to his judgement.  And, for all his undeniable brilliance as a coder, Gary allowed himself to become one of Bankman-Fried's pawns.

Gary's good judgment quickly reasserted itself once he wrenched himself away from Bankman-Fried.  Gary was the first cooperating witness to meet with the Government and the first to plead guilty.  He has never shrunk from his complicity in and culpability for the serious crimes of which he stands convicted and will always feel profound shame and regret for his misconduct. *See, e.g.*, Ex. C (Chen) at 2 ("Gary feels deep regret and guilt."); Ex. A (Q. Wang) at 2 ("He deeply regrets his part in what happened with FTX."); Ex. D (Benjamin) at 2 ("[H]e is very remorseful for what happened and is committed to doing what is right."); Ex. G (Kalinich) at 3 ("I know that he will continue to do all he can to rectify and make amends for the financial harm caused to others."); Ex. H (Sun) at 2 ("I believe his apology is sincere and that his regret is genuine."); Ex L (Polycam Leadership) ("We found Gary to be deeply remorseful.").

Nevertheless, the nature and circumstances of Gary's offense are strikingly different from those of his co-defendants.  Gary was unaware of the scheme when it started, never informed of its particulars, and unlike Bankman-Fried, Ellison, and Singh, never once took an affirmative step to deceive anyone.  As the trial record reflects, Bankman-Fried did not believe Gary was someone who deserved an honest account of what was really happening.  Instead, he seemed to regard his "friend" as a tool to be manipulated.

36

At trial, Gary recounted his discussions with Bankman-Fried related to Alameda's theft of FTX customer funds.  Remarkably, the majority of these conversations consisted of Bankman-Fried telling him bald-faced lies.  First, Bankman-Fried lied to Gary about the purposes for which Alameda's special features were required.  *See, e.g.*, Tr. 359:5-9, 373:9-14, 398:6-10, 493:17-24.  Second, when Gary stumbled into partial visibility on Alameda's use of FTX customer funds, Bankman-Fried falsely assured him there was no issue because Alameda's loans were appropriately collateralized.  Tr. 377:9-12, 20-25.  Finally, as Gary worked to help protect customer assets in the hours before bankruptcy, Bankman-Fried revealed that he had used the "Korean friend" account to keep aspects of Alameda's enormous debt from him.  Tr. 453:23-25, 455:21-25.  For too long, Gary allowed himself to believe those lies, assuming that Bankman-Fried's background in finance and seeming success meant that Bankman-Fried *had* to know better.  To Gary's lasting shame, when he finally realized the extent of Alameda's theft less than a year before FTX's collapse, he failed to stop the scheme and instead quietly continued his round-the-clock work to keep the FTX platform's day-to-day operations running.

Even Bankman-Fried seems to have recognized and deferred to Gary's integrity.  When Bankman-Fried wanted someone to *deliberately* generate false information, he never looked to Gary.  When Bankman-Fried needed someone to create false documentation for third-party lenders or make deceptive social media posts about Alameda's financial health, he turned to Ellison.  PSR ¶ 28; Tr. 898:9-900:6 (Ellison).  When Bankman-Fried needed someone to pad FTX's books with fake revenue or make political donations under false pretenses, he turned to Singh.  PSR ¶¶ 26, 36; *see also supra* note 14 & GX 600 (Singh's creation of the false FTX insurance fund display); Tr. 1460:20-1461:18 (Singh's proposal of fake transactions to conceal his outstanding loans).  Even

after Gary finally became aware of Alameda's theft, Bankman-Fried knew better than to ask him to actively perpetuate the fraud.

Gary's indifference to money also starkly distinguishes him from the four other defendants who have appeared before this Court for sentencing. Bankman-Fried, Salame, Ellison, and Singh all received and spent millions of dollars of FTX customer funds on private investments, luxury goods, exotic travel, and/or personal real estate. By contrast, although Gary's equity stakes in Alameda and FTX made Gary a billionaire on paper, he *never* tried to convert that equity into liquid resources or otherwise alter the lowkey lifestyle he had always led. Having grown up with modest means, Gary had considered his roughly $200,000 income at Google more than a person could reasonably spend, and he was entirely content to live on that same salary for the duration of his Alameda and FTX employment. Even as FTX's collapse loomed large, Gary never looked to monetize his FTX holdings.

The Probation Department has recognized the significant gap between Gary's conduct and that of other defendants in this case. Citing Gary's role, performance on supervised release, steady employment, and familial responsibilities, Probation recommend a substantial downward variance from the Guidelines, while clarifying that because they were not yet privy to the details of Gary's assistance to the Government, "**cooperation was not considered when determining a sentence herein**." PSR at 31. But of course, Gary did cooperate, and he did so swiftly, thoroughly, and impactfully. We respectfully submit that the speed and scope of his cooperation supports a further downward variance.

From the first frenzied hours of FTX's collapse, Gary worked tirelessly to help right FTX's wrongs. As the company fell apart, he did not withdraw a cent of his own or Cheryl's money. He focused on accurately identifying FTX's assets and liabilities and helping FTX customers

38

expeditiously process withdrawals.  *See* Tr. 451:22-24, 452:23-454:6.  Gary had not had a full night's sleep for days by the time FTX declared bankruptcy.  But he worked through the night to help protect hundreds of millions of customer assets from hackers, the beginning of extended, robust, and ongoing cooperation with the FTX Debtors.  *See supra* Section IV.C.

The § 5K1.1 factors underscore the degree to which Gary's cooperation warrants a substantial downward variance.  His assistance was not only eminently timely but also more so than any other cooperating witness in this case.  *See* U.S.S.G. § 5K1.1(a)(5).  Despite the chaos and disorientation of FTX's collapse, Gary knew he wanted to support the inevitable law enforcement investigations into what happened and help make customers whole.  Even as Bankman-Fried treated the Bahamas as an inviolable sanctuary from prosecution, Gary contacted SDNY through counsel and began to explain what he understood to have happened.  Bahamian law enforcement inexplicably delayed returning Gary's passport, but Gary presented himself at the U.S. embassy in Nassau to get an emergency travel document and rushed back to this country to cooperate.  Thanks to his determined efforts, he was the first cooperating witness to meet with the Government and the only one to be fully debriefed before SDNY indicted Bankman-Fried.

As we expect the Government will further detail, Gary's cooperation was as relentlessly truthful as it was timely.  *See* U.S.S.G. § 5K1.1(a)(2).  It is common for aspiring cooperators to hold back or minimize details of their culpability, but Gary never once had to augment or amend anything he said.  To the contrary, his early descriptions were consistently corroborated by other evidence.  As the Government has already publicly acknowledged, Gary's wide-ranging cooperation was singularly important to accelerating a prosecution whose deterrent legacy will derive in substantial part from the speed at which it proceeded.  U.S.S.G. § 5K1.1(a)(1); *see also*

*supra* note 12.  As reflected in the Government's summations, Gary's lengthy trial testimony also played an important part in securing Bankman-Fried's conviction on all counts.

Without repeating every aspect of the extensive, multifaceted and ongoing cooperation outlined above, *see supra* Section IV.A-D, one aspect of Gary's efforts deserves particular emphasis: his work to develop new software tools to combat fraud in public and crypto markets is, as this Court knows, highly unusual (and perhaps unprecedented) for a cooperating witness.  It simultaneously illustrates the extent of Gary's coding talent and the intensity of his commitment to doing everything he possibly can to support the Government and mitigate harms to future fraud victims.  *See* U.S.S.G. § 5K1.1(a)(3).  A custodial sentence would interrupt Gary's further refining of the public markets tool and development of the crypto-market tool and preclude further near-term collaboration with the Government around similar projects.  It would similarly impede his availability to continue assisting the FTX Debtors in recovering FTX customer assets.

Alongside his whole-hearted cooperation, Gary has worked to build a life for himself and his family.  Gary had no meaningful financial cushion and his parents have modest means.  So, in between five-hour bus rides to and from Manhattan to cooperate, Gary looked for work.  Polycam's admirable investment in giving Gary an opportunity to succeed has allowed Gary to distinguish himself as a friend and colleague of dedication, skill, and integrity.  It has also given Gary hope that he will be able to do what matters most to him: support his wife and son.

Despite his hard work for Polycam, Gary's forfeiture obligations, settlement with the FTX Debtors, and similar current and anticipated expenses have prevented him from accumulating savings during the pendency of these proceedings.  Cheryl is nine months pregnant, in the process of naturalizing, and has not been able to work.  A custodial sentence would leave both her and

Gary's soon-to-be-born son without their primary source of financial support.[17]  Gary and Cheryl desperately hope to be able to tackle the inevitable challenges of new parenthood in the same way they have faced all the obstacles of the past two years: together.

The remaining statutory sentencing factors similarly counsel in favor of significant lenience.  Given the nature of Gary's participation in the offense conduct, and the life he has led before and since his professional path crossed Bankman-Fried's, Gary presents no risk of recidivism, and specific deterrence is not at issue here.  This Court has rightly noted that the scale and notoriety of the FTX fraud increase the salience of general deterrence and concern for promoting respect for law.  Ellison Sentence Hr'g Tr. at 32:8-21, ECF No. 524.  But, as Singh's sentence reflects, the fact of a crime's size or public profile does not necessarily dictate custodial sentences for everyone who participated—and should not support one for Gary here.  Sentence Hr'g Tr. at 28:1-3, 29:19-30:2, *United States v. Singh*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Oct. 30, 2024) (*Singh* Sentencing Tr.).

The key factors that this Court cited in support of Singh's time-served sentence are similarly applicable to Gary.  Like Singh, Gary's involvement in the offense was "much more limited than" Bankman-Fried and Ellison.  *Singh* Sentencing Tr. at 28:6-7.  Like Singh, Gary learned of the scale and scope of Alameda's theft "relatively late in the day" and was subject to Bankman-Fried's "charismatic, demanding," and "deceitful" influence.  *Id.* at 28:7-10.  Like Singh, Gary is readily distinguishable from Ellison, who "was involved from the beginning" and "knew for years what was going on."  *Id.* at 30:3-5.  Like Singh, Gary was "young and

---

[17] Cutting off Gary's ability to continue earning an income would also undercut his ability to pay SEC or CFTC-imposed financial penalties and otherwise help make victims whole. *Cf.* 18 U.S.C. § 3553(a)(7).

inexperienced," particularly with respect to finance and, when he learned of the theft, "had no real idea of what to do." *Id.* at 28:16-18. Like Singh, Gary "didn't try to figure out what was the spectrum of options" after FTX's collapse but instead embraced cooperation and did so in a manner that reflects a "serious moral element" to his decision-making. *Id.* at 28:23-29:14. And, like Singh, Gary's cooperation was "remarkable." *Id.* at 29:15.

Indeed, we respectfully submit that both Gary's involvement in the offense conduct and his cooperation compare favorably with Singh's. Unlike Singh, Gary did not engage in money laundering or participate in the straw donor scheme. Unlike Singh, Gary did not generate false revenue, code a fake insurance fund, try to persuade Bankman-Fried to fraudulently conceal his loans, or otherwise participate in affirmatively deceptive conduct. And, unlike Singh, Gary did not receive cash bonuses or spend FTX proceeds on real estate or other extravagant goods. All of these factors combine to make him meaningfully less culpable than Singh.

Gary's cooperation also exceeded Singh's in a variety of notable ways. Gary was the first to cooperate and pled to a cooperation agreement months before Singh. Gary was the only cooperator who had been fully debriefed before Bankman-Fried's arrest and shared information that contributed to that arrest being executed safely and smoothly. Gary was the original source of prosecutors' understanding of the FTX code, which understanding Singh only later corroborated. *See* Gov't Singh Sentencing Submission at 12, ECF No. 526 ("The only other person in a position to describe the code and Bankman-Fried's involvement in it was Gary Wang, whom Singh corroborated, demonstrating that Wang was not the chief architect of the hidden advantages for Alameda in FTX's code."). Gary's testimony featured earlier and more prominently in Bankman-Fried's trial, and Gary has made himself available to testify at two additional trials. Finally, Gary's ongoing cooperation has uniquely included the development of software tools to

combat fraud.[18]  For all these reasons, imposing a harsher sentence on Gary than that imposed on

Singh would create a markedly unwarranted sentencing disparity.

Cooperator sentences in other high-profile prosecutions further underscore the degree to

which a non-custodial sentence is appropriate for Gary.  As perhaps most comparable to this case,

three separate witnesses who cooperated in SDNY's prosecution of Bernie Madoff received non-

custodial sentences.  *See* Judgment, *United States v. Cotellessa-Pitz*, No. 10 Cr. 228 (LTS)

(S.D.N.Y. May 27, 2015), ECF No. 1348 (time-served and 250 hours community service);

Judgment, *United States v. Friehling*, No. 09 Cr. 700 (LTS) (S.D.N.Y. June 4, 2015), ECF No.

113 (time-served with 10 months' home detention); Judgment, *United States v. Lipkin*, No. 10 Cr.

228 (LTS) (S.D.N.Y. May 27, 2015), ECF No. 1349 (time-served with 9 months' home detention).

Madoff's accountant, David Friehling, is a particularly useful point of reference.  Like

Gary, he was on notice of key aspects of Madoff's Ponzi scheme but largely insulated from its

particulars.  *See* Sentence Hr'g Tr. at 40-41, *United States v. Friehling*, No. 09 Cr. 700 (LTS)

(S.D.N.Y. May 28, 2015), ECF No. 114 (*Friehling* Sentence Tr.).  Having played an instrumental

role in a fraud whose public spectacle and victim impact rivaled that of FTX, Mr. Friehling faced

a Guidelines range that was decades higher than Gary's.  *Id.* at 38 (noting Friehling's undisputed

Guidelines range of 114 years' imprisonment).  While emphasizing that Friehling's crimes were

"very serious, indeed," Judge Swain also recognized Friehling's good character and the fact that

he, like Gary, "worked quickly and proactively to begin to right the wrongs caused by his

participation" in the fraud.  *Id.* at 40, 42.  She further considered Friehling's loss of his savings,

dedication to supporting his family, and the degree to which he had been exposed to public scrutiny

---

[18] Separate and apart from his cooperation with the Government, Gary also provided greater assistance to the FTX Debtors, including helping safeguard more than $800 million in customer assets from hackers.

and judgment before imposing a non-custodial sentence. *Id.* at 43, 48. All of those same factors

counsel in favor of lenience here. Indeed, we respectfully submit that Gary compares favorably to

Mr. Friehling. Unlike Gary, Mr. Friehling was a sophisticated gatekeeper, who only cooperated

after his arrest. *See* Complaint, *United States v. Friehling*, No. 09 Cr. 700 (LTS) (S.D.N.Y. Mar.

17, 2009), ECF No. 1; *Friehling* Sentence Tr. at 42-43.

Singh and the Madoff cooperating witnesses stand among many SDNY cooperating

witnesses in large or high-profile cases whose cooperation earned them non-custodial sentences.

Other examples (among many) include:

- This Court's imposition of a time-served sentence on Thomas Gassnola, who pleaded guilty to conspiracy to commit wire fraud for his role in the widely publicized NCAA pay-for-play scheme. *See* Sentence Hr'g Tr. at 8:21-9:4, *United States v. Gassnola*, No. 18 Cr. 252 (LAK) (S.D.N.Y. Sept. 10, 2019), ECF No. 24.

- This Court's imposition of a time-served sentence on Daniel Tzvetkoff, who cooperated but ultimately did not testify in SDNY's widely publicized takedown of illegal international online gaming providers. *See* Sentence Hr'g Tr. at 4:13-17, *United States v. Tzvetkoff*, No. 10 Cr. 336 (LAK) (S.D.N.Y. June 4, 2014), ECF No. 280. Unlike Gary, Mr. Tzvetkoff's cooperation only began after his arrest.

- Judge Chin's imposition of a time-served sentence on Anil Kumar, a cooperating witness in the high-profile insider trading prosecutions of Galleon Group founder Raj Rajaratnam and hedge fund director Rajat Gupta. *See* Judgment, *United States v. Kumar*, No. 10 Cr. 13-01 (DC) (S.D.N.Y. July 2, 2012), ECF No. 50. Unlike Gary, Mr. Kumar's cooperation only began after his arrest.

This Court succinctly explained the basis for such judicial lenience when imposing a sentence of

probation on a cooperating witness in an insider-trading case, noting that a cooperation agreement

"serves a utilitarian purpose without which other people couldn't have been brought to justice."

Sentence Hr'g Tr. at 5:5-6, *United States v. Glass*, No. 07 Cr. 159 (LAK) (S.D.N.Y. Dec. 8, 2008),

ECF No. 19.

Against this backdrop, a custodial sentence for Gary would create an unwarranted

sentencing disparity between him and Singh and other similarly situated cooperating witnesses,

including many whose cooperation was less prompt, robust, and impactful than Gary's. A term of imprisonment would also fail to account for Gary's limited role in the offense conduct, the swiftness of his assistance to the Government, or the extent of his ongoing cooperation, including the software tool that he built for prosecutors. Sending Gary to prison would risk undercutting the utilitarian benefits of cooperation by conveying a damaging deterrent signal. This case is unusually closely watched, and as this Court recognized when sentencing Singh, there is danger in imposing "a sentence that discourages others" from cooperation. *Singh* Sentencing Tr. at 29:23-30:2. If someone like Gary, whose participation was limited, whose profit was non-existent, and whose cooperation was famously immediate and wholehearted, receives a custodial sentence, an enormous number of potential cooperators may think twice before pursuing cooperation.

## VII.    CONCLUSION

Gary is a quiet young man.  But his actions since FTX's collapse have spoken volumes about the depth of his remorse and the strength of his character.  Gary wants nothing more than to be a good husband and father and continue his work with the Government and other stakeholders to facilitate FTX victims' recovery and mitigate the risk of future frauds.  A custodial sentence would fail to account for his relative culpability and exceptional cooperation, and unnecessarily disrupt his ability to further assist the Government and continue contributing to his family and the wider world.  It would also create an unwarranted sentencing disparity with Singh and other similarly situated cooperating witnesses.  For all these reasons and those set forth above, we respectfully request that the Court impose a sentence of time served.


Dated: New York, New York
       November, 6 2024

                                        Respectfully submitted,

                                        /s/ Ilan Graff
                                        Ilan Graff
                                        Alex B. Miller
                                        FRIED, FRANK, HARRIS,
                                          SHRIVER & JACOBSON LLP
                                        One New York Plaza
                                        New York, NY 10004
                                        (212) 859-8931
                                        ilan.graff@friedfrank.com
                                        alex.miller@friedfrank.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2024 the foregoing document and its exhibits were served electronically to all parties of record by the CM/ECF system.

/s/ Ilan Graff
Ilan Graff

November 6, 2024